No. 19-35008

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA WILDERNESS LEAGUE, DEFENDERS OF WILDLIFE, THE SIERRA CLUB, AND THE WILDERNESS SOCIETY,

*Plaintiff-Appellants*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, DAVID BERNHARDT, Secretary of the Interior, and BRIAN STEED, in his official capacity as the official exercising the authority of the Director of the Bureau of Land Management,

*Defendant-Appellees*,

and

CONOCOPHILLIPS ALASKA, INC.,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Alaska
No. 3:18-cv-00030-SLG
Hon. Sharon L. Gleason

_____

## APPELLANTS' OPENING BRIEF

_____

Suzanne Bostrom
Brook Brisson
Valerie Brown
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
*Attorneys for Appellants*

<u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Northern Alaska Environmental Center, Alaska Wilderness League, Defenders of Wildlife, Sierra Club, and The Wilderness Society state they have no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and that no publicly held corporation owns 10% or more of their stocks because they have never issued any stock or other security.

Date: April 15, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*

<u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................ 1

TABLE OF AUTHORITIES ........................................................................ 3

TABLE OF ABBREVIATIONS AND ACRONYMS ............................................. 8

INTRODUCTION ...................................................................................... 9

JURISDICTIONAL STATEMENT ................................................................ 10

STATUTORY AND REGULATORY AUTHORITIES ......................................... 11

ISSUES PRESENTED ................................................................................ 11

STATEMENT OF THE CASE ...................................................................... 11

SUMMARY OF THE ARGUMENT .............................................................. 12

STANDARD OF REVIEW ......................................................................... 14

STATEMENT OF THE FACTS .................................................................... 15

    I.    The Reserve Contains Exceptional Wildlife, Fish, and Other
        Conservation Values. ................................................................... 15

    II.    BLM's Management Plan for the Reserve Considered Impacts
        at a High Level and Did Not Consider Site-Specific Impacts. ........... 17

    III.    A Project Decision Tiered to the IAP Found There Would Be
        Significant Impacts to Subsistence and Required Mitigation. ........... 20

    IV.    There Have Been Other Significant Developments Since the
        Adoption of BLM's Management Plan that Warrant NEPA
        Review. ................................................................................... 22

    V.    BLM Conducts Annual Lease Sales Without Required NEPA
        Review. ................................................................................... 23

LEGAL FRAMEWORK ............................................................................ 27

    I.    NEPA Requires an Analysis of the Environmental Impacts of
        Agency Actions. ....................................................................... 27

    II.    The NPRPA Requires NEPA Review of Impacts Prior to a
        Lease Sale. .............................................................................. 32

ARGUMENT ..................................................................................35

I. BLM Violated NEPA and the NPRPA by Failing to Take a Hard Look at the Direct, Indirect, and Cumulative Impacts of the 2017 Lease Sale in a NEPA Analysis. ......................................35

A. The District Court Erred in Concluding Northern Center Was Required to Bring a Supplemental NEPA Claim. ...........35

B. BLM Was Required to Consider the Direct, Indirect, and Cumulative Impacts of the Lease Sale in an EA or EIS. ..........38

C. BLM Failed to Take a Hard Look at the Direct, Indirect, and Cumulative Impacts of the Lease Sale. ..............................43

1. BLM Failed to Take a Hard Look at New Information Related to the USGS Report and New Discoveries Around the Reserve. ...................................47

2. BLM Failed to Take a Hard Look at Cumulative Impacts from the Willow Discovery. ............................50

3. BLM Failed to Take a Hard Look at Cumulative Impacts from Other Discoveries in the Region. .............52

4. BLM Failed to Take a Hard Look at the Cumulative Impacts Related to the 2016 Lease Sale. ....54

5. BLM Failed to Take a Hard Look at Cumulative Impacts Related to the GMT-1 Project and the RMS. ...56

II. The District Court Erred in Concluding BLM Was Not Required to Conduct a Site-Specific NEPA Analysis. ......................58

III. The Court Should Set Aside BLM's Decisions and Vacate the Leases. .......................................................................................65

CONCLUSION ..............................................................................68

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir.1993) ................................................................66

*Am. Textile Mfrs. Inst. Inc. v. Donovan*,
  452 U.S. 490 (1981) ..........................................................................46

*AquAlliance v. U.S. Bureau of Reclamation*,
  312 F. Supp. 3d 878 (E.D. Cal. 2018) ................................................66

*Ariz. Libertarian Party v. Reagan*,
  798 F.3d 723 (9th Cir. 2015) ............................................................21

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)..............................................................................43

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ................................................... passim

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ..................................................... passim

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
  688 F.3d 989 (9th Cir. 2012) ............................................................66

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) ..........................................................65

*Ctr. for Food Safety v. Vilsack*,
  734 F. Supp. 2d 948 (N.D. Cal. 2010)................................................66

*Coeur Alaska v. Se. Alaska Conservation Council*,
  557 U.S. 261 (2009)............................................................................65

*Confederated Tribes & Bands of Yakima Indian Nation v. Fed.
  Energy Regulatory Comm'n*,
  746 F.2d 466 (9th Cir. 1984) ............................................................46

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ............................................... 60, 61, 64

*Dent v. Holder*,
  627 F.3d 365 (9th Cir. 2010) ............................................................22

*Dudum v. Arntz*,
    640 F.3d 1098 (9th Cir. 2011) ............................................................22

*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
    192 F.3d 922 (9th Cir. 1999) ..............................................................29

*Fed. Commc'n Comm'n v. NextWave Pers. Commc'ns, Inc.*,
    537 U.S. 293 (2003) ............................................................................65

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ............................................................................65

*Friends of Yosemite Valley v. Norton*,
    348 F.3d 789 (9th Cir. 2003) ....................................................... passim

*High Sierra Hikers Ass'n v. Blackwell*,
    390 F.3d 630 (9th Cir. 2004) ....................................................... passim

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ............................................................66

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ..............................................................66

*Idaho Sporting Cong. Inc. v. Alexander*,
    222 F.3d 562 (9th Cir. 2002) ............................................... 41, 42, 65

*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) .................................................... passim

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ........................................................ 44, 45

*Klamath-Siskiyou Wildlands Ctr. v. NOAA Nat'l Marine Fisheries Serv.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) .............................................67

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ............................................................14

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ............................................................28

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................14

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ..............................................................43

4

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
 241 F.3d 722 (9th Cir. 2001) ....................................................... 28, 43

*Native Ecosystems Council v. U.S. Forest Serv.*,
 418 F.3d 953 (9th Cir. 2005) ..............................................................14

*Native Vill. of Point Hope v. Jewell*,
 740 F.3d 489 (9th Cir. 2014) ................................................. 49, 54, 64

*Neighbors of Cuddy Mountain v. Alexander*,
 303 F.3d 1059 (9th Cir. 2002) ...........................................................27

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
 137 F.3d 1372 (9th Cir. 1998) ...........................................................29

*New Mexico ex. rel. Richardson v. Bureau of Land Mgmt.*,
 565 F.3d 683 (10th Cir. 2009) ......................................... 30, 59, 60, 64

*N. Alaska Envtl. Ctr. v. Kempthorne*,
 457 F.3d 969 (9th Cir. 2006) .................................................. 13, 61, 62

*N. Alaska Envtl. Ctr. v. Lujan*,
 961 F.2d 886 (9th Cir. 1992) ..............................................................32

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004)...........................................................30, 35, 36, 39

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
 477 F.3d 668 (9th Cir. 2007) ..............................................................65

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
 361 F.3d 1108 (9th Cir. 2004) ...........................................................45

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
 402 F.3d 846 (9th Cir. 2005) ........................................................ 43, 44

*Or. Nat. Desert Ass'n v. U.S. Bureau of Land Mgmt.*,
 625 F.3d 1092 (9th Cir. 2010) ...........................................................68

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*,
 377 F.3d 1147 (10th Cir. 2004) .........................................................30

*Pit River Tribe v. U.S. Forest Serv.*,
 469 F.3d 768 (9th Cir. 2006) .................................................. 32, 46, 61, 65

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
 806 F.3d 520 (9th Cir. 2015) ........................................................ 66, 67

*Reno Air Racing Ass'n v. McCord*,
 452 F.3d 1126 (9th Cir. 2006) ...........................................................66

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...................................................................... 27, 67

*San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*,
  326 F. Supp. 3d 1227 (D.N.M. 2018) (vacating ...................................65

*Sierra Club v. Peterson*,
  717 F.2d 1409 (D.C. Cir. 1983) ................................................. 60, 64

*S. Utah Wilderness All. v. Norton*,
  457 F. Supp. 2d 1253 (D. Utah 2006)............................................41

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
  486 F.3d 638 (9th Cir. 2007) ...................................................65

## Statutes

5 U.S.C. §§ 701–706 ...........................................................................10
5 U.S.C. § 706(2) ....................................................................... 14, 65
28 U.S.C. § 1331 ...................................................................................10
28 U.S.C. § 1361 ...................................................................................10
28 U.S.C. § 2201 ...................................................................................10
28 U.S.C. § 2202 ...................................................................................10
42 U.S.C. § 4332 ........................................................................... 27, 42
42 U.S.C. §§ 6501–6507 .......................................................................32
42 U.S.C. §§ 6503(b) .............................................................................16
42 U.S.C. § 6504(a) ........................................................................ 16, 32
42 U.S.C. § 6506a ........................................................................... 16, 33

## Rules

Fed. R. App. P. 26.1 ............................................................................... i
Fed. R. App. P. 4(a)(1)...........................................................................10

## Regulations

40 C.F.R. § 1500.1 ........................................................................ 27, 67
40 C.F.R. § 1501.4 ................................................................................28
40 C.F.R. § 1502.9(c)(ii)........................................................................42
40 C.F.R. § 1502.16 ..............................................................................29
40 C.F.R. § 1502.20 ..............................................................................31
40 C.F.R. § 1502.22(a)...........................................................................29

40 C.F.R. § 1508.8 ....................................................................29

40 C.F.R. § 1508.9 .............................................................. 28, 43

40 C.F.R. § 1508.10 ..................................................................40

40 C.F.R. § 1508.18(b) ....................................................... 27, 38

40 C.F.R. § 1508.25(c) ..............................................................29

40 C.F.R. § 1508.27 ..................................................................42

40 C.F.R. § 1508.28 .............................................................. 31, 40

43 C.F.R. § 46.140 ............................................................... 31, 40

43 C.F.R. § 46.300(a)................................................................39

43 C.F.R. § 1601.0-2 .................................................................36

43 C.F.R. §§ 2361.0-1 to 2361.3................................................33

43 C.F.R. § 2361.1(a).................................................................33

43 C.F.R. §§ 3130.0-1 to 3132.5-2 ...........................................33

43 C.F.R. § 3131.2 ................................................. 33–34, 38, 46

43 C.F.R. § 3131.3 ....................................................................34

43 C.F.R. § 3131.4-1.................................................................34

43 C.F.R. § 3131.5 ....................................................................34

Procedures for Leasing of Oil and Gas in the National Petroleum
 Reserve; Alaska, 46 Fed. Reg. 55494 (Nov. 9, 1981) ........................................46

TABLE OF ABBREVIATIONS AND ACRONYMS

| Abbreviation/Acronym | Explanation |
| --- | --- |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| DNA | Determination of NEPA Adequacy |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| GMT | Greater Mooses Tooth |
| GMT-1 | Greater Mooses Tooth 1 |
| IAP | Integrated Activity Plan |
| NEPA | National Environmental Policy Act |
| Northern Center | Northern Alaska Environmental Center |
| NPRPA | Naval Petroleum Reserves Production Act |
| NSO | No Surface Occupancy |
| Reserve | National Petroleum Reserve–Alaska |
| RMS | Regional Mitigation Strategy |
| USGS | U.S. Geological Survey |

INTRODUCTION

The National Petroleum Reserve–Alaska (Reserve) is the largest and one of the wildest expanses of public lands in the United States. It stretches across the Western Arctic, from the Chukchi and Beaufort Seas in the north to the foothills of the Brooks Range in the south. The Reserve provides important habitat for numerous species, including grizzly and polar bears, wolves, migratory birds, and caribou.

The Bureau of Land Management (BLM) adopted the first comprehensive management plan for the Reserve in 2013, called the Integrated Activity Plan (IAP). The IAP provides broad guidance for how BLM manages a wide range of interests and resources, including oil and gas, wildlife and habitat, subsistence, and other values and activities.

In 2017, BLM conducted an oil and gas lease sale in the Reserve. Prior to that lease sale, numerous organizations, including the appellants (collectively, Northern Center), raised concerns about the impacts of additional leasing in the Reserve and the need for BLM to conduct an appropriate review under the National Environmental Policy Act (NEPA).

Despite this, BLM failed to prepare either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS) pursuant to NEPA prior to the lease sale. BLM instead relied on a non-NEPA document to determine that it

9

would not conduct a NEPA analysis. BLM's failure to prepare a NEPA analysis prior to the lease sale to consider the direct, indirect, and cumulative impacts, including site-specific impacts, violates NEPA and BLM's regulations under the Naval Petroleum Reserves Production Act (NPRPA). Accordingly, this Court should reverse the decision of the District Court, hold that BLM violated NEPA and the NPRPA, and set aside the leases and any related decision documents.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1331, 1361, 2201, and 2202. On December 6, 2018, the District Court denied Northern Center's motion for summary judgment and granted Federal Defendant-Appellees' cross-motion for summary judgment.[1] The District Court issued a final judgment in this action on December 10, 2018.[2] Northern Center timely filed a Notice of Appeal pursuant to Appellate Rule of Civil Procedure 4(a)(1) on January 3, 2019.[3]

---

[1] Plaintiff-Appellants' Excerpt of Record (ER) 13.
[2] ER 1.
[3] ER 14.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

NEPA mandates that agencies conduct an analysis to evaluate the direct, indirect, and cumulative impacts, including site-specific impacts, of major federal actions prior to taking action. BLM did not conduct a NEPA analysis prior to the lease sale and lease issuance, relying instead on a non-NEPA document that did not analyze the impacts. Did BLM violate NEPA and the NPRPA regulations by failing to conduct this analysis prior to the lease sale?

## STATEMENT OF THE CASE

BLM held the 2017 lease sale without first preparing either an EA or an EIS pursuant to NEPA to examine the direct, indirect, and cumulative impacts of that lease sale, including site-specific impacts. Prior to the lease sale, BLM only prepared a Determination of NEPA Adequacy (DNA), which is not a NEPA document. In the DNA, BLM tiered to the programmatic-level management plan and concluded the agency was not obligated to conduct any further NEPA analysis.

11

The Northern Center challenged BLM's failure to prepare a NEPA analysis prior to conducting the lease sale.[4] Northern Center amended its complaint on May 21, 2018.[5] The District Court granted summary judgment for the Federal Defendants and Intervenor-Defendant ConocoPhillips Alaska, Inc. (ConocoPhillips) on December 6, 2018, and entered final judgment on December 10, 2018.[6]

The District Court held Northern Center waived its NEPA claims by failing to plead them as supplementation claims and concluded that, under Ninth Circuit case law, BLM did not need to conduct a site-specific analysis of each leased parcel prior to leasing.[7] Northern Center now appeals and asks this court to reverse the decision of the District Court.

## SUMMARY OF THE ARGUMENT

BLM violated both NEPA and the NPRPA regulations by failing to undertake a NEPA analysis prior to the lease sale. First, BLM was obligated under NEPA, at a minimum, to prepare an EA for the lease sale to take a "hard look" at the direct, indirect, and cumulative impacts of this lease sale, including at new

---

[4] Compl., D. Ct. ECF No. 1.
[5] First Am. Compl., D. Ct. ECF No. 32.
[6] ER 1, 13.
[7] ER 11–13.

12

information and developments indicating the impacts of the lease sale were far greater than previously anticipated. Instead, BLM used a DNA, which is not a NEPA document, to determine it did not need to conduct any further NEPA analysis. By doing so, BLM violated NEPA.

Second, BLM was obligated to conduct a site-specific analysis prior to the lease sale because the agency made an irretrievable commitment of resources by issuing leases. The Ninth Circuit's decision in *Northern Alaska Environmental Center v. Kempthorne*[8] does not excuse BLM from this obligation. The District Court erred in equating site-specific analysis with parcel-by-parcel analysis. Site-specific is not necessarily parcel-by-parcel, but rather an analysis of the direct, indirect and cumulative impacts associated with the lease sale. BLM did not conduct a site-specific analysis of the lease sale and did not retain the right to later deny development and other proposals in the leases. By doing so, BLM violated NEPA.

Third, BLM was obligated to conduct a NEPA analysis prior to holding the lease sale under the agency's NPRPA regulations. BLM did not conduct a NEPA analysis prior to the lease sale. BLM's failure violated its NPRPA regulations.

---

[8] 457 F.3d 969, 975–76 (9th Cir. 2006).

13

In sum, BLM's failure to prepare either an EA or EIS prior to the lease sale to look at the direct, indirect, and cumulative impacts, including site-specific impacts, violates both NEPA and the NPRPA. The District Court's decision should be reversed.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo and may direct summary judgment for either party based on its de novo review of the administrative record.[9] The Administrative Procedure Act (APA) requires a reviewing court to hold unlawful and set aside an agency decision that is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.[10] A decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[11] An agency's decision

---

[9] *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).
[10] 5 U.S.C. § 706(2); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005).
[11] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

not to prepare an EIS is typically reviewed under the arbitrary and capricious standard, but "where an agency has decided that a project does not require an EIS without first conducting an EA, [the court] review[s] under the reasonableness standard."[12]

## STATEMENT OF THE FACTS

### I. THE RESERVE CONTAINS EXCEPTIONAL WILDLIFE, FISH, AND OTHER CONSERVATION VALUES.

The Reserve has outstanding conservation and environmental values. At approximately 22.8 million acres — an area roughly the size of Indiana — it is the largest single public land unit in the country.[13] The Reserve provides important habitat for caribou, grizzly and polar bears, wolves, and a wide range of birds.[14] It is also home to multiple caribou herds, which are a key subsistence resource to numerous communities across northwest Alaska.[15]

The Reserve was first set aside in 1923 as a petroleum reserve for the U.S. Navy.[16] But in 1976, it was re-designated and Congress passed the NPRPA. This

---

[12] *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004).
[13] *See* ER 84, 205.
[14] ER 185, 193, 195.
[15] ER 195, 198–99.
[16] ER 203–05.

new law recognized the exceptional ecological values in the Reserve[17] and mandated consideration and maximum protection of these values.[18] Under this law, Congress instructed the Secretary of the Interior to designate Special Areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value."[19]

The Secretary designated multiple Special Areas to ensure "maximum protection" of these values.[20] The Teshekpuk Lake Special Area is one of the most productive wetland complexes in the Arctic.[21] It provides vital nesting habitat for hundreds of thousands of migratory birds.[22] The Teshekpuk Lake area, along with neighboring Smith Bay, supports the highest density of shorebirds in the circumpolar Arctic, including multiple threatened species.[23] This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd, an important subsistence resource.[24] The Colville River Delta is the largest and most

---

[17] ER 204–05.
[18] ER 204–05; 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b).
[19] *Id.* § 6504(a).
[20] ER 145, 175–76.
[21] The Teshekpuk and Colville Special Areas are adjacent to and within areas open to leasing in the northeast Reserve. ER 168 (map).
[22] *See* ER 181–83, 186, 235.
[23] *See* ER 186, 189–91, 200–202, 235.
[24] ER 139, 181, 197.

ecologically rich river delta in northern Alaska.[25] The cliffs within the Colville River Special Area provide critical nesting sites and adjacent hunting areas for numerous raptor species.[26] In short, the habitat, subsistence, and conservation values of the Reserve are remarkable.

## II. BLM'S MANAGEMENT PLAN FOR THE RESERVE CONSIDERED IMPACTS AT A HIGH LEVEL AND DID NOT CONSIDER SITE-SPECIFIC IMPACTS.

BLM adopted the first-ever management plan covering the entire Reserve in 2013.[27] This plan, called the Integrated Activity Plan (IAP), established broad directives for how BLM would manage the resources and values in the Reserve.[28] As part of that process, BLM prepared an EIS pursuant to NEPA to look at various management and land-allocation alternatives.[29] In issuing the Record of Decision (ROD) for the IAP, BLM adopted Alternative B-2. Although Alternative B-2 protected many of the wildlife, habitat, and subsistence values of the Reserve, it also made approximately 11.8-million acres available for future oil and gas leasing

---

[25] *See* ER 184.
[26] ER 181, 192.
[27] *See* ER 134–50, 154, 171. Prior plans had been adopted that covered some areas, but not the entire Reserve.
[28] *See* ER 154, 157–62, 171.
[29] *See* ER 157–62, 171, 173–74.

17

and development.[30] Alternative B-2 also incorporated stipulations and best management practices applicable to oil and gas and other activities.[31]

In the EIS, BLM examined a hypothetical development scenario and hypothetical layouts for oil and gas facilities to evaluate potential impacts to surface resources at the programmatic level.[32] These hypothetical development designs included likely infrastructure — such as drill pads, airstrips, processing facilities, and pipelines — for developments that might occur.[33] BLM developed two categories of hypothetical development scenarios: one for areas with known petroleum resources and a second for areas with unknown oil and gas potential.[34] The majority of the 2017 lease sale was within areas with unknown oil and gas potential.[35]

The analysis of impacts for areas with known petroleum resources was focused on two existing oil and gas units near the community of Nuiqsut, in the northeast corner of the Reserve, and an area around Umiat, along the southeast

--------

[30] ER 151.
[31] ER 139.
[32] ER 215–16.
[33] ER 207–14.
[34] ER 220–32.
[35] *See* ER 94.

border of the Reserve.[36] At the time that the IAP was adopted, the only planned development in the Reserve was on the extreme eastern boundary near Nuiqsut.[37]

For the potential development of unknown oil and gas resources, BLM relied on the U.S. Geological Survey's (USGS) estimate of potential oil and gas resources, which assigned approximate resource estimates for different economic zones in the Reserve.[38] For these unknown oil and gas resource areas, BLM's hypothetical development scenario did not propose or consider specific areas where development might take place. BLM also did not evaluate the site-specific impacts of development occurring in any specific areas where there are unknown resources.[39]

BLM analyzed the potential impacts of the IAP on subsistence at only the programmatic level.[40] BLM concluded there would be no significant restrictions to subsistence uses from oil and gas activities.[41] According to BLM, any impacts would remain localized and would not significantly affect subsistence species,

---

[36] *See* ER 220–25; ER 246 (map).
[37] *See* ER 221–22.
[38] ER 225–32.
[39] *See, e.g.*, ER 233–34.
[40] *See* ER 163–67, 236–45.
[41] ER 163, 240; *see also* ER 163 (finding significant impacts to subsistence only when taking into account the potential cumulative impacts from other actions).

access to subsistence species, or subsistence use.[42] BLM determined that the IAP

contained adequate stipulations and best management practices to ensure that

significant restrictions to subsistence uses and needs would not occur.[43]

### III. A PROJECT DECISION TIERED TO THE IAP FOUND THERE WOULD BE SIGNIFICANT IMPACTS TO SUBSISTENCE AND REQUIRED MITIGATION.

In 2015, BLM approved ConocoPhillips' permit for the Greater Mooses

Tooth 1 (GMT-1) development.[44] The project includes a drilling pad and road that

extends ConocoPhillips' oil and gas infrastructure in the northeast corner even

further into the Reserve.[45] In making the decision, BLM waived a protective

provision in the IAP that would have kept oil and gas infrastructure out of an

established buffer around Fish Creek, an important subsistence use area for the

community of Nuiqsut.[46]

In its GMT-1 decision, BLM found that there would be significant impacts

to subsistence users and other values from the project that could not be fully

mitigated by the stipulations and best-management practices in the IAP.[47] To

---

[42] ER 237.
[43] ER 163, 240.
[44] ER 106–07.
[45] ER 108, 119 (map showing the general location of proposed and existing infrastructure in the northeast Reserve).
[46] ER 109.
[47] ER 110–11, 113, 115.

address these impacts BLM required additional compensatory mitigation funding
of $8 million from ConocoPhillips.[48] These funds were to be used to support
BLM's development of a Regional Mitigation Strategy (RMS) for the northeastern
region of the Reserve and to finance compensatory mitigation projects to address
the major impacts to subsistence that could not be mitigated.[49]

BLM drafted the RMS to help mitigate impacts from both GMT-1 and future
oil and gas projects.[50] The RMS would also consider foreseeable future land uses,
including oil and gas developments enabled by the existence of GMT-1, and the
foreseeable impacts from those developments on the resources and values in the
region.[51] BLM anticipated that any avoidance, minimization, and compensatory
mitigation measures identified in the RMS could be incorporated into future
decisions.[52] BLM issued a draft RMS in 2016, but had yet to issue the final by the
time of the lease sale.[53]

---

[48] ER 114, 118.
[49] ER 115.
[50] ER 115.
[51] ER 115–16.
[52] ER 116–17.
[53] *See* BLM, NPR-A Regional Mitigation Strategy Website,
https://www.blm.gov/programs/planning-and-nepa/plans-in-
development/alaska/npr-a_rms (last visited Apr. 9, 2019); BLM, DRAFT REGIONAL
MITIGATION STRATEGY (2016), *available at*
https://www.blm.gov/sites/blm.gov/files/Planning_Alaska_DRAFT_NPR-
A%20RMS_final.pdf. The court can take judicial notice of agency websites and
documents. *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir.

## IV. THERE HAVE BEEN OTHER SIGNIFICANT DEVELOPMENTS SINCE THE ADOPTION OF BLM'S MANAGEMENT PLAN THAT WARRANT NEPA REVIEW.

Since the IAP was adopted, there have been a number of other discoveries and development activities that have the potential to significantly expand the cumulative impacts of development within and around the Reserve. Caelus Energy announced a substantial find of over one-billion barrels of oil in state waters immediately off the coast of the Reserve.[54] ConocoPhillips announced a 300-million-barrel oil discovery at the Willow prospect in the northeastern part of the Reserve,[55] which could more than double the amount of infrastructure and industrial activity in that area. Armstrong Energy, Inc. (Armstrong) announced a major onshore discovery at the Nanushuk-Pikka prospect.[56] Hailed as one of the largest onshore oil discoveries on the North Slope in decades, Nanushuk lies on state lands immediately adjacent to the Reserve and the community of Nuiqsut.[57]

---

2015) ("We may take judicial notice of 'official information posted on a governmental website, the accuracy of which [is] undisputed.'" (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011))); *Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010) (stating the court can take judicial notice of the agency's records).

[54] ER 66.

[55] ER 65; ConocoPhillips' Answer to First Am. Compl. ¶ 42, D. Ct. ECF No. 33.

[56] ER 65.

[57] U.S. Army Corps of Eng'rs, Nanushuk Project EIS Website, http://www.nanushukeis.com (last visited Apr. 9, 2019) [hereinafter Nanushuk Website] (showing the location of the Nanushuk project). The court can take judicial notice of an agency website. *See* cases cited *supra* note 53.

The company was in the permitting process for the Nanushuk project at the time of the lease sale.[58]

In mid-2017, Secretary of the Interior Ryan Zinke signed Secretarial Order 3352. The Secretarial Order called for development of a plan to update the existing USGS assessments of undiscovered and technically recoverable oil and natural gas resources on Alaska's North Slope, with a focus on federal lands in the Reserve.[59] USGS issued an updated assessment shortly after the lease sale that substantially increased the estimates of potential oil resources in and around the Reserve based on these discoveries.[60]

## V. BLM CONDUCTS ANNUAL LEASE SALES WITHOUT REQUIRED NEPA REVIEW.

Since the adoption of the IAP (BLM's programmatic-level management plan for the Reserve), BLM has conducted annual lease sales.[61] The results of the lease sales from 2013 to 2015 were relatively small.[62] At the 2016 lease sale, companies bid on tracts totaling over 600,000 acres.[63] The 2016 lease sale nearly doubled the

---

[58] *See* Nanushuk Website, *supra* note 57.
[59] ER 97.
[60] ER 65–68.
[61] *See* ER 98–104, 105, 120, 125.
[62] ER 125 (22 tracts in 2013); ER 120 (7 tracts in 2014); ER 105 (6 tracts in 2015). This brief uses *tract* and *parcel* synonymously.
[63] ER 98.

existing leased acreage in the Reserve.[64] The majority of the tracts were in an area

extending south and west from ConocoPhillips' existing leases and oil

developments in the northeast corner of the Reserve, and included a substantial

number of acres within the boundaries of the Teshekpuk Lake and Colville River

Special Areas.[65]

Prior to the 2017 lease sale, BLM solicited comments and nominations from

industry and the public on which tracts to include in the lease sale and which areas

to protect.[66] BLM asked for comments on all tracts within the Reserve, including

those closed to oil and gas leasing under the IAP.[67] Northern Center submitted

comments urging BLM not to conduct any further leasing until it completed a site-

specific environmental NEPA analysis and assessed the direct, indirect and

cumulative impacts of leasing. Specifically, Northern Center asked BLM to assess

the overall impacts of development and further leasing in the region, particularly

given new discoveries and developments.[68] Northern Center asserted that BLM

was required to analyze the foreseeable effects of oil and gas development in the

region and to take a hard look at the direct, indirect, and cumulative impacts of

---

[64] ER 84.
[65] ER 84.
[66] ER 95.
[67] ER 95.
[68] ER 83–84, 86.

leasing additional areas.[69] Northern Center also asked BLM not to conduct any

further leasing in the northeast area of the Reserve until the agency issued a final

RMS to ensure there were adequate mitigation measures in place and to ensure

BLM fully understood the impacts of further leasing and development.[70] During

the comment period, companies interested in leasing also nominated tracts to be

made available for lease.[71]

    After the comment period, BLM issued a Detailed Statement of Sale. In that

document, the agency identified the specific tracts it would offer for lease.[72] BLM

offered 900 tracts, covering approximately 10.3 million acres.[73]

    Before identifying which areas to offer for lease, BLM prepared a DNA. The

DNA was not available for public review or comment.[74] The DNA tiered to the

NEPA analyses for the IAP and a 2008 Special Area Management Plan for the

Colville River Special Area.[75] In the DNA, BLM summarily concluded that it did

---

[69] ER 83–84.
[70] ER 86.
[71] *See* Fed. Defs.' Notice of Lodging Am. Admin. R. 9, D. Ct. ECF No. 28 (showing companies submitted proprietary lease-tract nominations to BLM that were withheld from the record).
[72] ER 69, 94.
[73] ER 64.
[74] Fed. Defs.' Answer to First Am. Compl. ¶ 49, D. Ct. ECF No. 34 (admitting the DNA was not available for public comment); First Am. Compl., *supra* note 5, ¶ 49.
[75] ER 78.

not need to do any additional NEPA analysis, finding its existing analysis adequate and no new information that would change the analysis for the lease sale.[76] BLM also stated that the direct, indirect, and cumulative impacts from the lease sale would be similar and essentially unchanged from those considered in the IAP.[77]

BLM held the lease sale in late 2017.[78] ConocoPhillips and its partner Anadarko bid on seven tracts totaling approximately 80,000 acres.[79] BLM accepted ConocoPhillips and Anadarko's bids in January,[80] and ConocoPhillips and Anadarko signed the leases on February 1st and 5th, respectively.[81] On February 22nd, after the filing of this lawsuit, BLM issued a revised DNA for the lease sale.[82] The revised DNA offered a justification for why the information BLM had known about but not considered in the original DNA, such as the revised USGS assessment, recent oil and gas discoveries in and around the Reserve, the results of the 2016 lease sale, and the GMT-1 decision, would not have changed the decision

---

[76] ER 79.
[77] ER 80.
[78] ER 64.
[79] ER 64.
[80] ER 61.
[81] ER 20–21, 25–26, 30–31, 35–36, 40–41, 45–46, 50–51.
[82] ER 52–60.

to conduct the lease sale and enter into the leases.[83] BLM signed the leases that

same day.[84]

## LEGAL FRAMEWORK

I.   **NEPA REQUIRES AN ANALYSIS OF THE ENVIRONMENTAL IMPACTS OF AGENCY ACTIONS.**

NEPA is "our basic national charter for protection of the environment."[85]

NEPA's analysis and disclosure goals are two-fold: (1) to ensure informed agency

decision making, and (2) to ensure public involvement.[86] NEPA requires that

federal agencies prepare a detailed EIS for any major Federal action that may

significantly affect the quality of the human environment.[87] By focusing the

agency's attention on the environmental consequences of its proposed action,

NEPA "ensures that important effects will not be overlooked or underestimated

only to be discovered after resources have been committed or the die otherwise

cast."[88] NEPA "is not designed to postpone analysis of an environmental

---

[83] ER 52–60.
[84] *See, e.g.*, ER 17.
[85] 40 C.F.R. § 1500.1(a).
[86] *Robertson v. Methow Valley Citizens Council* (*Methow Valley*), 490 U.S. 332, 349 (1989); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002).
[87] 42 U.S.C. § 4332; 40 C.F.R. § 1508.18(b)(4).
[88] *Methow Valley*, 490 U.S. at 349.

consequence to the last possible moment" and is instead "designed to require such analysis as soon as it can reasonably be done."[89]

In order to determine whether a project's impacts may be significant enough to require an EIS, an agency may first prepare an environmental assessment (EA).[90] An EA "[s]hall include brief discussions of the need for the proposal . . . [and] of the environmental impacts of the proposed action and alternatives."[91] If the EA reveals that "the agency's action *may* have a significant effect upon the . . . environment, an EIS must be prepared."[92] Conversely, if the agency concludes in the EA that there will not be significant impacts, it issues a Finding of No Significant Impact (FONSI) and foregoes an EIS.[93] In such cases, the agency must adequately explain its decision by supplying a "convincing statement of reasons" for why the action's effects are insignificant.[94]

---

[89] *Kern v. U.S. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002).
[90] 40 C.F.R. §§ 1501.4, 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).
[91] 40 C.F.R. § 1508.9.
[92] *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (internal quotation marks omitted), *overruled on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).
[93] 40 C.F.R. §§ 1501.4, 1508.9.
[94] *Blue Mountains Biodiversity Project v. Blackwood* (*Blue Mountains*), 161 F.3d 1208, 1212 (9th Cir. 1998).

28

NEPA requires agencies to take a "hard look" at the direct, indirect, and cumulative environmental impacts of a proposed action.[95] To satisfy the "hard look" standard, the agency must provide a "scientific and analytic basis" for comparing the alternatives,[96] meaning the agency must provide "some quantified or detailed information."[97] "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."[98]

Two levels of NEPA-analysis are completed for planning and management decisions: programmatic and site-specific. For programmatic review, an agency "develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative in an [EIS] and adopts an amendable [management] plan to guide management of multiple use resources."[99] Broad land use plans are not normally used to make site-specific implementation decisions and, therefore, generally do not include site-specific

---

[95] *Id.* at 1211; *see also* 40 C.F.R. §§ 1502.16, 1508.8, 1508.25(c).
[96] 40 C.F.R. § 1502.16.
[97] *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998).
[98] *Id.* at 1380; *see* 40 C.F.R. § 1502.22(a).
[99] *Friends of Yosemite Valley v. Norton* (*Yosemite Valley*), 348 F.3d 789, 800 (9th Cir. 2003) (quoting *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n.2 (9th Cir. 1999)).

analysis.[100] When the agency considers an implementation decision made pursuant to the programmatic plan, the agency conducts the next level of analysis: a site-specific review, "during which individual site specific projects, consistent with the [management] plan, are proposed and assessed."[101]

In the oil and gas context, projects and environmental review typically follow a multi-step process, with NEPA review beginning broad and becoming more site-specific at each later step. At the "earliest and broadest level of decision-making, [BLM] develops land use plans," such as the IAP for the Reserve.[102] BLM next holds lease sales and issues leases for the use of a specific area.[103] Third, the lessee may apply for a permit to drill to develop its lease.[104] The level of detail required by NEPA at each step varies, and depends on the nature and scope of the proposed action.[105]

For multi-stage agency programs, including oil and gas programs, NEPA provides that the environmental analysis conducted at each stage may incorporate

---

[100] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 70 (2004).
[101] *Yosemite Valley*, 348 F.3d at 800.
[102] *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).
[103] *New Mexico ex. rel. Richardson v. BLM* (*Richardson*), 565 F.3d 683, 716 (10th Cir. 2009).
[104] *Id.*
[105] *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

by reference previous, related analysis through "tiering."[106] An EA "prepared in support of an individual proposed action can be tiered to a programmatic or other broader-scope [EIS]."[107] An agency may prepare an EA "if the environmental assessment is tiered to a broader [EIS] which fully analyzed those significant effects."[108] Tiering an EA to the programmatic statement is allowed "so long as any previously unanalyzed effects are not significant."[109] However, "[t]o the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis."[110]

NEPA also requires that agencies evaluate the site-specific impacts of an action.[111] As the Ninth Circuit explained, the key inquiry is not "*whether* the project's site-specific impact should be evaluated in detail, but *when* such detailed evaluation should occur."[112] Although a programmatic EIS is required to provide "sufficient detail to foster informed decision-making," an agency is not required to

---

[106] 40 C.F.R. §§ 1502.20, 1508.28 (stating that "[t]iering is appropriate when the sequence of statements or analyses is . . . [f]rom a program, plan, or policy environmental impact statement to a . . . site-specific statement or analysis").
[107] 43 C.F.R. § 46.140(c).
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Block*, 690 F.2d at 761.
[112] *Id.* (emphasis added).

fully evaluate site-specific impacts "until a critical decision has been made to act on site development."[113] An agency reaches the threshold triggering site-specific review when it proposes to make an irreversible and irretrievable commitment.[114] Once this critical decision-point is reached, "any vague prior programmatic statements are no longer enough" to satisfy NEPA.[115] At this point, the agency must conduct a site-specific analysis appropriately scaled to the proposed action.[116] Relatedly, an agency cannot defer analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time when making an irretrievable commitment of resources.[117]

## II. THE NPRPA REQUIRES NEPA REVIEW OF IMPACTS PRIOR TO A LEASE SALE.

The NPRPA governs BLM's overall management of the surface values and subsurface resources in the Reserve.[118] The NPRPA is, in many ways, a multi-use directive. BLM has a broad obligation to protect the surface values of the Reserve.[119] Under the NPRPA, BLM administers a competitive oil and gas leasing

---

[113] *Yosemite Valley*, 348 F.3d at 800 (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992)).
[114] *Block*, 690 F.2d at 761.
[115] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006).
[116] *Id.*; *Yosemite Valley*, 348 F.3d at 800–01.
[117] *Kern*, 284 F.3d at 1072.
[118] 42 U.S.C. §§ 6501–6507.
[119] *See, e.g.*, 42 U.S.C. § 6504(a) (indicating oil and gas activities in and around Teshekpuk Lake and other areas designated by the Secretary as having significant

program in the Reserve, but is also required to "include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources."[120]

The Reserve-specific regulations BLM adopted pursuant to the NPRPA set out how BLM should conduct lease sales and protect the surface values in the Reserve.[121] The regulations require BLM to take any actions deemed "necessary to mitigate or avoid unnecessary surface damage and to minimize ecological disturbance."[122]

For lease sales, BLM first issues a call for nominations and public comments on lease tracts to offer and areas that should receive special concern and analysis.[123] Prior to selecting which tracts the agency will offer in the lease sale, BLM is required to complete its environmental review under NEPA.[124] When

---

subsistence, recreational, fish and wildlife, or historical or scenic value are required to be conducted in a manner that assures "maximum protection of such surface values").

[120] 42 U.S.C. § 6506a(a)–(b).

[121] *Id.* § 6506a(o); 43 C.F.R. §§ 2361.0-1 to 2361.3, 3130.0-1 to 3132.5-2.

[122] 43 C.F.R. § 2361.1(a).

[123] *Id.* § 3131.2(a).

[124] *Id.* § 3131.2(b) ("The State Director, after completion of the required environmental analysis (see 40 CFR 1500–1508), shall select tracts to be offered for sale.").

identifying the specific tracts to offer, BLM must consider "available environmental information, multiple-use conflicts, resource potential, industry interest, information from appropriate Federal agencies," and other information.[125] BLM is also required to develop and make public mitigation measures, including lease stipulations and information for lessees, to address adverse impacts.[126] Once BLM completes this review, it issues a detailed statement of the sale that includes information on the available tracts and lease terms, and holds the lease sale.[127] If BLM accepts a company's bid, the agency sends written notice of the final decision on the bid along with copies of the leases to the lessee.[128] The lessee and BLM then execute the leases.[129]

---

[125] *Id.*
[126] *Id.* §§ 3131.2, 3131.3.
[127] *Id.* § 3131.4-1.
[128] *Id.* § 3132.5(e).
[129] *Id.* § 3132.5(e), (h).

34

ARGUMENT

I.    **BLM VIOLATED NEPA AND THE NPRPA BY FAILING TO TAKE A HARD LOOK AT THE DIRECT, INDIRECT, AND CUMULATIVE IMPACTS OF THE 2017 LEASE SALE IN A NEPA ANALYSIS.**

    A.    **The District Court Erred in Concluding Northern Center Was Required to Bring a Supplemental NEPA Claim.**

The District Court's decision that Northern Center waived its hard look claim by failing to raise it as a supplementation claim is contrary to NEPA and U.S. Supreme Court case law.[130] Whether BLM had an obligation to prepare a supplemental NEPA analysis to update its management plan for the Reserve — the IAP — is distinct and wholly separate from the question of whether BLM had an obligation to prepare a NEPA analysis for the lease sale. Northern Center did not argue BLM needed to prepare a supplemental NEPA analysis to update the entire management plan for the Reserve; that was not at issue in this case.

The U.S. Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*) highlights the distinction between management plans and agency actions pursuant to a plan.[131] *SUWA* instructs that it would have been inappropriate for Northern Center to bring a supplementation claim. The Supreme Court noted that "land use plans are a preliminary step in the overall process of managing

---

[130] ER 11–13.
[131] 542 U.S. 55 (2004).

35

public lands — designed to guide and control future management actions."[132] Land use plans are not final implementation decisions for actions that require further steps, and are not normally used to make site-specific implementation decisions.[133] The Supreme Court also explained that supplementation is necessary only if there is a major federal action that has yet to occur regarding adoption of the land use plan.[134] Approval of a land use plan is a major federal action in itself subject to NEPA, and that action is complete once the agency approves that plan.[135] Once adopted, there is no ongoing major federal action to supplement, absent amendment or revision of that plan.[136]

Here, the question is whether BLM was obligated to conduct a NEPA analysis for a later, distinct decision — the lease sale. That decision is separate from the decision to adopt the programmatic-level management plan for the Reserve. The IAP is a management plan for a 23-million-acre area, covering far

---

[132] *Id.* at 69 (internal quotation marks omitted) (quoting 43 C.F.R. § 1601.0-2); *see also Yosemite Valley*, 348 F.3d at 800–01 (discussing how management plans determine what future uses will be considered in a particular area, but are distinct from later implementation decisions). The Supreme Court's discussion in *SUWA* was in part related to the statutory and regulatory provisions under the Federal Land Policy and Management Act. BLM follows an analogous process in the Reserve.
[133] *SUWA*, 542 U.S. at 69–70.
[134] *Id.* at 73.
[135] *Id.*
[136] *Id.*

more than oil and gas leasing. The purpose of the IAP was to determine appropriate management for the entire Reserve, and to balance oil and gas activities with BLM's statutory obligation to protect the habitat, uses, and other values of the Reserve.[137] In adopting the IAP, BLM looked at a broad range of management issues for the Reserve, including oil and gas, subsistence use, management and protection of designated Special Areas, protection of wilderness characteristics, Wild and Scenic River Designation, land rehabilitation, climate change, and more.[138] The IAP was a guide for future actions, but it did not commit BLM to issue specific leases or authorize specific lease sales.[139] That commitment and those decisions occur later, at the lease sale stage. This lawsuit only challenges that later decision: leasing.

The District Court's decision equates to saying that BLM would only be obligated to conduct a NEPA analysis at the lease sale stage if new information rose to the level of requiring an amendment to the entire Reserve-wide management plan. But the Supreme Court's decision in *SUWA* instructs that Northern Center was not obligated to bring a supplementation claim to challenge

---

[137] ER 171.
[138] ER 173–74.
[139] ER 179.

BLM's failure to do NEPA for the lease sale. Because Northern Center is not claiming that BLM must supplement or revise the IAP, but is instead challenging a later implementation decision, whether BLM was obligated to supplement its environmental analysis for the IAP is not at issue in this case. It follows that Northern Center did not need to plead a supplementation claim to challenge BLM's lack of NEPA analysis for its lease decisions.

Instead, the key issue here is whether BLM was obligated to prepare a NEPA analysis taking a hard look at the potential impacts of the lease sale. As discussed next, BLM was obligated, at a minimum, to prepare an EA examining the potential impacts of the lease sale, but failed to do so.

## B. BLM Was Required to Consider the Direct, Indirect, and Cumulative Impacts of the Lease Sale in an EA or EIS.

BLM needed to comply with NEPA at the lease sale stage. The lease sale itself is a major federal action subject to NEPA.[140] BLM's regulations for the Reserve acknowledge that a lease sale is a major federal action subject to NEPA.[141] Department of the Interior regulations also state that agencies, including BLM, are required to prepare an EA for each proposed federal action unless it is subject to a

---

[140] 43 C.F.R. § 3131.2(b); 40 C.F.R. § 1508.18(b).
[141] 43 C.F.R. § 3131.2(b).

categorical exclusion, it is covered by an earlier environmental document, or the agency has already decided to prepare an EIS for the action.[142]

None of those exceptions apply here. The lease sale is not subject to a categorical exclusion. This lease sale is also not fully covered by the IAP or Colville River Special Area plan, to which BLM tiered its analysis. As explained, the IAP was not an implementation decision; it was a programmatic-level plan governing management of the entire Reserve.[143] The IAP did not assess the site-specific impacts of this lease sale.[144] The IAP did not make the specific decision of which tracts to offer in this lease sale, and did not affirmatively commit BLM to issue any leases.[145] The IAP specifically deferred that decision until the lease sale stage.[146] The fact that the IAP contemplated at a high level that future leasing or other activities might occur does not excuse BLM from having to comply with NEPA at subsequent stages, such as the lease sale stage.[147] The Colville River

---

[142] 43 C.F.R. § 46.300(a).

[143] *See generally SUWA*, 542 U.S. at 69–70 (discussing how management plans guide future actions and are distinct from implementation decisions).

[144] *See infra* Argument Part II.

[145] *See, e.g.*, ER 179.

[146] ER 179.

[147] *See, e.g.*, *Kern*, 284 F.3d at 1078 (indicating BLM was obligated to fully analyze the impacts, including cumulative impacts, of its action in NEPA analyses for the management plan and for subsequent site-specific decisions guided by that plan, and recognizing there might be some overlap in those analyses); *Blue Mountains*, 161 F.3d at 1214 (stating the adoption of a management plan that contemplates certain actions might occur does not exempt those future actions

Special Area management plan was focused on protections for peregrine falcons within a much smaller area of the Reserve than was at issue in this lease sale.[148] That pre-IAP plan similarly does not excuse BLM from having to comply with NEPA at the lease sale stage.

While BLM tiered to the IAP EIS and Colville plan,[149] that does not excuse or fulfill BLM's NEPA obligations for the lease sale. The tiering regulations contemplate that BLM, at a minimum, would have prepared an EA analyzing the impacts of this lease sale.[150] BLM is asking this Court to stretch the tiering regulations too far by allowing it to walk away from its NEPA obligations after completing only a programmatic-level analysis, while at the same time irretrievably committing resources. There was also new information indicating the foreseeable impacts of this lease sale were far greater than originally anticipated in

---

from further NEPA review); *cf. Yosemite Valley*, 348 F.3d at 800–01 (concluding the agency would need to prepare appropriate NEPA analyses for future actions guided by the management plan).

[148] BLM, COLVILLE RIVER SPECIAL AREA MANAGEMENT PLAN ENVIRONMENTAL ASSESSMENT (2008), https://eplanning.blm.gov/epl-front-office/projects/nepa/5251/160692/196467/Colville_River_Special_Area_EA.pdf; *see also* ER 126–33. The plan itself does not appear in the record, raising questions about BLM's review of the plan prior to the lease sale.

[149] ER 53, 79.

[150] *See, e.g.*, 43 C.F.R. § 46.140; 40 C.F.R. § 1508.28; 40 C.F.R. § 1508.10 (defining "environmental document" as an EA, EIS, FONSI, and notice of intent); *see also Blue Mountains*, 161 F.3d at 1214 (indicating the tiering regulations did not exempt the agency from having to comply with NEPA by potentially conducting even an EIS level of analysis).

the IAP analysis.[151] That information was neither known nor analyzed at the time of the IAP.

BLM was required, at a minimum, to prepare an EA for the lease sale. BLM instead relied on a DNA. DNAs are "an administrative convenience created by the BLM" and are not defined or referred to in NEPA or its implementing regulations.[152] They are not a NEPA document and cannot contain NEPA analysis.[153] The Ninth Circuit has recognized a "limited role" for non-NEPA environmental evaluation documents, such as DNAs, for the purpose of determining whether an agency is required to prepare a supplemental EA or EIS.[154] The Ninth Circuit has permitted agencies to use such documents, in part, because NEPA and its regulations are silent on the question of how agencies are supposed to determine the significance of information for supplemental EIS or EA purposes.[155] However, the Ninth Circuit has cautioned that such documents cannot

---

[151] *See infra* Argument Part I.C.
[152] *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006).
[153] *Id.*; *cf. Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2002).
[154] *Idaho Sporting Cong.*, 222 F.3d at 566. This case related to the Forest Service's use of a supplemental information report, which is another non-NEPA document similar to a DNA.
[155] *Id.*

41

contain analysis or information the agency is required to include in a NEPA

analysis (i.e., an EA or EIS) and cannot serve as a substitute for such analysis.[156]

Here, BLM's use of the DNA goes too far. First, as discussed above, this is

not a supplemental NEPA case. Accordingly, it does not fall within the limited

circumstances where the Ninth Circuit has allowed agencies to use documents like

a DNA. Second, the DNA contains analysis that BLM should, at a minimum, have

included in an EA. BLM's purported analysis of the significance of the new

information in its revised DNA is precisely the type of analysis (in combination

with additional analysis) that should have taken place in at least an EA.[157] The

purpose of an EA is to ensure the agency takes a hard look at whether the

environmental impact of a proposed action is significant enough to warrant an

---

[156] *Id.* at 566–67.

[157] *See infra* Argument Part I.C. There is overlapping use of the term "significance" in NEPA. That term is used in both the threshold determination of whether an agency is required to prepare an EIS (i.e., whether there is a major federal action that *significantly* effects the environment), 40 C.F.R. § 1508.27, and in the context of whether an agency is required to prepare a supplemental EIS (i.e., whether there are *significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts). 42 U.S.C. § 4332; 40 C.F.R. § 1502.9(c)(ii). As discussed above, this case does not raise the question of whether BLM needed to supplement its existing analysis for the IAP; it relates to the distinct question of whether BLM was obligated to prepare either an EA or EIS for the lease sale. The question of what is "significant" in this case is, therefore, focused on the threshold NEPA question of whether there are significant environmental effects that need to be analyzed in an EIS.

EIS.[158] If the EA shows that the agency's action "may have a significant effect upon the environment," then the agency must prepare an EIS.[159] Rather than taking a hard look at the direct, indirect and cumulate impacts of the new information in an EA or EIS, BLM instead dismissed that information in a non-NEPA document and concluded it did not need to provide *any* NEPA analysis for the lease sale. BLM violated NEPA by failing, at a minimum, to prepare an EA prior to the lease sale.

## C. BLM Failed to Take a Hard Look at the Direct, Indirect, and Cumulative Impacts of the Lease Sale.

BLM violated NEPA by failing to take a hard look at the consequences of its action through either an EA or an EIS. NEPA requires an agency not only take a hard look at the environmental consequences prior to making a decision, but that it also "inform the public that it has indeed considered environmental concerns in its decisionmaking process."[160] When an agency decides not to prepare an EIS, it must put forth a "convincing statement of reasons" to explain its decision and demonstrate it was based on a reasoned consideration of the relevant factors.[161]

---

[158] *High Sierra Hikers*, 390 F.3d at 639.
[159] *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 730; 40 C.F.R. § 1508.9.
[160] *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).
[161] *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (quoting *Blue Mountains*, 161 F.3d at 1212); *Nat'l Ass'n of Home Builders*

Agencies cannot avoid meeting their NEPA obligations "by making conclusory assertions that an activity will have only an insignificant impact on the environment."[162]

Prior to the lease sale, Northern Center explained that BLM needed to assess the direct, indirect, and cumulative impacts of the lease sale, particularly in light of recent developments in the region.[163] In its comments, Northern Center pointed to a number of relevant developments and discoveries both in and around the Reserve that the agency needed to consider, including the Willow and Smith Bay discoveries, the adjacent Nanushuk development, USGS's then-pending reassessment of oil and gas resources, the results of the 2016 lease sale, the GMT-1 decision, and the fact that BLM was in the process of developing an RMS for the northeastern Reserve to address the significant impacts of development.[164] None of this information was known at the time of the IAP.[165] The cumulative impacts of these post-IAP developments could only be assessed at the time of the lease sale.

--------------------------------

*v. Norton*, 340 F.3d 835, 846 (9th Cir. 2003); *see also High Sierra Hikers*, 390 F.3d at 640 (indicating the court will apply a lower reasonableness standard when reviewing an agency decision not to prepare an EIS without first preparing an EA).
[162] *Ocean Advocates*, 402 F.3d at 864; *see also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004).
[163] ER 84.
[164] ER 84.
[165] *See infra* Argument Part I.C.1–.5.

Despite these concerns, BLM did not conduct any additional NEPA analysis prior to the lease sale and issuing leases.

Instead, BLM issued a DNA. In its original DNA, BLM provided only conclusory statements that there was no new information or circumstances that would change its impacts analysis in the IAP.[166] These are precisely the type of conclusory statements courts have rejected as insufficient to show the agency has taken a hard look for purposes of NEPA.[167] Those conclusory statements were insufficient to show BLM took a hard look prior to the lease sale at any of the information Northern Center identified in its comments.

In response to this litigation, BLM rewrote its DNA to address the information Northern Center raised in its comments and in this litigation.[168] The revised DNA was flawed for numerous reasons. First, as discussed, BLM's analysis of this information should have been done, at a minimum, in an EA.[169] Second, BLM revised the DNA after the lease sale, contrary to BLM's regulations,

---

[166] ER 52–60.

[167] *See, e.g., Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995 ("This conclusory presentation does not offer any more than the kind of 'general statements about possible effects and some risk' which we have held to be insufficient to constitute a 'hard look.'" (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004))).

[168] ER 52–60; Fed. Defs.' Resp. to Pls.' Mot. for Summ. J. at 27 n.8, D. Ct. ECF No. 47 [hereinafter BLM Br.].

[169] *See supra* Argument Part I.B.

which require BLM to complete its NEPA review prior to the lease sale and as part of the process of selecting which tracts to offer.[170] Agencies are required to comply with their own regulations.[171] BLM violated its regulations by failing to conduct a NEPA analysis prior to the lease sale and by instead creating an after-the-fact justification in response to this litigation.[172]

Finally, even if the court looks to the revised DNA, BLM still failed to provide a reasoned explanation for its decision not to prepare an EA or EIS.[173] There were substantial questions about the potential impacts from leasing that were not considered or known at the time of the IAP, particularly in light of new information. At a minimum, BLM was required to take a hard look at all relevant new information that had a bearing on the potential direct, indirect and cumulative

---

[170] 43 C.F.R. § 3131.2(b); *see also* Procedures for Leasing of Oil and Gas in the National Petroleum Reserve; Alaska, 46 Fed. Reg. 55494, 55495 (Nov. 9, 1981) (indicating BLM adopted this regulation to "make it clear that the tract selection process will include the environmental analysis process required by [NEPA and its implementing regulations]").

[171] *Confederated Tribes & Bands of Yakima Indian Nation v. Fed. Energy Regulatory Comm'n*, 746 F.2d 466, 474 (9th Cir. 1984).

[172] *Am. Textile Mfrs. Inst. Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he post hoc rationalizations of the agency or the parties to . . . litigation cannot serve as a sufficient predicate for agency action."); *Pit River Tribe*, 469 F.3d at 786 (indicating an after-the-fact environmental review cannot cure an initial failure to conduct that review).

[173] Here, where BLM did not prepare an EA to support its conclusion that it did not need to conduct any NEPA analysis, its decision is subject to a lower reasonableness standard. *High Sierra Hikers*, 390 F.3d at 640.

impacts of the lease sale in an EA. BLM's dismissal of this relevant new information in the revised DNA was unreasonable and contrary to the evidence before the agency. Because BLM failed to take a hard look at this information in a NEPA analysis or to provide a reasoned explanation for why it was not required to do any NEPA analysis for the lease sale, BLM violated NEPA.[174]

1.  *BLM Failed to Take a Hard Look at New Information Related to the USGS Report and New Discoveries Around the Reserve.*

BLM failed to take a hard look at relevant new information related to the USGS report and other discoveries around the Reserve that indicated the scale of potential development and impacts were likely far greater than assumed at the time of the IAP.[175] At the time of the lease sale, USGS was revising its estimates of the potential oil and gas resources in and around the Reserve to account for all of these new discoveries.[176] The report was finalized 16 days after the lease sale, and BLM discussed it in its revised DNA.[177] The new USGS report increased the undiscovered oil estimates for areas in and near the Reserve nearly six-fold, from approximately 1.5 billion barrels in the prior report (which was considered in the

---

[174] *See, e.g.*, *id.* (setting aside an agency decision where the agency failed to prepare either an EA or an EIS).
[175] *See* ER 247–50.
[176] *See* ER 65–68.
[177] *See* ER 52–57.

47

IAP) up to 8.7 billion barrels of technically recoverable resources.[178] This was a substantial increase impacting assumptions about the potential for oil and gas development in the region. This new information had a direct bearing on the potential direct, indirect, and cumulative impacts of the lease sale, and should have been analyzed in a NEPA document.

BLM acknowledged in the revised DNA that USGS substantially revised upward its estimate of the mean quantity of undiscovered, technically recoverable oil resources in and near the Reserve.[179] But BLM dismissed the importance of the information by stating the IAP's analysis was based on the amount of economically recoverable undiscovered oil and gas resources, and not the amount of technically recoverable resources.[180] This is not a reasoned explanation because it conflicts with the agency's previous acknowledgement that both the technically and economically recoverable oil estimates played a significant role in its impacts assessment. The IAP's analysis of the potential impacts was based on the assumption that there was far less technically and economically recoverable oil than USGS now believes to be the case.[181] BLM recognized in the IAP that there

---

[178] ER 54.
[179] ER 54.
[180] ER 54–55.
[181] ER 157, 170, 206.

was a clear link between the estimates of technically and economically recoverable oil, and how that would impact the likely scale of development and the balance between development and the protection of other values.[182] The revised estimates indicated there was a significant increase in the amount of oil development likely to occur in and around the Reserve. Yet none of this was considered at the time of the IAP or in a subsequent NEPA analysis.[183]

All of this information was directly relevant to the question of what the direct, indirect, and cumulative impacts of the lease sale were likely to be and should have been considered in a NEPA analysis.[184] Far more was known at the time of the lease sale about the potential scale of development than was known at the time of the IAP. Despite that, BLM failed to take a hard look at this new information in a NEPA analysis and failed to provide a reasoned explanation for its dismissal of the information. This violates NEPA.

---

[182] ER 206 ("The USGS's reduction in its estimate of technically recoverable oil resulted in the agency also reducing its projections of the scale of economically viable oil developments."); ER 157 (discussing the substantial reduction in the estimates of technically recoverable oil and indicating that if, in the future, new exploration or technologies suggest more oil could be recovered, it could be appropriate to reconsider the balance between oil and gas leasing and the protection of other values).

[183] *See infra* Argument Part I.C.2–.3.

[184] *See, e.g.*, *Native Vill. of Point Hope v. Jewell* (*Point Hope*), 740 F.3d 489, 504 (9th Cir. 2014) (recognizing the significance of oil estimates to the agency's assessment of the impacts of a lease sale).

> 2. *BLM Failed to Take a Hard Look at Cumulative Impacts from the Willow Discovery.*

Northern Center raised substantial questions related to the potential direct, indirect, and cumulative impacts of additional leasing activities in light of ConocoPhillips' Willow discovery. Willow was one of several major discoveries since the IAP.[185] At 300-million barrels, the Willow prospect will be an expansive new development in the Reserve.[186] ConocoPhillips plans to bring Willow into production by roughly 2023 and to connect that development back to other developments in the northeast corner of the Reserve.[187]

This development was not considered in the IAP; indeed, it is located in an area the IAP did not identify as having a potential oil reservoir.[188] In the IAP, BLM estimated a total of 128 million barrels of undiscovered economically recoverable oil might be found in the northeast corner of the Reserve (where the GMT and Bear Tooth units are located) and assumed the total amount of undiscovered economically recoverable oil for the entire 22-million-acre Reserve was 491

---

[185] ER 65.
[186] ER 56.
[187] *See* ER 84.
[188] *See* ER 221 (failing to show any oil accumulations in the vicinity of the Willow prospect, which is located another 10 miles west of the Spark-Rendezvous prospect); ER 56 (indicating Willow would involve a new processing facility and multiple satellite drill pads).

50

million barrels.[189] In other words, the Willow prospect alone accounts for roughly two-thirds of the total BLM assumed would be developed across the *entire* Reserve in the IAP. This significant prospect is far more than BLM assumed would be discovered and developed in the northeast region.

In the revised DNA, BLM claimed the IAP fully accounted for Willow as part of its analysis of the Greater Mooses Tooth Unit.[190] But BLM later conceded in its briefing that the Willow discovery occurred after it issued the IAP and that the IAP did not specifically consider infrastructure at the location of the Willow discovery.[191]

What BLM knows now about Willow and development is very different from what BLM thought would be developed when it issued the IAP, especially in the northeast region. In the IAP, BLM did not expect there would be any large discoveries beyond what was already known in existing units.[192] The IAP looked

---

[189] ER 229 & fig.4-12.
[190] ER 56.
[191] BLM Br., *supra* note 168, at 50 n.17 (conceding the Willow discovery occurred after the IAP and the IAP did not specifically predict there would be infrastructure at the Willow location).
[192] *See, e.g.*, ER 247 (containing USGS's assumptions about the potential resources in the Reserve); ER 216–18 (assuming few, if any, new high potential areas would be discovered).

generally at oil and gas and where development might occur,[193] but it did not

anticipate oil development on the scale of Willow or in this concentrated of an area

in the northeastern Reserve. BLM's dismissal of this information was unreasonable

and contrary to the evidence before the agency. BLM violated NEPA by failing to

take a hard look at the direct, indirect, and cumulative impacts of the lease sale,

including the cumulative impacts associated with the Willow prospect.

3.  *BLM Failed to Take a Hard Look at Cumulative Impacts from
    Other Discoveries in the Region.*

Northern Center raised substantial questions related to the potential impacts

of other discoveries that could substantially increase the cumulative impacts to

subsistence and other resources in the Reserve. These included both the Nanushuk

(Pikka and Horseshoe) discoveries, as well as the Smith Bay discovery.[194] These

discoveries, along with Willow, led USGS to substantially revise its oil estimates

for the Reserve and region.[195]

Armstrong Energy's Pikka and Horseshoe discoveries were announced in

2015 and 2017.[196] These discoveries are adjacent to the Reserve on state land, near

---

[193] *See* ER 220–32 (looking at two development scenarios, one for unknown
resources and one for known resources).
[194] ER 65 (mapping the general locations of these discoveries).
[195] ER 65.
[196] ER 65.

the community of Nuiqsut.[197] Combined, they are one of the largest onshore oil

and gas discoveries in decades and hold a total of more than 1 billion barrels of

oil.[198] Both Armstrong and its successors were in the process of permitting

infrastructure related to this massive new development at the time of the lease

sale.[199] The discovery at Smith Bay is estimated to contain more than 1 billion

barrels of oil.[200] Smith Bay — similar to Willow and Nanushuk — was a

significantly larger discovery than anticipated at the time of the IAP.[201]

BLM acknowledges in the revised DNA that there was the potential for

these projects to cumulatively combine with other impacts from leasing and

development in the Reserve,[202] yet failed to take the threshold step of analyzing

their significance in an EA. BLM instead dismisses this information on the ground

that the developments are outside the Reserve, and that the IAP contemplated

generally that exploration might lead to discoveries and development outside the

Reserve.[203] This is contrary to NEPA. BLM's obligation to analyze the cumulative

---

[197] *See* ER 65.
[198] ER 56, 65–68.
[199] *See* ER 65; Nanushuk Website, *supra* note 57.
[200] ER 66.
[201] *See* ER 65–66 (indicating Smith Bay is one of the discoveries that led USGS to substantially revise its oil estimates).
[202] ER 57.
[203] ER 56–57.

impacts under NEPA extends beyond the boundaries of the Reserve; BLM must assess the direct, indirect, and cumulative impacts of the proposed action.[204] The generalized assessment in the IAP that exploration and future discoveries might occur is not sufficient at this stage. The IAP did not contemplate that there would be discoveries and development projects on this scale or so close to the Reserve. At the time of the lease sale, BLM had both the information and the legal obligation to engage in a more pointed hard look analysis of the reasonably foreseeable cumulative impacts in light of these new developments. BLM's dismissal of this information was unreasonable, and its failure to consider the cumulative impacts of the Nanushuk and Smith Bay discoveries, at a minimum, in an EA violates NEPA.

4.    *BLM Failed to Take a Hard Look at the Cumulative Impacts Related to the 2016 Lease Sale.*

Northern Center raised substantial questions about the potential impacts of the 2017 lease sale in light of the results of the 2016 lease sale. The 2016 lease sale resulted in the sale of over 600,000 acres of additional oil and gas leases in the Reserve, nearly doubling the 895,000 acres leased at that time.[205] BLM dismisses

---

[204] *See, e.g.*, *Kern*, 284 F.3d at 1077–78 (holding BLM could not limit its analysis to the limited geographic region and needed to assess the cumulative impacts from reasonably foreseeable future actions in the region); *Point Hope*, 740 F.3d at 503 (requiring an assessment of all foreseeable direct, indirect, and cumulative impacts).
[205] ER 57, 84.

the significance of this information in the revised DNA by asserting the IAP already accounted for that level of leasing and that there was more acreage under lease at the time of the IAP.[206]

In dismissing the significance of the 2016 lease sale, BLM ignores the significance of not only what was leased in the 2016 lease sale, but who leased it and where. Almost all the leases acquired in the 2016 lease sale were obtained by ConocoPhillips — the primary company moving forward aggressively with development in the Reserve.[207] The new leases were in a block extending out from ConocoPhillips' existing acreage and developments.[208] ConocoPhillips acquired this significant block of leases right before it announced its massive discovery at Willow.

The potential for development at the time of the lease sale in the lease area was strikingly different from what BLM considered in the IAP. At the time of the IAP, the USGS assessment had much lower estimates of the potential oil and gas resources in the Reserve based on the conclusion that there was low oil potential

---

[206] ER 57–58.
[207] ER 99–104.
[208] BLM, National Petroleum Reserve in Alaska Sale Map: 2016 Lease Sale (2016) [hereinafter 2016 Lease Map], *available at* https://www.blm.gov/sites/blm.gov/files/uploads/Oil_Gas_Alaska_NPR-A_LeaseSaleResults_Map_12142016.pdf. The court can take judicial notice of agency documents. *See supra* note 53.

starting 15–20 miles west of the existing development at Alpine.[209] USGS also explained that exploration had dropped off and several companies had relinquished their leases in the Reserve.[210]

This picture changed dramatically after adoption of the IAP. Combined with Willow and other discoveries, the 2016 lease sale indicated there was a significant resurgence in industry interest and an increase in the level of potential development from what was contemplated in the IAP.[211] The lease sale indicated that there was an increased likelihood that there would be significant activities in the northeast corner of the Reserve beyond what BLM considered in the IAP. All of this information was relevant and related directly to the potential impacts of further leasing in the Reserve. BLM failed to take a hard look at this information in a NEPA analysis, and failed to provide a reasoned explanation for its dismissal of this new information.

5.     *BLM Failed to Take a Hard Look at Cumulative Impacts Related to the GMT-1 Project and the RMS.*

Northern Center raised substantial questions about the potential impacts of the lease sale in light of the GMT-1 project and BLM's development of a Regional

---

[209] ER 247.
[210] ER 247.
[211] *See, e.g.*, ER 65 (indicating recent discoveries spurred further exploration and interest in the region).

Mitigation Strategy (RMS). In the IAP, BLM determined that the stipulations and best management practices adopted therein were sufficient to ensure there would not be significant impacts to subsistence uses and needs.[212] But, two years later, when making the first oil development decision after adoption of the IAP for the GMT-1 project, BLM found exactly the opposite. BLM found there would be major impacts to subsistence uses from that project, and that those impacts could not be fully mitigated by the measures in the IAP.[213] Contrary to BLM's assertions in the revised DNA,[214] this finding was not based on unique circumstances or a waiver of a protective measure; BLM's finding was that any version of that project would cause significant impacts to subsistence.[215] This finding was a result of "[a]dditional survey data, testimony from residents, and new information gathered since the [2010 IAP] . . . [that] *indicates that the intensity of these impacts and the overall degree of impacts may be higher than previously anticipated*."[216] In other words, in the IAP, BLM underestimated the impacts to subsistence and the effectiveness of mitigation — not just for GMT-1, but also for future projects.

---

[212] ER 163.
[213] *See, e.g.*, ER 115.
[214] ER 58.
[215] ER 121 (showing there would be major impacts to subsistence and environmental justice under any alternative authorizing GMT-1).
[216] ER 123–24 (emphasis added).

As a result of its findings, BLM decided to prepare an RMS to address the foreseeable impacts, including cumulative impacts, of GMT-1 and future projects that were not adequately addressed by the IAP.[217] One purpose of the RMS was to identify if additional areas needed to be off limits to leasing or development, and whether additional mitigation measures were needed to address impacts.[218] Despite this, the revised DNA does not even mention the RMS.

In sum, all of this information was highly relevant to the question of whether, where, and how additional leasing and development should occur in the Reserve. It had a direct bearing on the likely impacts of further leasing in the Reserve and should have been considered in a NEPA analysis. BLM's dismissal of this information and outright failure to address it in a NEPA analysis is unreasonable and contrary to the record before the agency. BLM failed to take a hard look at the potential impacts of the lease sale in light of this relevant information, in violation of NEPA.

## II. THE DISTRICT COURT ERRED IN CONCLUDING BLM WAS NOT REQUIRED TO CONDUCT A SITE-SPECIFIC NEPA ANALYSIS.

BLM was obligated to conduct a site-specific analysis prior to the lease sale. It did not. The District Court's holding that BLM was not required to do so is

---

[217] ER 58.
[218] *See* ER 115–17.

58

contrary to existing case law. Courts, including this Circuit, have repeatedly affirmed that agencies are required to conduct a site-specific analysis prior to making an irretrievable commitment of resources.[219] The key inquiry is not "*whether* the project's site-specific impact should be evaluated in detail, but *when* such detailed evaluation should occur."[220] An agency reaches the threshold triggering site-specific review when it "proposes to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site."[221]

In the oil and gas context, whether the agency crosses this threshold when issuing leases is determined by the terms of the leases. If an agency issues a lease that expressly retains the right to preclude later surface activities — called a no surface occupancy (NSO) lease — it does not constitute an irretrievable commitment of resources and the agency is not required to do a site-specific NEPA

---

[219] *See, e.g.*, *Yosemite Valley*, 348 F.3d at 801 ("NEPA requires a full evaluation of site-specific impacts *only when* a critical decision has been made to act on site development—i.e., when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to [a] project at a particular site." (internal quotation marks omitted)); *Block*, 690 F.2d at 761; *Richardson*, 565 F.3d at 718–19 ("NEPA required an analysis of the site-specific impacts of the . . . lease prior to its issuance, and BLM acted arbitrarily and capriciously by failing to conduct one." (footnote omitted)).
[220] *Block*, 690 F.2d at 761 (emphasis added).
[221] *Id.* (internal quotation marks omitted).

analysis.[222] However, if an agency issues a lease that does not contain an express provision reserving the agency's authority to preclude surface occupancy — called a non-NSO lease — it constitutes an irretrievable commitment of resources and a site-specific analysis is required.[223]

Here, BLM made an irretrievable commitment of resources when it issued the leases because the leases did not retain BLM's authority to preclude any surface disturbing activities.[224] It is undisputed that BLM did not retain this authority.[225] While BLM may have some authority to regulate activities on the leases, it cannot say no. Because BLM did not retain the authority to fully preclude surface disturbing activities on the leases, BLM made an irretrievable commitment of resources and was required to conduct a site-specific NEPA analysis. BLM cannot defer analyzing all reasonably foreseeable environmental impacts past the

---

[222] *Conner v. Burford*, 848 F.2d 1441, 1448 (9th Cir. 1988).

[223] *Id.* at 1448–50; *Sierra Club v. Peterson*, 717 F.2d 1409, 1414–15 (D.C. Cir. 1983); *see also Richardson*, 565 F.3d at 718–19.

[224] *See, e.g.*, ER 70 (granting the "exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas . . . together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension"); ER 70 (indicating the leases are subject to regulations and orders, but that those can only be imposed to the extent the provisions are "not inconsistent with lease rights granted or specific provision[s]" of the lease); ER 71 (listing measures BLM can impose "[t]o the extent consistent with the lease rights granted").

[225] *See* BLM Br., *supra* note 168, at 35–42; ConocoPhillips Alaska's Resp. in Opp'n to Pls.' Mot. for Summ. J. at 31, D. Ct. ECF No. 46 [hereinafter CPAI Br.]; ER 10 (stating the leases were non-NSO leases).

point when it waives the right to preclude those activities.[226] Promises that the

agency will later conduct a more in-depth NEPA analysis are meaningless if BLM

has already waived its right to say no to those projects.[227]

The District Court misapplied the holding in *Northern Alaska*

*Environmental Center v. Kempthorne* by conflating the terms "site-specific" and

"parcel by parcel."[228] *Kempthorne* did not modify the bedrock principle that an

agency is required to conduct a site-specific NEPA analysis prior to making an

irretrievable commitment of resources.[229] In *Kempthorne*, the Ninth Circuit in fact

reiterated the need for a site-specific analysis whenever there is an irretrievable

commitment of resources.[230] The question in *Kempthorne* was whether BLM was

---

[226] *See, e.g.*, *Block*, 690 F.2d at 761, 763, 765; *Pit River Tribe*, 469 F.3d at 784; *Conner*, 848 F.2d at 1451.
[227] *See Conner*, 848 F.2d at 1451.
[228] 457 F.3d at 975–76; *see* ER 10–11.
[229] *See, e.g.*, *Block*, 690 F.2d at 761; *Conner*, 848 F.2d at 1451.
[230] 457 F.3d at 975–76 ("With respect to the need for site specific analysis in the EIS, our law under NEPA makes it clear that there must be such analysis whenever there is an 'irretrievable commitment of resources' by a federal agency to a project."). In *Kempthorne*, the court made seemingly conflicting statements about the nature of the leases and timing of the irretrievable commitment of resources. The Court acknowledged that there was an irretrievable commitment of resources, but the court also assumed that BLM still had the ability to prohibit or deny later applications for activities. *Id.* at 976. If BLM had truly retained the authority to later deny activities, that would have made those leases non-NSO leases. Here, no party disputes that there has been an irretrievable commitment of resources and that BLM no longer retains the authority to later prohibit applications for activities outright.

required to conduct a site-specific analysis going parcel by parcel (i.e., lease tract by lease tract) in a management plan that covered the northwest portion of the Reserve.[231] The Ninth Circuit concluded the analysis in that particular EIS was site-specific enough and that the agency did not need to review the potential effects by going parcel by parcel through every lease tract in its EIS.[232] The Ninth Circuit did not hold that the agency was wholly exempt from having to do a site-specific analysis at the lease sale stage — just that the required site-specific analysis did not need to be parcel by parcel at that stage.[233]

Here, consistent with precedent, Northern Center argued that BLM was required to conduct a site-specific analysis prior to making an irretrievable commitment of resources — not that BLM was obligated to conduct a parcel-by-parcel level of analysis. The IAP was not a site-specific analysis. The IAP was a broad, programmatic-level analysis for a management plan that governed how BLM would manage the entire, 22.8-million-acre Reserve.[234] The Record of Decision for the IAP stated that the IAP "is suitably specific for broad-scale management decisions," but never purported to be a site-specific analysis.[235] To

---

[231] *Id.* at 976 ("The issue is whether [the EIS] was sufficiently site specific.").
[232] *Id.* at 976–77.
[233] *Id.* at 977.
[234] *See* ER 154.
[235] ER 154.

this point, the IAP did not decide which tracts to offer in this lease sale, and did not commit BLM to issue specific leases; it specifically deferred that decision for subsequent individual lease sales.[236]

The District Court recognized that the IAP was only a programmatic-level EIS, and never held the IAP was site-specific.[237] However, the District Court erred by equating the terms "parcel-by-parcel" with "site-specific" to interpret *Kempthorne* to mean that the agency was not required to conduct a site-specific analysis at the lease sale stage. While *Kempthorne* is clear that a parcel-by-parcel analysis is not necessarily required at the lease sale stage, it is also clear that a site-specific analysis is required.

BLM was not exempt from having to conduct a site-specific analysis for the lease sale in this case. NEPA requires that an agency conduct an analysis of the environmental consequences of its decision as soon as it can reasonably be done.[238] An agency is required to provide "as much environmental analysis as is reasonably possible under the circumstances, thereby providing sufficient detail to foster

---

[236] ER 179 (noting BLM may or may not offer areas open to leasing as part of the lease sales); ER 69, 72, 73–77.
[237] ER 10.
[238] *Kern*, 284 F.3d at 1072.

63

informed decision-making at the stage in question."[239] An agency has some

amount of flexibility in deciding the level of analysis to perform at a particular

stage,[240] but it cannot completely forego conducting that analysis altogether, as

BLM did here. That is especially true where the agency waived its ability to later

to say no to projects, as BLM did here. BLM was obligated to consider all

reasonably foreseeable environmental impacts at the leasing stage as part of its

site-specific analysis.[241] Those impacts include the precise direct, indirect and

cumulative impacts identified above that BLM failed to take a requisite hard look

at. Here, BLM had a choice: if it did not have enough information at this stage to

do a site-specific analysis, it could have delayed that analysis provided that it also

retained its authority to later say no to projects.[242] But it cannot both tie its hands

by issuing leases that allow future development and completely bypass site-

specific analysis at this stage. BLM's failure to conduct a site-specific analysis

_____

[239] *Point Hope*, 740 F.3d at 498 (quoting *Yosemite Valley*, 348 F.3d at 800); *see also Kern*, 284 F.3d at 1072, 1075–78 (indicating the scope of analysis should be appropriate to the action in question, but that the impacts of a site-specific project must be fully analyzed in a NEPA document).
[240] *See Point Hope*, 740 F.3d at 498.
[241] *See, e.g.*, *Richardson*, 565 F.3d at 718–19.
[242] *Conner*, 848 F.2d at 1450–51 (indicating the agency can delay its analysis, "provided that it reserves both the authority to *preclude* all activities pending submission of site-specific proposals and the authority to *prevent* proposed activities if the environmental consequences are unacceptable" (quoting *Peterson*, 717 F.2d at 1415)).

looking at all reasonably foreseeable impacts at the lease sale stage was arbitrary and capricious, and contrary to NEPA.

## III. THE COURT SHOULD SET ASIDE BLM'S DECISIONS AND VACATE THE LEASES.

The APA mandates that when an agency action "is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "[t]he reviewing court shall . . . hold unlawful and set aside [the] agency action."[243] The Supreme Court and this Circuit recognize that vacatur is the presumptive remedy under the APA.[244] Accordingly, the Court should apply the APA's presumptive remedy and vacate BLM's decisions and the leases.[245]

BLM and ConocoPhillips may argue that vacatur is not appropriate and seek an exception from the default APA remedy.[246] Because it is an equitable defense,

---

[243] 5 U.S.C. § 706(2).
[244] *See, e.g.*, *Fed. Commc'n Comm'n v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003); *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 (9th Cir. 2007); *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007), *rev'd on other grounds sub nom. Coeur Alaska v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009); *Idaho Sporting Cong.*, 222 F.3d at 567.
[245] *See, e.g.*, *Pit River Tribe*, 469 F.3d at 788 (stating that an oil and gas lease extension approval "must be undone" and the rest of the approval process set aside where the agencies violated their duties under NEPA and the National Historic Preservation Act); *San Juan Citizens All. v. U.S. BLM*, 326 F. Supp. 3d 1227, 1256 (D.N.M. 2018) (vacating a NEPA document and leases).
[246] *See* BLM Br., *supra* note 168, at 55–56; CPAI Br., *supra* note 225, at 49–53.

65

the burden is on the party seeking remand without vacatur to show that deviation

from the presumptive APA remedy is warranted.[247] BLM and ConocoPhillips

cannot meet that burden.

As this Court explained, "[w]hen determining whether to leave an agency

action in place on remand, we weigh the seriousness of the agency's errors against

'the disruptive consequences of an interim change that may itself be changed.'"[248]

Remand without vacatur is only warranted "in rare circumstances."[249] Courts only

depart from the default remedy of vacatur in "rare circumstances" — specifically,

when serious environmental harm is likely to result from vacating the underlying

decision.[250]

---

[247] *See Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1138–39 (9th Cir. 2006) (stating a party asserting an equitable defense "must show" its applicability); *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 883 (E.D. Cal. 2018) (noting that federal agency failed to justify remand without vacatur).
[248] *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir.1993)).
[249] *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010).
[250] *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010); *see, e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 993–94 (declining to vacate permit where vacatur could actually cause more of the exact type of environmental harm the Clean Air Act was intended to prevent); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (refusing to vacate an invalid rule because vacatur would cause "potential extinction of an animal species"); *cf. Pollinator Stewardship Council*, 806 F.3d at 532–33 (vacating pesticide rule "given the precariousness of bee populations").

This case is not one of the "rare circumstances" where remand without vacatur is warranted. Regarding the first factor, BLM's errors are serious. The agency did not undertake a NEPA analysis of the direct, indirect, and cumulative effects — including site-specific impacts — prior to the lease sale and issuing leases. Failure to do so cuts to NEPA's core purposes: to ensure that the agency takes a hard look at the potential environmental consequences before making its decision and taking action.[251] BLM proceeded contrary to NEPA and the NPRPA's clear mandates by failing to do any NEPA analysis for the lease sale.[252] BLM's violations are serious errors.[253]

Regarding the second factor, the critical focus when looking at the disruptive consequences is whether there is likely to be serious environmental harm from vacatur.[254] Vacatur would not cause any harm to the environment or resources in the Reserve. To the contrary, vacatur could make the resulting decision more protective of the environment by ensuring BLM fully considers all impacts before

---

[251] 40 C.F.R. § 1500.1(b)–(c); *Methow Valley*, 490 U.S. at 348–49.
[252] *See supra* Argument Parts I.B–C, II.
[253] *See, e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. NOAA Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1245 (N.D. Cal. 2015) (determining that failure to consider cumulative impacts under NEPA was a serious error and vacating).
[254] *See Pollinator Stewardship Council*, 806 F.3d at 532.

making any leasing decisions, including where to offer to lease.[255] Indeed, upon consideration of the impacts on remand, BLM may decide not to offer the same areas for lease or could impose additional protective measures for the Reserve's ecological and subsistence resources.

Accordingly, the Court should apply the APA's presumptive remedy and vacate BLM's decision documents and the leases.

## CONCLUSION

BLM violated NEPA and the NPRPA regulations by failing to do any NEPA analysis prior to the lease sale and lease issuance. At a minimum, BLM should have prepared an EA prior to the lease sale taking a hard look at the direct, indirect, and cumulative impacts of the lease sale, including site-specific impacts. For these reasons, Northern Center respectfully requests that the Court reverse the District Court's decision, hold that BLM violated both NEPA and the NPRPA regulation, and vacate the leases and decision documents.

---

[255] *See Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1124 (9th Cir. 2010) ("NEPA is not a paper exercise, and new analyses may point in new directions.").

Date: April 15, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*

69

<u>STATEMENT OF RELATED CASES</u>

The following case is related to this appeal:

*Natural Resources Defense Council et al. v. Zinke et al.*, No. 19-35006, involves a challenge under the National Environmental Policy Act to the U.S. Department of the Interior's 2016 and 2017 oil and gas lease sales in the National Petroleum Reserve–Alaska.

Date: April 15, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,675 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016 Times New Roman 14-point font.

Date: April 15, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

## Statutes

5 U.S.C. § 706 ................................................................................... A-2
42 U.S.C. § 4332(C) .......................................................................... A-3
42 U.S.C. § 6503(b) ........................................................................... A-4
42 U.S.C. § 6504(a) ........................................................................... A-4
42 U.S.C. § 6506a(a)–(b) .................................................................. A-4

## Regulations

40 C.F.R. § 1500.1 ............................................................................. A-5
40 C.F.R. § 1501.4 ............................................................................. A-5
40 C.F.R. § 1502.16 ........................................................................... A-7
40 C.F.R. § 1502.20 ........................................................................... A-8
40 C.F.R. § 1502.22(a) ...................................................................... A-8
40 C.F.R. § 1508.8 ............................................................................. A-8
40 C.F.R. § 1508.9 ............................................................................. A-9
40 C.F.R. § 1508.10 ........................................................................... A-9
40 C.F.R. § 1508.18(b) .................................................................... A-10
40 C.F.R. § 1508.25(c) ..................................................................... A-10
40 C.F.R. § 1508.27 ......................................................................... A-11
40 C.F.R. § 1508.28 ......................................................................... A-12
43 C.F.R. § 46.140 ........................................................................... A-13
43 C.F.R. § 46.300(a) ....................................................................... A-14
43 C.F.R. § 2361.0–1 ....................................................................... A-14
43 C.F.R. § 2361.0–2 ....................................................................... A-14
43 C.F.R. § 2361.1(a) ....................................................................... A-15
43 C.F.R. § 3131.2 ........................................................................... A-15
43 C.F.R. § 3131.3 ........................................................................... A-15

<u>Addendum</u>

**5 U.S.C. § 706**
**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) without observance of procedure required by law;

> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**42 U.S.C. § 4332(C)**
**Cooperation of agencies; reports; availability of information;**
**recommendations; international and national coordination of efforts.**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**42 U.S.C. § 6503(b)**
**Transfer of jurisdiction, duties, property, etc., to Secretary of the Interior from Secretary of Navy.**

(b) Protection of environmental, fish and wildlife, and historical or scenic values; promulgation of rules and regulations

With respect to any activities related to the protection of environmental, fish and wildlife, and historical or scenic values, the Secretary of the Interior shall assume all responsibilities as of April 5, 1976. As soon as possible, but not later than the effective date of transfer, the Secretary of the Interior may promulgate such rules and regulations as he deems necessary and appropriate for the protection of such values within the reserve.

**42 U.S.C. § 6504(a)**
**Administration of reserve**

(a) Conduct of exploration within designated areas to protect surface values

Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

**42 U.S.C. § 6506a(a)–(b)**
**Competitive leasing of oil and gas**

(a) In general
The Secretary shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act.

(b) Mitigation of adverse effects
Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska.

A-4

**40 C.F.R. § 1500.1**
**Purpose.**

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

**40 C.F.R. § 1501.4**
**Whether to prepare an environmental impact statement.**

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

**40 C.F.R. § 1502.16**
**Environmental consequences.**

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

**40 C.F.R. § 1502.20**
**Tiering.**

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

**40 C.F.R. § 1502.22(a)**
**Incomplete or unavailable information.**

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

**40 C.F.R. § 1508.8**
**Effects.**

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

A-8

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**40 C.F.R. § 1508.9**
**Environmental assessment.**

Environmental assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

> (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

> (3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**40 C.F.R. § 1508.10**
**Environmental document.**

Environmental document includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

A-9

**40 C.F.R. § 1508.18(b)**
**Major Federal action.**

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.


**40 C.F.R. § 1508.25(c)**
**Scope.**

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(c) Impacts, which may be:

(1) Direct;

(2) indirect;

A-10

(3) cumulative.

**40 C.F.R. § 1508.27**
**Significantly.**

Significantly as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

A-11

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.


**40 C.F.R. § 1508.28**
**Tiering.**

Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead

agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

## 43 C.F.R. § 46.140
## Using tiered documents.

A NEPA document that tiers to another broader NEPA document in accordance with 40 CFR 1508.28 must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions.

(a) Where the impacts of the narrower action are identified and analyzed in the broader NEPA document, no further analysis is necessary, and the previously prepared document can be used for purposes of the pending action.

(b) To the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis.

(c) An environmental assessment prepared in support of an individual proposed action can be tiered to a programmatic or other broader-scope environmental impact statement. An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, whether direct, indirect, or cumulative, if the environmental assessment is tiered to a broader environmental impact statement which fully analyzed those significant effects. Tiering to the programmatic or broader-scope environmental impact statement would allow the preparation of an environmental assessment and a finding of no significant impact for the individual proposed action, so long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also be called a "finding of no new significant impact."

**43 C.F.R. § 46.300(a)**
**Purpose of an environmental assessment and when it must be prepared.**

The purpose of an environmental assessment is to allow the Responsible Official to determine whether to prepare an environmental impact statement or a finding of no significant impact.

(a) A bureau must ensure that an environmental assessment is prepared for all proposed Federal actions, except those:

(1) That are covered by a categorical exclusion;

(2) That are covered sufficiently by an earlier environmental document as determined and documented by the Responsible Official; or

(3) For which the bureau has already decided to prepare an environmental impact statement.

**43 C.F.R. § 2361.0–1**
**Purpose.**

The purpose of the regulations in this subpart is to provide procedures for the protection and control of environmental, fish and wildlife, and historical or scenic values in the National Petroleum Reserve in Alaska pursuant to the provisions of the Naval Petroleum Reserves Production Act of 1976.

**43 C.F.R. § 2361.0–2**
**Objectives.**

The objective of this subpart is to provide for the protection of the environmental, fish and wildlife, and historical or scenic values of the Reserve so that activities which are or might be detrimental to such values will be carefully controlled to the extent consistent with the requirements of the Act for petroleum exploration of the reserve.

A-14

**43 C.F.R. § 2361.1(a)**
**Protection of the environment.**

(a) The authorized officer shall take such action, including monitoring, as he deems necessary to mitigate or avoid unnecessary surface damage and to minimize ecological disturbance throughout the reserve to the extent consistent with the requirements of the Act for the exploration of the reserve.

**43 C.F.R. § 3131.2**
**Tentative tract selection.**

(a) The State Director Alaska, Bureau of Land Management, shall issue calls for Nominations and Comments on tracts for leasing for oil and gas in specified areas. The call for Nominations and Comments shall be published in the Federal Register and may be published in other publications as desired by the State Director. Nominations and Comments on tracts shall be addressed to the State Director Alaska, Bureau of Land Management. The State Director shall also request comments on tracts which should receive special concern and analysis.

(b) The State Director, after completion of the required environmental analysis (see 40 CFR 1500–1508), shall select tracts to be offered for sale. In making the selection, the State Director shall consider available environmental information, multiple-use conflicts, resource potential, industry interest, information from appropriate Federal agencies and other available information. The State Director shall develop measures to mitigate adverse impacts, including lease stipulations and information to lessees. These mitigating measures shall be made public in the notice of sale.

**43 C.F.R. § 3131.3**
**Special stipulations.**

Special stipulations shall be developed to the extent the authorized officer deems necessary and appropriate for mitigating reasonably foreseeable and significant adverse impacts on the surface resources. Special Areas stipulations for exploration or production shall be developed in accordance with section 104 of the Naval Petroleum Reserves Production Act of 1976. Any special stipulations and conditions shall be set forth in the notice of sale and shall be attached to and made a part of the lease, if issued. Additional stipulations needed to protect surface

A-15

resources and special areas may be imposed at the time the surface use plan and permit to drill are approved.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: April 15, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*