No. 19-35008

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NORTHERN ALASKA ENVIRONMENTAL CENTER, et al.,
*Plaintiffs/Appellants*,

v.

U.S. DEPARTMENT OF INTERIOR, et al.,
*Defendants/Appellees*,

and

CONOCOPHILLIPS ALASKA, INC.,
*Intervenor Defendant/Appellee.*

Appeal from the United States District Court for the District of Alaska
No. 3:18-cv-00030 (Hon. Sharon L. Gleason)

**ANSWERING BRIEF FOR THE FEDERAL APPELLEES**


JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
JOHN DAVID GUNTER, II
ROMNEY S. PHILPOTT
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

Of Counsel:

MICHAEL GIERYIC
*Attorney-Advisor*
Office of the Solicitor
U.S. Department of the Interior

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUES ........ 2

PERTINENT STATUTES AND REGULATIONS ........ 3

STATEMENT OF THE CASE ........ 3

A. Oil and gas development in the National Petroleum Reserve in Alaska is a multi-step process. ........ 3

B. BLM adopted a holistic approach to managing oil and gas activities in the National Petroleum Reserve and comprehensively analyzed the impacts of such activities. ........ 6

C. BLM has conducted multiple lease sales since 2013, including the 2017 lease sale at issue here. ........ 12

D. Plaintiffs challenged BLM's decision to issue leases bid upon during the 2017 lease sale. ........ 16

SUMMARY OF ARGUMENT ........ 18

STANDARD OF REVIEW ........ 20

ARGUMENT ........ 21

I. Plaintiffs' claim that BLM failed to comply with NEPA by failing to analyze the impacts of leasing the subject tracts should be rejected. ........ 21

A. Plaintiffs' challenge to BLM's environmental impact statement for the integrated activity plan is time-barred. ........ 21

B. In any event, the level of site-specific analysis contained in the environmental impact statement was reasonable. ........ 23

C. This Court should reject Plaintiffs' hodgepodge of arguments to the contrary....27

II. BLM reasonably determined that it did not need to supplement its environmental impact statement for the integrated activity plan....34

A. BLM properly considered the new information in its Revised Determination of NEPA Adequacy....36

B. The environmental impact statement did not underestimate potential impacts of new discoveries....38

C. The four discoveries identified in the USGS assessment do not show that there will be greater impacts of development than BLM analyzed....41

D. The current number of leases does not suggest that there will be more development than BLM anticipated....46

E. BLM reasonably determined that it had already studied the likely impact of the leases here on subsistence uses....47

III. Were this Court to hold that BLM acted arbitrarily, it should remand without vacatur....48

CONCLUSION....50

STATEMENT OF RELATED CASES

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................37

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) .......................................................................31

*Bright v. Bechtel Petroleum, Inc.*,
780 F.2d 766 (9th Cir. 1986) .........................................................................23

*California Communities Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .........................................................................49

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) .........................................................................31

*Center for Biological Diversity v. Export-Import Bank of United States*,
894 F.3d 1005 (9th Cir. 2018) .......................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................................38

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......................................................................23

*DOT v. Public Citizen*,
541 U.S. 752 (2004) ........................................................................................33

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ..........................................................................................20

*Great Old Broads for Wilderness v. Kimbell*,
709 F.3d 836 (9th Cir. 2013) .........................................................................33

*Humane Society of United States v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .......................................................................48

*Idaho Sporting Congress Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) .........................................................................33

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ......................................................................23

*Independent Towers of Washington v. Washington*,
350 F.3d 925 (9th Cir. 2003) ......................................................................35

*Kern v. BLM*,
284 F.3d 1062 (9th Cir. 2002) ....................................................................31

*Laub v. U.S. Department of Interior*,
342 F.3d 1080 (9th Cir. 2003) ....................................................................37

*Marsh v. Oregon Natural Resources Council*,
490 U.S. 360 (1989) ..................................................................................35

*Mayo v. Reynolds*,
875 F.3d 11 (D.C. Cir. 2017)................................................................ 30, 31

*Native Village of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) ......................................................................31

*NRDC v. U.S. NRC*,
606 F.2d 1261 (D.C. Cir. 1979) .................................................................32

*North Idaho Community Action Network v. U.S. DOT*,
545 F.3d 1147 (9th Cir. 2008) ....................................................................33

*North Slope Borough v. Andrus*,
642 F.2d 589 (1980)....................................................................................25

*Northern Alaska Environmental Center v. Kempthorne*,
457 F. 3d 969 (9th Cir. 2006) .................................. 3, 17, 18, 24, 25, 27, 28, 29, 30

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ............................................................................... 34, 35

*Pit River Tribe v. U.S. Forest Service*,
615 F.3d 1069 (9th Cir. 2010) ....................................................................49

*Price Road Neighborhood Ass'n v. U.S. DOT*,
113 F.3d 1505 (9th Cir. 1997) ....................................................................33

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .............................................................................. 5, 33

*Salmon River Concerned Citizens v. Robertson*,
32 F.3d 1346 (9th Cir. 1994) ..............................................................................30

*San Luis Delta-Mendota Water Authority v. Locke*,
776 F.3d 971 (9th Cir. 2014) ..............................................................................41

*Scientists Institute for Public Information, Inc. v. AEC*,
481 F.2d 1079 (D.C. Cir. 1983) ........................................................................ 32, 33

*Sierra Club v. Hathaway*,
579 F.2d 1162 (9th Cir. 1978)..............................................................................31

*Southern Utah Wilderness Alliance v. Palma*,
707 F.3d 1143 (10th Cir. 2013)..............................................................................37

*Tribal Village of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988)..............................................................................25

*Tri-Valley CAREs v. U.S. Department of Energy*,
671 F.3d 1113 (9th Cir. 2012)..............................................................................36

*Turtle Island Restoration Network v. U.S. Department of Commerce*,
438 F.3d 937 (9th Cir. 2006) ..............................................................................23

*United States v. 162.20 Acres of Land*,
733 F.2d 377 (5th Cir. 1984) ..............................................................................32

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ..............................................................................5

*Wilderness Watch v. U.S. Fish & Wildlife Service*,
629 F.3d 1024 (9th Cir. 2010)..............................................................................49

*Wyoming Outdoor Council v. U.S. Forest Service*,
165 F.3d 43 (D.C. Cir. 1999)..............................................................................37

## Statutes and Court Rule

Administrative Procedure Act,
5 U.S.C. §§ 701-06 ........ 20

5 U.S.C. § 704 ........ 37

5 U.S.C. § 706(2) ........ 20

28 U.S.C. § 1291 ........ 2

28 U.S.C. § 1331 ........ 2

National Environmental Policy Act,
42 U.S.C. §§ 4321 et seq. ........ 2

42 U.S.C. § 4332 ........ 5

Naval Petroleum Reserves Production Act,
42 U.S.C. §§ 6501-6508 ........ 3

42 U.S.C. §§ 6502-6503 ........ 3

42 U.S.C. § 6506a(a) ........ 3

42 U.S.C. § 6506a(b) ........ 28

42 U.S.C. § 6506a(k)(2) ........ 5, 29

42 U.S.C. § 6506a(n)(1) ........ 22

Pub. L. No. 94-258, 90 Stat. 303 (1976) ........ 3

Fed. R. App. P. 4(a)(1)(B) ........ 2

## Regulations

40 C.F.R. §§ 1500-1508 ........ 5

40 C.F.R. § 1501.4(b)(1) ........ 6

40 C.F.R. § 1502.9(c) ........ 6, 35

40 C.F.R. § 1502.20 .......... 32, 41

40 C.F.R. § 1508.7 .......... 45

40 C.F.R. § 1508.9 .......... 6

43 C.F.R. § 2361.1 .......... 28

43 C.F.R. Part 3130 .......... 4

43 C.F.R. Part 3150 .......... 5

43 C.F.R. Part 3160 .......... 5

43 C.F.R. § 3131.2 .......... 4, 36

43 C.F.R. § 3131.3 .......... 4, 5

43 C.F.R. § 3131.4-1 .......... 4

43 C.F.R. § 3132.5 .......... 4

43 C.F.R. § 3135.2(a) .......... 5, 28

43 C.F.R. § 3135.3(a) .......... 29

43 C.F.R. § 3136.3 .......... 28

43 C.F.R. § 3162.3-1 .......... 5

43 C.F.R. § 46.120 .......... 6, 30, 32, 33, 35

43 C.F.R. § 46.140 .......... 32

77 Fed. Reg. 76,515 (Dec. 28, 2012) .......... 9, 22

83 Fed. Reg. 58,785 (Nov. 21, 2018) .......... 16

**Other Authorities**

Executive Order 3797-A (Feb. 27, 1923) .......... 3

## INTRODUCTION

The Bureau of Land Management ("BLM") manages the National Petroleum Reserve in Alaska ("Reserve") pursuant to an integrated activity plan that designated certain areas in the Reserve for oil and gas leasing. Before it adopted the plan in 2013, BLM prepared an environmental impact statement pursuant to the National Environmental Policy Act ("NEPA") that analyzed impacts that could result from oil and gas leasing in those areas. BLM has offered oil and gas lease tracts in the Reserve for sale each year pursuant to the plan and, in 2017, held a lease sale that resulted in the issuance of seven leases totaling 79,998 acres. Before it issued those leases, BLM determined that it did not need to supplement its 2012 environmental impact statement because no new information showed that the impacts of leasing would be significantly different from the impacts that it had previously considered.

Plaintiff environmental groups sued BLM. They allege that BLM violated NEPA because it did not prepare a site-specific analysis to address the impacts of the seven leases and because it did not study the new information in either an environmental assessment or an environmental impact statement. The district court granted summary judgment to BLM and dismissed Plaintiffs' claims with prejudice. As set forth herein, BLM sufficiently analyzed the environmental impacts of leasing in its environmental impact statement for the integrated activity plan and reasonably determined that it did not need to supplement its environmental impact statement. Therefore, the judgment of the district court should be affirmed.

## STATEMENT OF JURISDICTION

(a) The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under a federal statute, namely, NEPA, 42 U.S.C. §§ 4321 et seq. 1 Excerpts of Record ("E.R.") 2-13.

(b) The district court's judgment was final because it resolved all claims against all defendants. 1 E.R. 1-13. This Court has jurisdiction under 28 U.S.C. § 1291.

(c) The district court entered judgment on December 7, 2018. 1 E.R. 1. Plaintiffs filed their notice of appeal on January 3, 2019, or 27 days later. 2 E.R. 14-16. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs' challenge to the adequacy of BLM's 2012 environmental impact statement is time-barred; and if such challenge is not time-barred, whether BLM's environmental impact statement for the integrated activity plan sufficiently analyzed the impacts of leasing in the Reserve.

2. Whether this Court should decline to consider Plaintiffs' arguments concerning new information where Plaintiffs expressly disavow any claim that BLM should supplement its analysis; and if this Court considers such arguments, whether BLM reasonably determined that it did not need to supplement its 2012 environmental impact statement prior to offering leases for sale in 2017.

3. If this Court were to hold that BLM violated NEPA, whether this Court should remand to BLM without vacating the leases (or alternatively remand to the district court to determine the appropriate remedy after additional briefing).

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum following this brief.

## STATEMENT OF THE CASE

### A. Oil and gas development in the National Petroleum Reserve in Alaska is a multi-step process.

The National Petroleum Reserve consists of approximately 23 million acres on the North Slope in Alaska. It was established in 1923 as a reserve "for oil and gas only," Executive Order 3797-A (Feb. 27, 1923), and it was managed by the Navy until 1976 when Congress enacted the Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501-6508. *See generally Northern Alaska Environmental Center v. Kempthorne*, 457 F. 3d 969, 973-74 (9th Cir. 2006) ("*NAEC*"). That statute withdrew the Reserve from operation of the mining and mineral leasing laws and placed it under the jurisdiction of the Department of the Interior so that it could be managed "consistent with the total energy needs of the Nation, and for other purposes." Pub. L. No. 94-258, 90 Stat. 303, 303 (1976); 42 U.S.C. §§ 6502-6503. The statute was amended in 1980, for among other purposes, to require Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [Reserve]." *Id.* § 6506a(a).

BLM's oil and gas program in the Reserve is managed through a multi-stage process involving leasing, exploration, and development. This case involves the leasing stage. At that stage, BLM determines which lands to make available for leasing, which lands to defer or make unavailable, and what stipulations and other mitigation to apply to protect resources on the surface. BLM makes these decisions through the development of an "integrated activity plan" that identifies the areas that BLM will make available for oil and gas leasing and the special stipulations (which are designed to minimize environmental impacts) that BLM will apply to oil and gas activities. Once BLM adopts such a plan through a record of decision, it may offer for sale and ultimately issue oil and gas leases in any area in which such leasing has been authorized, following the process outlined in 43 C.F.R. Part 3130.

For each lease sale, BLM publishes in the Federal Register a call for nominations and comments on potential tracts for leasing. *Id.* § 3131.2(a). BLM reviews such nominations for compliance with the plan and makes final tract selections. *Id.* § 3131.2(b). The special stipulations that are adopted in the plan are applied to each lease tract to be offered in the sale. *Id.* § 3131.3. BLM then offers the selected lease tracts for bidding, which it does through a notice of sale published in the Federal Register and an accompanying detailed statement of sale. *Id.* § 3131.4-1. If bids are made and accepted, BLM may issue the leases. *Id.* § 3132.5(h).

The lease sale stage is just the first step toward development in the Reserve. Leases do not authorize any on-the-ground activities. Before any lessee may even

explore for oil and gas (or otherwise conduct any ground-disturbing activities), it must obtain authorization under procedures set forth in 43 C.F.R. Part 3150 (governing geophysical surveys) and 43 C.F.R. Part 3160 (governing drilling operations). If a lessee discovers oil or gas, it may seek approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations. *Id.* § 3162.3-1. BLM may require additional project-specific stipulations to further protect surface resources. *Id.* § 3131.3. Even after BLM authorizes ground-disturbing activities, it may suspend operations if suspension "is in the interest of conservation of natural resources" or "mitigates reasonably foreseeable and significantly adverse effects on surface resources." *Id.* § 3135.2(a)(1), (3); 42 U.S.C. § 6506a(k)(2). Besides BLM, other federal and state agencies require lessees to obtain permits before conducting ground-disturbing activities. 4 S.E.R. 1138-41.

BLM must comply with NEPA at the leasing, exploration, and development stages. NEPA is a procedural statute that serves to inform agency decision makers of the environmental impacts of proposed actions and ensures that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). NEPA accordingly requires federal agencies to consider the environmental consequences of proposed major federal actions "significantly affecting the quality of the human environment" in a document referred to as an "environmental impact statement" or "EIS." *See* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1500-1508; *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). An agency may prepare

a shorter document referred to as an "environmental assessment" in order to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.4(b)(1), 1508.9. An agency must supplement an EIS if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1)(ii). BLM may prepare a "determination of NEPA adequacy" to decide whether it may rely upon a previously prepared EIS or must prepare a supplemental EIS based on new information. *See* 43 C.F.R. § 46.120(c).

Between 1980 and 2012, BLM prepared multiple integrated activity plans for different portions of the Reserve and issued 556 oil and gas leases encompassing some 6 million acres. 1 Supplemental Excerpts of Record ("S.E.R") 209-10. By the end of 2012, more than half of the previously issued leases had expired or were relinquished. 2 S.E.R. 452. Between 2000 and 2012, industry drilled 29 exploration wells on 28 federal leases in the Reserve. 1 S.E.R. 210. No oil development occurred in the Reserve before 2014, when construction began on a satellite well pad, which is connected by road and pipeline to a central processing facility (the Alpine facility) that is located on State-owned lands just outside the eastern boundary of the Reserve. *Id.*

### B. BLM adopted a holistic approach to managing oil and gas activities in the National Petroleum Reserve and comprehensively analyzed the impacts of such activities.

In 2010, BLM decided to approach oil and gas activities in the Reserve more holistically and initiated the development of a single integrated activity plan to guide its oil and gas program for the entire Reserve. 1 S.E.R. 25. The purpose of developing such

a plan was to make decisions concerning "what lands should be made available for oil and gas leasing and with what protections for surface resources and uses." 1 S.E.R. 26. Making such decisions holistically (rather than on an ad hoc basis, as had been done in the past) would "provide greater certainty and opportunity to industry while better protecting the environment, public use of the land, and public health." *Id.*

In a robust and collaborative two-year planning process, 4 S.E.R. 982-85, BLM developed a combined integrated activity plan and environmental impact statement ("IAP/EIS") that analyzed five alternatives (A, B-1, B-2, C, and D) for managing the Reserve, 1 S.E.R. 27-28. These alternatives differed in terms of the amount and location of the land that would be made available for oil and gas leasing. *See* 1 S.E.R. 28, 49-55, 76-145; 4 S.E.R. 1162-67. The alternatives also varied with respect to the size of areas that would be protected as "special areas" under 42 U.S.C. § 6504(a), 1 S.E.R. 62, and with respect to the stipulations that would apply to leased parcels, 1 S.E.R. 76-145, including numerous site-specific stipulations known as K-stipulations, 1 S.E.R. 118-143.

Alternative B-2, which is the alternative that BLM ultimately selected, balanced oil and gas leasing and development with the protection of surface resources and subsistence uses. Alternative B-2 made approximately 52% of the Reserve (or 11.8 million acres) available for leasing, and it closed to leasing the remaining approximately 11 million acres of the Reserve, including 3.1 million acres in the Teshekpuk Lake Special Area in the northeastern portion of the Reserve and 7.3 million acres in the

southwestern portion of the Reserve. 1 S.E.R. 54-59; 4 S.E.R. 1166. The alternative enlarged two existing special areas, established an entirely new special area, and restricted new non-subsistence infrastructure in large portions of the special areas. 1 S.E.R. 56-58. Alternative B-2 also required oil and gas activities to comply with numerous stipulations and best management practices. 1 S.E.R. 76-145; 4 S.E.R. 1167. These allocations are shown as follows:




4 S.E.R. 1166.

BLM considered and analyzed the potential environmental impacts of each alternative—including reasonably foreseeable ground-disturbing activities that could ultimately result from leasing—in the lengthy 2,600-page IAP/EIS, which it issued in December 2012. 1 S.E.R. 22-292; 2 S.E.R. 293-584; 3 S.E.R. 585-876; 4 S.E.R. 877-

1168; 77 Fed. Reg. 76,515 (Dec. 28, 2012). The IAP/EIS approached this analysis by estimating the levels of petroleum-related activities and associated surface disturbances for each alternative based on what BLM would expect to see as a result of a typical oil and gas project. 2 S.E.R. 451. More precise analysis of site-specific impacts was not possible at this stage because the precise "timing and location of future commercial-sized discoveries cannot be accurately predicted until exploration drilling occurs." *Id.*

The IAP/EIS described the phases of a typical oil and gas project, 2 S.E.R. 452-54, and the likely environmental impacts at each phase. Starting with exploration, the IAP/EIS explained that seismic surveys (which require a separate permit from BLM) are used to create images of the subsurface to help identify the location of oil and gas resources. The IAP/EIS explained how such surveys are conducted and the type of equipment and infrastructure involved therein. 2 S.E.R. 455-64. If surveys reveal the presence of resources, a lessee may seek approval to drill an exploration well, which can confirm the presence of oil or gas. The IAP/EIS described how exploration wells are drilled, 2 S.E.R. 463, and the likely impacts of such drilling, 2 S.E.R. 465. If exploration wells result in the discovery of an oil or gas field, then a lessee would delineate the field by drilling additional wells (typically five per discovery). 2 S.E.R. 464-66. After delineation would come production operations, which use significant amounts of water and typically require construction of a central processing facility, multiple production pads, an airstrip, staging areas, camp facilities, a storage yard, various pipelines, and associated roads. 2 S.E.R. 466-83. Oil and gas must be transported via pipelines or

roads, each of which would result in various impacts. 2 S.E.R. 483-90. An oil and gas project ends with "abandonment" of a field, which includes plugging all wells, removing all equipment, restoring the site, and conducting final environmental studies. 2 S.E.R. 482-83.

To assess the extent of potential development in the Reserve without underestimating impacts, BLM made "optimistic" assumptions about future oil and gas activity based on the agency's knowledge of the largely undiscovered petroleum resources in the area, current industry practice, and an economic assessment prepared by the U.S. Geological Survey ("USGS") in 2011. 2 S.E.R. 490-95, 502-04, 524-38; 4 S.E.R. 1142-61. BLM assumed that every tract designated as available for leasing would in fact be leased (even though only a small percentage of tracts have in fact been leased), 1 S.E.R. 43, and that economic conditions would support aggressive development, 2 S.E.R. 490-507. Using these assumptions, BLM described the amount of economically recoverable oil that it estimated for each alternative. 2 S.E.R. 513-24.

BLM also exhaustively described the affected environment and analyzed the potential environmental effects of each alternative on the following resources: air quality and climate, paleontological resources, soil resources, surface and groundwater resources and water quality, vegetation, wetlands and floodplains, birds, terrestrial mammals, marine mammals, special status species, cultural resources, subsistence, sociocultural systems, environmental justice, recreation resources, wild and scenic rivers, wilderness characteristics, visual resources, economy, and public health. *See, e.g.,*

1 S.E.R. 146-72 (Table 2-4 summarizing and comparing impacts from each alternative); 1 S.E.R. 173-292; 2 S.E.R. 293-584; 3 S.E.R. 585-665. For Alternative B-2, BLM described potential impacts that would result from an estimated construction of 20 exploratory oil wells, 56 exploratory gas wells, 8 central processing units, 14 production pads, 566 miles of gravel road, 29 runways, and 59,342 miles of ice roads, among other things. 2 S.E.R. 520-23, 546-84. BLM further described how lease stipulations and best management practices would mitigate adverse impacts to the affected resources. *See, e.g.,* 2 S.E.R. 583-84; 3 S.E.R. 585, 592-93. The IAP/EIS also included a 300-page analysis of cumulative impacts of leasing that spanned from the year 1900 through 2100 and included "much of the North Slope," including "contiguous State and Native lands to the east" of the Reserve. 3 S.E.R. 670-876; 4 S.E.R. 877-964; 1 S.E.R. 146-72.

BLM issued a record of decision in February 2013 that adopted Alternative B-2 with only minor modifications that are not relevant here. 5 S.E.R 1169-1282; 5 S.E.R. 1271-73 (listing modifications). The decision made 11.8 million acres available for oil and gas leasing and designated the remaining areas as unavailable for leasing, as described above (pp. 7-8). 5 S.E.R. 1174, 1178-80, 1191, 1280. The decision required new leases to comply with various protective measures and explained that surface-disturbing activities would require additional authorization. 5 S.E.R. 1174, 1178-81, 1219.

### C. BLM has conducted multiple lease sales since 2013, including the 2017 lease sale at issue here.

BLM held annual lease sales in the Reserve from 2013 to 2016 to carry out the record of decision. 5 S.E.R. 1302, 1307, 1355, 1362. For each lease sale after the 2013 sale (which was held the same year that the record of decision was issued), BLM issued a "determination of NEPA adequacy," which found (1) that all of the impacts likely to be expected from the annual lease sales had been encompassed within the detailed analysis of the IAP/EIS, and (2) that no new information showed that the issuance of leases would present any significantly different environmental impacts. 5 S.E.R. 1303-06, 1351, 1356-61.[1]

In August 2017, BLM published in the Federal Register a Call for Nominations and Comments asking for public input on its annual lease sale that would be held later that year. 2 E.R. 95. BLM received a variety of comments. *See, e.g.,* 5 S.E.R. 1283-84; 2 E.R. 82-93. As it had done for prior sales, BLM prepared a Determination of NEPA Adequacy in September 2017, which explained that the lease tracts proposed for the 2017 sale were within the area authorized by 2013 record of decision and that BLM did not need to supplement its IAP/EIS. 2 E.R. 78-81.

BLM held the lease sale on December 6, 2017. 2 E.R. 64. Only one company (ConocoPhillips) participated in the bidding, and it bid on only seven of the 900 tracts

[1] The 2016 lease sale is at issue (along with the 2017 lease sale) in *Natural Resources Defense Council v. Bernhardt*, Ninth Circuit No. 19-35006.

(equaling 79,998 acres out of 10.3 million acres). *Id.* The bids that BLM received are shown in red in the following map, along with parcels with current leases (in purple) and areas that are unavailable for leasing (in light blue):




5 S.E.R. 1299. BLM provided ConocoPhillips with notice that it found the bids acceptable, along with lease forms that, when completed, constituted a formal "offer to lease all or any of the lands" described in the lease forms. 2 E.R. 61. However, BLM still retained authority to reject any lease offer that it received. 5 S.E.R. 1372-74.

Prior to making a decision to issue the leases, BLM issued a Revised Determination of NEPA Adequacy that considered whether certain new information,

including information that it received after holding the December 6, 2017 sale, required supplementation of the IAP/EIS. 2 E.R. 52-60. The first of this information was an updated assessment—issued by USGS on December 22, 2017—of the amount of "mean undiscovered, technically recoverable oil resources" in and near the Reserve. 2 E.R. 65-68; 2 E.R. 54; 2 S.E.R. 500-03. The IAP/EIS had been based on a 2010 USGS technological assessment that estimated 1.5 billion barrels of *technically recoverable* oil in the study area and on a 2011 USGS economic assessment that estimated 604 million barrels of *economically recoverable* oil in the Reserve. 2 E.R. 54-55; 2 S.E.R. 503-07. The amount of economically recoverable oil can differ substantially from the amount of technically recoverable oil due to the high cost of exploration and development and comparatively low market prices. 2 E.R. 55.

The 2017 USGS technological assessment increased its estimate of *technically recoverable oil* to 8.7 billion barrels. 2 E.R. 66. But BLM explained that this increased estimate did not necessarily require a revision to its estimate of economically recoverable oil: comparing those two types of estimates "is much like comparing apples to oranges, and is therefore of little if any utility" in assessing how much oil might actually be developed. *Id.* BLM also noted that the 2017 USGS assessment involved an area that only partially overlaps with the Reserve, presenting "a second type of apples to oranges comparison" that was of little utility to BLM in assessing how much oil would likely be developed as a result of leasing in the Reserve. *Id.*

Moreover, BLM explained that only one of the four discoveries identified in the 2017 USGS assessment (the Willow discovery) is actually located in the Reserve. 2 E.R. 66. The IAP/EIS fully accounted for that discovery as a part of anticipated development in an area known as the Greater Mooses Tooth unit, which BLM analyzed in the IAP/EIS. 2 E.R. 56. The three other discoveries were not likely to result in any wells in the Reserve, and any potential cumulative impacts resulting from the development of those discoveries were accounted for in the cumulative impacts analysis in the IAP/EIS. 2 E.R. 56-57. BLM accordingly concluded that neither the increased estimate of technically recoverable oil nor the four new discoveries would appreciably affect the analysis in the IAP/EIS, "which already erred on the conservative side and over analyzed likely potential impacts." 2 E.R. 57.

The Revised Determination of NEPA Adequacy next considered whether additional NEPA analysis was necessary to consider the amount of acreage in the Reserve that had been leased since BLM first approved the integrated activity plan in 2013. BLM determined that the IAP/EIS "anticipated and account[ed] for" the current "level of leasing." *Id.*

Finally, the Revised Determination of NEPA Adequacy also considered BLM's conclusions in a separate 2014 supplemental EIS that a site-specific proposal to develop resources in the Greater Mooses Tooth unit could significantly restrict subsistence uses. 2 E.R. 58. These impacts were unique to that project because the proposed ground-disturbing activities would occur in an area of critical importance. *Id.* After issuing the

2014 supplemental EIS, BLM resolved its concerns over subsistence impacts by authorizing only limited development and requiring extensive mitigation measures (including a $7,000,000 payment from the project proponent) that would offset the adverse impacts to subsistence uses. *Id.*; 5 S.E.R. 1311. BLM also committed to developing a Regional Mitigation Strategy that would serve more broadly to "identify priority areas within the Northeastern [Reserve] region for avoidance and future compensatory mitigation actions." 5 S.E.R. 1348. Because BLM's concerns were limited to the unique area at issue there and were resolved by the time the development project was authorized, BLM determined that its site-specific findings in the 2014 supplemental EIS did not suggest that the IAP/EIS had erroneously concluded that leasing would not significantly impact subsistence uses. 2 E.R. 58.

BLM ultimately concluded that nothing in the new information demonstrated a significant difference in the potential impacts that it had described and analyzed in the IAP/EIS. 2 E.R. 60. BLM accordingly signed and issued seven leases on February 22, 2018. 2 E.R. 17-51; 5 S.E.R. 1300-01. BLM is currently preparing a new IAP/EIS that will replace the 2012 IAP/EIS. *See* 83 Fed. Reg. 58,785 (Nov. 21, 2018).

### D. Plaintiffs challenged BLM's decision to issue leases bid upon during the 2017 lease sale.

Before BLM had issued any leases resulting from the 2017 sale, Plaintiffs filed suit to challenge BLM's decision to conduct the lease sale. 2 E.R. 253. Plaintiffs amended their complaint after BLM issued the leases to include a challenge to BLM's

issuance of the leases themselves. 2 E.R. 255. The amended complaint asserts three NEPA claims, all of which reduce to a single argument: that before BLM issued the leases, it should have completed a new NEPA analysis in an environmental assessment or an EIS that considered both the site-specific impacts of issuing the leases and the new information that had become available since 2012. 1 S.E.R. 11-13, ¶¶ 56-71. The lessee, ConocoPhillips Alaska, Inc., intervened as a defendant, and the parties cross-moved for summary judgment. 1 E.R. 254-55.

In December 2018, the district court granted summary judgment for BLM and ConocoPhillips. The court held that BLM was not required to prepare a new NEPA analysis before it conducted the 2017 lease sale because it had prepared the IAP/EIS for that purpose and the IAP/EIS was sufficiently site-specific to satisfy NEPA under this Court's decision in *NAEC*, 457 F.3d at 976. 1 E.R. 7-12. The court also noted that any challenge to the sufficiency of the IAP/EIS would have been time-barred by the 60-day statute of limitations in the Naval Petroleum Reserves Production Act. 1 E.R. 10-11, 11 n.49.

The district court declined to consider Plaintiffs' arguments that BLM should have evaluated new information. Plaintiffs expressly disavowed any claim that BLM should have supplemented the IAP/EIS, and the court held that a supplementation claim was the appropriate way to challenge BLM's alleged failure to account for new information because BLM relied upon the IAP/EIS to satisfy its NEPA obligations for the 2017 sale. 1 E.R. 11-12. The court also held that it would have likely been

unnecessary for BLM to supplement its EIS given its explanation in its Revised Determination of NEPA Adequacy. 1 E.R. 12 n.54.

## SUMMARY OF ARGUMENT

1. Although Plaintiffs' first claim is styled as a challenge to the 2017 lease sale, it in fact challenges the sufficiency of the 2012 IAP/EIS on the basis that it did not include a sufficiently site-specific analysis of leasing in the Reserve. Because that claim was asserted years after the 60-day limitations period in the Naval Petroleum Reserves Production Act, it is time-barred.

Even if the claim were not time-barred, it should be dismissed under this Court's decision in *NAEC*, which affirmed in a similar factual situation the multi-step approach that BLM took to complying with NEPA here. As in *NAEC*, BLM more than met its obligations under NEPA to evaluate, to the extent possible, the site-specific impacts of activities associated with potential leasing, exploration and development of oil and gas resources in the area. BLM prepared the IAP/EIS to satisfy its NEPA obligations for multiple lease sales in the areas that it approved for leasing in its 2013 record of decision. The IAP/EIS therefore evaluated potential environmental impacts that would result if BLM leased those areas, including an exhaustive resource inventory, an identification of likely development scenarios, and a detailed evaluation of how exploration and development under those scenarios could affect each resource. The 2017 leases are located in an area that was authorized for leasing in the 2013 record of decision, and so the impacts that might result from leasing those areas were studied in the IAP/EIS.

NEPA does not require an agency to prepare a new NEPA analysis where it has already evaluated the impacts of an action. Should ConocoPhillips wish to proceed with exploration or development of resources in tracts it acquired leases for in the 2017 sale, it will need to apply to BLM for permits authorizing it to do so. BLM would consider any site-specific impacts of proposed ground-disturbing activities once it can evaluate a concrete proposal, and Plaintiffs would have an opportunity to seek judicial review of BLM's decision at that time. Nothing more is required of BLM in these circumstances.

2. Where an agency has already prepared an EIS to evaluate the impacts of an action (as BLM did here), a claim that BLM must evaluate new information is governed by NEPA's regulations concerning "supplementation." Plaintiffs, however, have disavowed any claims that BLM should supplement the IAP/EIS. Accordingly, this Court may properly join the district court in declining to consider Plaintiffs' arguments concerning new information. Moreover, even if Plaintiffs had asserted a duty to supplement BLM's prior analysis, the Court should reject that claim. Before BLM issued any of the seven leases here, BLM considered the new information that had come to light since the IAP/EIS was issued in 2012. BLM explained in its Revised Determination of NEPA Adequacy that nothing in that new information suggests that the leases will result in environmental impacts that are significantly different from those previously considered in the IAP/EIS. BLM's determination that it did not need to supplement its IAP/EIS was reasonable.

3. Were the Court to conclude that BLM failed to comply with NEPA, it should remand to BLM for further study *without* vacating the leases. Vacating the leases would cause economic loss to the federal and state governments and would serve no environmental purpose where the leases themselves authorize no ground-disturbing activities. Alternatively, the Court should remand the matter to the district court to determine the appropriate remedy because the district court is best situated to evaluate the facts underlying relevant equitable considerations.

The judgment of the district court should be affirmed.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Center for Biological Diversity v. Export-Import Bank of United States*, 894 F.3d 1005, 1010-11 (9th Cir. 2018). BLM's compliance with NEPA is reviewed under the highly deferential standard of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. The APA grants courts authority to "hold unlawful and set aside" final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2). Agency action is arbitrary only if the agency (1) "relied on factors which Congress has not intended it to consider"; (2) "entirely failed to consider an important aspect of the problem"; or (3) offered an explanation that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)

## ARGUMENT

### I. Plaintiffs' claim that BLM failed to comply with NEPA by failing to analyze the impacts of leasing the subject tracts should be rejected.

Plaintiffs argue that BLM should have prepared an environmental assessment or an EIS to analyze the site-specific impacts of leasing before it decided to hold the lease sale and issue the seven leases. This argument rests on the erroneous premise that BLM has never before analyzed the impacts of leasing. In fact, BLM analyzed the impacts of leasing in its IAP/EIS, and BLM properly relied upon that analysis to issue the seven leases. Plaintiffs' claim accordingly amounts to a challenge to the adequacy of the IAP/EIS and, as such, is barred by the statute of limitations in the Naval Petroleum Reserves Protection Act. The claim may be alternatively rejected on the merits. No further NEPA analysis was necessary because the comprehensive IAP/EIS sufficiently analyzed in as much detail as possible the impacts of oil and gas leasing in areas of the Reserve that BLM ultimately approved for leasing in the 2013 record of decision, including the area containing the seven lease tracts at issue in this case. BLM's environmental analysis in the IAP/EIS was thorough, and nothing more was required of BLM (or was even possible for the agency to do) at the leasing stage.

#### A. Plaintiffs' challenge to BLM's environmental impact statement for the integrated activity plan is time-barred.

Plaintiffs argue (at 36-43, 58-65) that BLM violated NEPA because it considered only programmatic level impacts in the IAP/EIS and did not sufficiently address any site-specific impacts that might result from subsequent lease sales, including the 2017

lease sale at issue here. *See also* 1 S.E.R. 8-11, ¶¶ 36-37, 56-60. This claim amounts to a challenge to the sufficiency of the IAP/EIS, which was prepared to analyze the impacts of BLM's decision to lease certain areas of the Reserve. The Naval Petroleum Reserves Production Act of 1976 establishes a 60-day time limit for challenging an EIS concerning oil and gas leasing in the reserve:

> Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the [Reserve] shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.

42 U.S.C. § 6506a(n)(1). The notice of availability for the IAP/EIS, 77 Fed. Reg. 76515, issued on December 28, 2012, and the record of decision issued on February 21, 2013. But Plaintiffs did not bring this action until 2018, or more than *five years later*.

Plaintiffs actively participated in the administrative process for the IAP/EIS, raising the same concern that the analysis was not sufficiently site-specific. *See* 4 S.E.R. 993-97. Plaintiffs knew about the decisions that BLM made at that time regarding which areas would be available for leasing. They should have brought this suit within the 60-day limitations period. They instead waited to challenge the adequacy of the IAP/EIS until the 2017 lease sale. Their claim is now time-barred.

Plaintiffs may respond by stating that they are not arguing that the IAP/EIS was inadequate and instead are arguing that BLM should have prepared a new environmental assessment or EIS before it decided to hold the 2017 lease sale. But a

plaintiff cannot "conceal the true nature of a complaint through artful pleading." *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 769 (9th Cir. 1986); *see also Turtle Island Restoration Network v. U.S. Department of Commerce*, 438 F.3d 937, 945 (9th Cir. 2006) (holding that a statute of limitations cannot be avoided "through manipulation of form"). As discussed further below (pp. 23-27), the IAP/EIS was developed to serve as the basis for BLM's compliance with NEPA for subsequent lease sales in the Reserve. 1 S.E.R. 43. That NEPA document analyzed the impacts of leasing with as much specificity as is required and possible at the lease sale stage. *Id.* BLM relied on the analysis contained in the IAP/EIS before issuing the leases. 2 E.R. 52-60. Any argument that BLM should have analyzed the impacts of leasing with more site specificity necessarily amounts to a challenge to the sufficiency of the IAP/EIS, but such a challenge is now time-barred.[2]

### B. In any event, the level of site-specific analysis contained in the environmental impact statement was reasonable.

When an agency makes an "irretrievable commitment of resources"—as BLM did here when it issued the leases—an agency must prepare a sufficiently site-specific assessment of environmental impacts of its action. *See Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002). BLM agrees that it must analyze the impacts of leasing, and BLM did so in the

[2] This limitations issue is also before the Court in *Natural Resources Defense Council v. Bernhardt*, Ninth Circuit No. 19-35006.

IAP/EIS. The disagreement between the parties is over the level of site-specific detail that is required (or even possible) at the leasing stage.

Plaintiffs' claim that more detailed site-specific analysis was required at the leasing stage is contrary to the settled law of this Court. In *NAEC*, which involved a very similar EIS for an integrated activity plan covering the northwest portion of the Reserve, this Court held that BLM did not need to conduct a parcel-by-parcel analysis of potential exploration and development on any particular lease tracts when it decided which areas to lease. Although the Court agreed with the plaintiffs that BLM's issuance of leases constituted an irretrievable commitment of resources that required BLM to assess environmental impacts, it held that the level of site-specific analysis requested by the plaintiffs is in fact impossible at the leasing stage. *Id.* at 976-77. There is "inherent" uncertainty in an oil and gas development program being implemented in the "separate stages of leasing, exploration and development" that prevents BLM from being able to accurately gauge the adverse effects of future development. *Id.* BLM makes decisions concerning which areas it will lease at the "earliest stage" of a development program, and such decisions involve large areas of land. *Id.* at 977. At this stage, there is "no way of knowing what plans for development, if any, may eventually materialize," *id.*, or "what, if any, areas subsequent exploration would find most suitable for drilling," *id.* at 974. Accordingly, it was reasonable for BLM to analyze the potential environmental impacts of leasing by analyzing impacts resulting from two different hypothetical development scenarios instead of doing "an analysis of any specific parcels." *Id.* at 974.

In so holding, this Court joined the D.C. Circuit in concluding that for oil and gas development programs, BLM "cannot be expected or required to wait until the totality of environmental effects is known." *Id.* at 977 (quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 600 (1980)). BLM's "good faith" compliance with NEPA in issuing the EIS was sufficient. *Id.* The Court also noted that any later plans for exploration or development would be subject to additional review and analysis. *Id.*

*NAEC* controls the disposition of Plaintiffs' claims in this suit. In deciding which areas of the Reserve to make available for leasing, BLM was obliged under NEPA to evaluate, to the extent possible, the site-specific impacts of activities associated with potential leasing, exploration and development of those resources. As this Court has recognized, however, the practical reality of oil and gas development limits the specificity of the analysis that is possible at the leasing stage because the precise location of commercially valuable deposits (and where ground-disturbing activities might subsequently occur) is unknown. *NAEC*, 457 F. 3d at 976; *see also Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988) ("We are the least troubled by what may seem to be incomplete or speculative data at the lease sale stage. Prior to exploration, it is difficult to make so much as an educated guess as to the volume of oil likely to be produced or the probable location of oil wells.").

In the face of that uncertainty, BLM reasonably provided the most detailed and site-specific analysis possible for purposes of making leasing decisions. As explained above (pp. 6-11), the 2,600-page IAP/EIS comprehensively analyzed the potential

environmental impacts of issuing oil and gas leases in the Reserve, including for the tracts that BLM leased as a result of the 2017 lease sale. The IAP/EIS described in detail the process and infrastructure necessary for oil and gas development and included a reasonable projection of the likely development scenarios in the Reserve. It exhaustively inventoried the resources that might be affected as a result of leasing, and it evaluated potential impacts of leasing on those resources and other potential uses of the Reserve. It described how stipulations and best management practices would mitigate impacts to the affected resources. The IAP/EIS included a lengthy analysis of the potential cumulative impacts that could result from leasing in the Reserve in combination with potential oil and gas activity outside the Reserve. This detailed evaluation enabled BLM to make meaningful conclusions about the potential environmental impacts from leasing through both exploration and development.

BLM explained to the public that it planned to rely upon the analysis contained in the IAP/EIS to satisfy its NEPA obligations with respect to multiple lease sales that could be authorized by the 2013 record of decision, even if those sales occurred in phases across a large area of the Reserve. 1 S.E.R. 43. BLM acknowledged, however, that it would need to determine whether the IAP/EIS were still adequate before it conducted any lease sales in the future. If the IAP/EIS were adequate, BLM would prepare only "an administrative determination of NEPA adequacy" instead of another environmental assessment or EIS. *Id.* By contrast, future BLM decisions would be necessary at a point when much more site-specific information was available. For

example, BLM would need to analyze proposed exploratory drilling plans or the construction of infrastructure at specific places within the large leases that it had granted. *See supra* pp. 4-5, 9. At that time, BLM could take advantage of "specific and detailed information about where and what kind of activity is proposed" and engage in further NEPA analysis to consider "site-specific terms and conditions." 1 S.E.R. 43-44.

In light of the foregoing, BLM has plainly taken the requisite hard look at the environmental impacts in as detailed and as site-specific an analysis as was practical at the leasing stage. *NAEC*, 457 F. 3d at 976-77.

### C. This Court should reject Plaintiffs' hodgepodge of arguments to the contrary.

None of Plaintiffs' arguments compels a contrary conclusion. Plaintiffs attempt (at 61-65) to limit the application of *NAEC* to this case by arguing that this Court simply held that BLM was not required to review the potential effects of leasing each specific parcel; not that BLM was exempt from analyzing site-specific impacts of leasing at the lease sale stage. But as explained above (pp. 6-11), the IAP/EIS analyzed *all* of the effects of leasing except those effects that depend upon knowledge of specific development plans on specific parcels. *NAEC* therefore applies with full force here, because it was not possible at the leasing stage for BLM to analyze site-specific impacts with any greater specificity than it has already done. The level of site-specific analysis requested by Plaintiffs here will be conducted if and when BLM faces the question whether to authorize any ground-disturbing exploration and development activities on

the leases. *See* 5 S.E.R. 1376 ("All surface disturbing activities such as exploratory drilling, road/pipeline construction, seismic acquisition, and overland moves require additional authorization(s) issued subsequent to leasing."); 1 S.E.R. 43 (noting that future actions on leases requiring BLM approval would require "further NEPA analysis based on specific and detailed information about where and what kind of activity is proposed"). Only at that stage will BLM be able to analyze a concrete proposal from the lessee. *NAEC*, 457 F.3d at 976-77 (explaining that such site-specific "analysis must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable").

Plaintiffs seem to suggest (at 60-61, 61 n.230, 63-65) that the present case is distinguishable from *NAEC* because BLM lacks discretion to limit the lessee's future ground-disturbing activities. There is no support for this suggestion. Applicable regulations grant BLM authority to (1) "provide maximum protection" to special resource areas; 43 C.F.R. § 2361.1; (2) "limit, restrict, or prohibit use of and access to lands within the Reserve;" *id.*; (3) suspend operations/production "in the interest of conservation of natural resources" or to "mitigate[] reasonable foreseeably and significantly adverse effects on surface resources;" *id.*, § 3135.2(a)(1), (3); and (4) even administratively cancel nonproducing leases for failure to comply with legal requirements. *id.*, § 3136.3. These regulations apply the Naval Petroleum Reserves Production Act's express authorizations to impose conditions ensuring the protection of surface resources in the Reserve. *See* 42 U.S.C. § 6506a(b) ("Activities undertaken

pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]."); *id.* § 6506a(k)(2) (Secretary may suspend operations and production on any lease or unit, including "in the interest of conservation").

The leases issued by BLM incorporate these requirements and authorize BLM to impose a variety of restrictions on surface uses to protect the Reserve. *See* 2 E.R. 17-19, 22-24, 27-29, 32-34, 37-39, 42-44, 47-49 (explaining that the rights granted in the lease "are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provision of this lease). Plaintiffs fail to show that the leases here are any different from the leases at issue in *NAEC*, or that BLM lacks authority to impose restrictions designed to protect surface resources.

Plaintiffs also suggest (at 36-43, 62-63) that BLM may not rely upon the IAP/EIS because it contained a programmatic analysis that did not fully analyze the impacts of leasing in that document. This contention is flatly contradicted by both the IAP/EIS itself and by the record of decision. The IAP/EIS explained that the analysis contained therein serves as the NEPA analysis for subsequent leasing of any areas that were made open for leasing in the record of decision, and that the record of decision made 11.8

million acres available for oil and gas leasing. *See supra* pp. 6-12. BLM relied on that analysis for each of its annual lease sales from 2013 through 2017.

Plaintiffs are correct in observing (at 39) that the IAP/EIS did not make the specific decision regarding which tracts to offer in the 2017 sale. But the temporal separation between BLM's earlier decision and its later decision makes no difference where BLM's selection of tracts in 2017 simply implemented its 2013 decision to make this area available for leasing. More broadly, nothing precludes BLM from preparing a single EIS both for the adoption of an integrated activity plan and for subsequent lease sales implementing that plan. BLM has consistently taken this approach in the Reserve. *NAEC*, 457 F.3d at 973-74. Agencies may prepare a "NEPA analysis at the outset of a long-term project"; once an agency has done so, it "is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program." *Mayo v. Reynolds*, 875 F.3d 11, 22 (D.C. Cir. 2017). Indeed, BLM's NEPA regulations direct the agency to "use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives" where doing so is "feasible" so that the agency can "avoid redundancy and unnecessary paperwork." 43 C.F.R. § 46.120.

Regardless of whether the analysis contained in the IAP/EIS is characterized as programmatic, the comprehensive analysis contained therein would "generally obviate[] the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994); *see also*

*Mayo*, 875 F.3d at 21. Where agencies prepare programmatic EISs, "site-specific impacts need not be fully evaluated until" the agency makes a "critical decision" authorizing development at a particular site. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (*citing Sierra Club v. Hathaway*, 579 F.2d 1162, 1168 (9th Cir. 1978)). BLM's decision to issue the leases here triggers no requirement to further analyze site-specific impacts because, as explained above (pp. 4-5, 23-27), a lease does not authorize any on-the-ground activities. The issuance of the leases simply reflects BLM's "discretionary choices in implementing the program" that it has already analyzed. *Mayo*, 875 F.3d at 21.

Plaintiffs' citations (at 38-39) to *Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002), and to *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998), are inapposite for similar reasons. *Kern* held that BLM could not rely upon a defective programmatic EIS that inadequately analyzed cumulative impacts when BLM issued a subsequent site-specific environmental assessment that it prepared to analyze the impacts of a particular timber sale. 284 F.3d at 1078. *Blue Mountains* held that the U.S. Forest Service could not rely upon a programmatic EIS that it had prepared for the management plan for the entire forest to approve a site-specific timber sale where the Service's site-specific analysis was inadequate and where the EIS included no such discussion of impacts. 161 F.3d at 1214. In contrast to those two cases, BLM has made no decisions here that authorize site-specific impacts, and so it is "not required at the lease sale stage to analyze potential environmental effects on a site-specific level of detail." *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493-94 (9th Cir. 2014).

Plaintiffs further contend (at 40-43), incorrectly, that BLM "tiered" to the IAP/EIS when it issued its Revised Determination of NEPA Adequacy, and that BLM should have prepared an environmental assessment under NEPA's tiering regulations. The regulations encourage an agency to tier a NEPA document to a previously issued broader NEPA document "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision." 40 C.F.R. § 1502.20; 43 C.F.R. § 46.140. These regulations do not apply where, as here, where an agency is merely determining whether it needs to supplement an existing NEPA analysis. Consistent with this precept, BLM did not purport to tier either its Original or Revised Determinations of NEPA Adequacy to the IAP/EIS. Rather, the IAP/EIS analyzed the environmental impacts of leasing the tracts that were leased as a result of the 2017 sale, and the two Determinations served as an administrative determination under 43 C.F.R. § 46.120(c) that BLM did not need to supplement the IAP/EIS's analysis.[3]

This Court has affirmed the use of these types of administrative determinations "for the purpose of determining whether new information or changed circumstances

---

[3] The regulations are also inapplicable because they do not require agencies to re-analyze the effects of specific projects that are fully addressed in a prior EIS. *See United States v. 162.20 Acres of Land*, 733 F.2d 377, 381 (5th Cir. 1984); *Scientists Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1093 (D.C. Cir. 1983) (explaining that subsequent, site-specific analysis is needed only to the extent that subsequent actions will produce "localized environmental impacts that were not fully evaluated in the program statement"); *NRDC v. U.S. NRC*, 606 F.2d 1261, 1270-72 (D.C. Cir. 1979) (holding that an agency need not consider impacts of using a certain alternative where such analysis was already included in the programmatic analysis).

require the preparation of a supplemental" environmental assessment or EIS under NEPA. *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (citing cases); *see also Price Road Neighborhood Ass'n v. U.S. DOT*, 113 F.3d 1505, 1510 (9th Cir. 1997) (affirming the use of an administrative determination that no supplemental EIS is required); *North Idaho Community Action Network v. U.S. DOT*, 545 F.3d 1147, 1154-55 (9th Cir. 2008) (same); 43 C.F.R. § 46.120(c). If the Revised Determination of NEPA Adequacy had found that the IAP/EIS did not adequately analyze the impacts of the lease sale, then BLM would have produced a new NEPA document (which it could have tiered to the IAP/EIS) that analyzed those new impacts. But that was not the case.

NEPA exists to ensure that agency decision-making is based on "detailed information concerning significant environmental impacts" and that information will be made available to others who may play a role in the decision-making process. *Robertson*, 490 U.S. at 349-50. Those purposes were served by the IAP/EIS. *See supra* pp. 6-11, 23-27. There is no practical or legal reason to require BLM to prepare a NEPA document (in addition to Determination of NEPA Adequacy) merely to explain that the analysis in the IAP/EIS was still valid. Such a requirement would elevate form over substance, an action that no "rule of reason" requires. *DOT v. Public Citizen*, 541 U.S. 752, 767 (2004); *cf. Scientists Institute*, 481 F.2d at 1092 (explaining that so long as an environmental analysis of the overall program is prepared, "[q]uestions of format" "properly reside within the discretion of the issuing agency"); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854-55 (9th Cir. 2013) (affirming an agency's record

of decision that explained its decision not to supplement, even though the agency typically prepared an administrative determination documenting its reasoning).

In sum, BLM complied with NEPA by fully analyzing in the IAP/EIS the environmental impacts of leasing in the Reserve, including the seven tracts at issue.

## II. BLM reasonably determined that it did not need to supplement its environmental impact statement for the integrated activity plan.

Plaintiffs wish that BLM had prepared a new environmental analysis to consider recent information before it issued the leases. Because BLM analyzed the impacts of leasing in the IAP/EIS, however, it did not need to prepare a new analysis. It simply needed to determine whether the new information identified by Plaintiffs showed that leasing would result in significant impacts that were not previously considered, such that BLM should "supplement" its IAP/EIS. BLM did just that in its Revised Determination of NEPA Adequacy, determining that it did *not* need to supplement its IAP/EIS. Plaintiffs disavowed any claim that BLM should "supplement" the IAP/EIS, and the district court accordingly declined to address that issue. This Court may also decline to consider the issue. Alternatively, the Court should affirm as reasonable BLM's decision not to supplement the IAP/EIS because nothing shows that leasing will result in any significant impacts not considered in that document.

Plaintiffs contend (at 35-36) that that it would have been inappropriate for them to bring a supplementation claim under *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69-70 (2004) ("*SUWA*"). That case, which involved a challenge to a resource

management plan issued by BLM under the Federal Land Policy and Management Act, is of limited application here. *SUWA* held that there is no ongoing federal action once BLM adopts a resource management plan. Here, by contrast, BLM's record of decision—which was issued under the under the Naval Petroleum Reserves Production Act—authorized BLM to lease tracts in the Reserve in multiple lease sales that could span several years. That action is still ongoing, as is evidenced by BLM's 2017 lease sale. To challenge any alleged failure on the part of BLM to account for new information, Plaintiffs would have had to argue that the new information was "significant" and required supplemental NEPA analysis under 40 C.F.R. § 1502.9(c)(1)(ii) and 43 C.F.R. § 46.120(c). Plaintiffs insist (at 35) that they are *not* making any such claim. *See also* 1 S.E.R. 15 ("This is not an SEIS claim."). The district court accordingly declined to consider their arguments concerning new information, and this Court likewise may decline to do so. *See Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (explaining that courts should not "manufacture arguments" for a litigant).

Alternatively, the Court may reject the challenge on the merits. An agency "need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989). Supplementation is required only when new information shows that "the remaining [federal] action will affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered." *Id.* at 373-74 (internal quotation marks omitted); 40 C.F.R. § 1502.9(c)(1)(i)-(ii). BLM considered in the

Revised Determination of NEPA Adequacy the information identified by Plaintiffs and determined that the information did not warrant supplementation of the IAP/EIS. This determination "implicates substantial agency expertise" and is owed deference. *Tri-Valley CAREs v. U.S. Department of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012).

### A. BLM properly considered the new information in its Revised Determination of NEPA Adequacy.

Plaintiffs contend (at 45-46) that the Court should refuse to consider the Revised Determination of NEPA Adequacy because, in their view, BLM violated 43 C.F.R. § 3131.2(b) by issuing the document after it held the lease sale (but before it issued the leases). That regulation provides that, as part of "[t]entative tract selection" and "after completion of the required environmental analysis (see 40 CFR 1500-1508), [BLM] shall select tracts to be offered for sale." Here, the "required environmental analysis" to which Section 3131.2(b) refers is the IAP/EIS that BLM completed several years before tentatively selecting the tracts it would offer to sell in 2017. As discussed above, the Revised Determination was simply BLM's determination that the IAP/EIS was still adequate under NEPA, i.e., that it continued to adequately serve as the "required environmental analysis." Plaintiffs' argument that this was improper, and Plaintiffs' implication that the regulations require BLM to conduct a new environmental analysis prior to selecting tracts for sale, have no basis in the plain language of the regulations. The regulations do not prohibit BLM from relying on a comprehensive environmental analysis that it has previously conducted. This Court should reject Plaintiffs' argument.

Moreover, it is BLM's issuance of the leases—and not BLM's decision to hold the lease sale—that provides the appropriate focal point for judicial review in this case. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency action is "final" when (1) the agency's decision-making process is consummated and (2) when rights and obligations are fixed. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Laub v. U.S. Department of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003). Conducting the lease sale simply solicited bids from interested parties, and did not give the bidder any rights in the lease itself. *See supra* pp. 4-5. The sale was an intermediate step in a multi-step leasing process that culminated in the issuance of leases. 2 E.R. 72. The leases actually fix the rights and obligations of the lessor (the United States, through BLM) and lessee (ConocoPhillips), and they represent the culmination of BLM's decision-making process concerning whether to lease public lands offered in the 2017 sale. *See Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1159 (10th Cir. 2013) ("Federal courts have repeatedly considered the act of issuing a lease to be final agency action which may be challenged in court."); *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 50 (D.C. Cir. 1999) (Before any leases are "issued by the BLM," judicial review is "premature.").

Before it actually issued the leases (and while retaining discretion to not issue them), BLM considered in the Revised Determination of NEPA Adequacy the information identified by Plaintiffs. *See, e.g.,* 1 E.R. 52, 60. The Revised Determination is accordingly part of the administrative record that this Court may review when

assessing the reasonableness of BLM's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (Judicial review of agency action is "review is to be based on the full administrative record that was before the [decisionmaker] at the time he made his decision.").

**B. The environmental impact statement did not underestimate potential impacts of new discoveries.**

Plaintiffs argue (at 47-49) that increased estimates of technically recoverable oil documented in the 2017 USGS assessment indicated that there might be greater potential for oil and gas development, and that BLM consequently underestimated the environmental impacts of leasing. To the contrary, BLM reasonably determined that the revised estimates did not suggest significantly different environmental impacts that the agency had not previously considered in the IAP/EIS. *See* supra pp. 14-15.

Specifically, BLM explained in the IAP/EIS that the amount of oil that might be developed depends not only on how much oil can be recovered as a technical matter, but also on other factors such as the timing of when oil is discovered, each companies' assessment of future prices of oil, and "other competitive calculations that play into corporate investment decisions." 2 S.E.R. 491. BLM accordingly based its analysis of impacts in the IAP/EIS on aggressive assumptions. *Id.*; 2 S.E.R. 491-93; 2 S.E.R. 524-38 (describing assumptions); 4 S.E.R. 1142-61 (same). BLM assumed it would hold multiple lease sales and that industry would aggressively lease and explore the tracts offered for sale, resulting in a large number of exploration wells. 2 S.E.R. 491. BLM

assumed that undiscovered oil would be found. *Id.* BLM estimated the amount of infrastructure that would be needed at "upper, but reasonable, limits." *Id.* For example, BLM assumed that a satellite production pad at an oil field would require longer than average 10- to 15-mile gravel roads and pipelines of equal length. *Id.* These and other assumptions assured that BLM's analysis of environmental impacts would not "understate potential impacts." *Id.*; *see also supra* pp. 9-10.

Of particular note is BLM's assumption that the price of oil would be at the "upper level of government projections," 2 S.E.R. 491, provided by USGS in a 2012 assessment of the amount of economically recoverable oil, 2 S.E.R. 502-04. The figures in the 2012 assessment relied upon estimated amounts of technically recoverable oil documented in a 2011 USGS assessment. BLM explained that although there were "good arguments to be made" that it should not adopt the highest prices, it did so "because it did not want to underestimate the potential development that may occur as an indirect result of its decision to offer oil and gas leases." 2 S.E.R. 503. Using high estimates would account "for the long-term ramifications of the decisions that could result from this plan," which "could be the basis for leasing for many years." *Id.*

Although USGS issued a 2017 assessment that upwardly revised the amount of oil that it had determined in 2010 was technically recoverable, USGS did not issue a new assessment of the amount of economically recoverable oil. 2 E.R. 55. Contrary to Plaintiffs' contentions (at 48-49), there is not a clear relationship between the amount of technically recoverable oil and the amount of economically recoverable oil. 2 E.R. 55.

Indeed, the USGS assessment itself recognizes the fact that various factors may "jeopardize[] the economic viability of oil accumulations." 2 E.R. 66. This is reflected by the fact that, even assuming the highest prices estimated in the 2011 economic assessment, only 67% of the technically recoverable oil would have been economic to produce. 2 S.E.R. 502. The amount of oil that can be produced economically depends on a variety of considerations that are not accounted for in an assessment of how much oil is technically able to be developed.

BLM also explained that the 2017 projections were not directly applicable to the IAP/EIS because the Assessment encompassed a large area of land and offshore waters "that only partially overlap[] with the study area" for the previous USGS assessments upon which BLM relied for the IAP/EIS. *Id.* In particular, the 2017 assessment includes "a large area of State and Native-owned land outside the NPR-A." *Id.* Particularly in light of that fact, it was reasonable for BLM not to use that assessment to estimate the potential for economically feasible production *within* the reserve. Furthermore, BLM had already accounted for the possibility of further exploration outside the reserve in discussing the potential cumulative impacts of its IAP, and those assumptions were consistent with the 2017 assessment. 2 E.R. 57; *see also* 3 S.E.R. 699-711 (discussion in IAP/EIS of reasonably foreseeable development for cumulative impacts).

In light of the fact that BLM used aggressive development assumptions to inform its analysis of impacts in the IAP/EIS and the fact that the 2017 assessment did not provide BLM with a direct comparison, BLM determined that the increased estimate of

technically recoverable oil—without an associated analysis of the amount of economically recoverable oil—was "of little if any utility" in assessing how much oil might actually be developed in the Reserve. 2 E.R. 55. BLM accordingly determined that the new assessment did not present significant new information that warranted supplemental NEPA analysis. This determination was a reasonable exercise of BLM's expertise in oil and gas leasing and is owed deference. *See San Luis Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).

### C. The four discoveries identified in the USGS assessment do not show that there will be greater impacts of development than BLM analyzed.

As with the increased estimates of technically recoverable oil, Plaintiffs contend (at 50-54) that the four new discoveries documented in the 2017 assessment suggest there will be more development and greater impacts than BLM estimated in the IAP/EIS. As noted above (p. 15), BLM considered these discoveries and reasonably concluded they do not suggest the environmental impacts of leasing will be significantly different from what is analyzed in the IAP/EIS.

Only one of the four discoveries—the Willow discovery—is located in the Reserve. 2 E.R. 56. It was estimated to contain 300 million barrels of oil. *Id.* The Willow discovery is located in both the Greater Mooses Tooth Unit and the Bear Tooth Unit. *Id.* The location of these oil fields is shown in the map below, which was included in the IAP/EIS:




4 S.E.R. 1168.

Plaintiffs contend (at 50-51) that BLM was not expecting a large discovery in the Greater Mooses Tooth and Bear Tooth Units, but in fact the Willow discovery validated the BLM's projections of a possible oil reservoir in that area. 2 E.R. 56; 2 S.E.R. 495 (discussing potential and inferred discoveries in the units). Between 1999 and 2012 when the IAP/EIS was issued, a total of 15 exploratory wells were drilled in the Greater Mooses Tooth unit, and one exploratory well was drilled in the Bear Tooth Unit. 3 S.E.R. 540; 1 S.E.R. 209-10. The IAP/EIS anticipated that industry would focus on those areas for future exploration and development and that eventually there would be discoveries of oil and gas resources there. 3 S.E.R. 540-41. The IAP/EIS also anticipated that leasing would cause various environmental impacts, including

construction of drill pads, wells, associated infrastructure, gravel roads, and pipelines. 2 S.E.R. 495-97, 516-21.

Although Plaintiffs assert (at 51-52) that the Willow discovery consists of more oil than BLM anticipated, the IAP/EIS estimated that those two units contained as much as 120 million barrels of economically recoverable oil. 2 S.E.R. 495. BLM determined that the size of the Willow discovery and the resulting oil and gas infrastructure and activity that is likely required to develop it (e.g., a new central processing facility and a small number of satellite drill pads) are very much in line with what BLM anticipated would be necessary to develop such a discovery. 2 E.R. 56; 2 S.E.R. 467 (projecting joint field development—likely to occur in economic zone 110, where Willow is located—as containing two production pads, with one housing a central processing facility).[4] In light of the foregoing, BLM reasonably concluded that the Willow discovery would not cause any impacts significantly different from what it had previously considered. 2 E.R. 56.

BLM also reasonably determined that it did not need to supplement the IAP/EIS to account for the three other discoveries (referred to as the Pikka, Horseshoe, and

[4] To be sure, because the discovery occurred after the IAP/EIS issued, the document did not specifically predict construction of infrastructure at the exact location of the Willow development. Nonetheless, the IAP/EIS certainly contemplated the possible development of new discoveries, particularly in the northeast portion of the Reserve, and it estimated potential surface disturbance in a manner to "make it very unlikely that this IAP/EIS will underestimate impacts." 2 S.E.R. 515-18. Because the lessee must obtain further BLM approval for any ground-disturbing operations, BLM will have another opportunity to analyze any impacts that are unique to that site.

Smith Bay discoveries). The Pikka and Horseshoe discoveries (estimated to contain as much as 1.0 billion technically recoverable barrels of oil) are located outside and to the east of the Reserve in an area between the Colville and Canning Rivers that is referred to as the "Colville-Canning Area." 3 S.E.R. 688; 2 E.R. 56. BLM explained that because of their location, those discoveries would not result in on-the-ground activities in the Reserve. *Id.* The Smith Bay discovery is a large discovery in State waters in the Beaufort Sea adjacent to the Reserve. BLM was always aware that oil existed in that region because a company had previously discovered oil on three federal leases within the Reserve near Smith Bay. 2 E.R. 56; 3 S.E.R. 688; 5 S.E.R. 1194-95, 1197. BLM accounted for the existence of oil resources in State waters, including by analyzing a potential pipeline route from this area through the Reserve. 2 E.R. 56; *see also* 2 S.E.R. 487-88; 3 S.E.R. 803-04. BLM further explained that there would be no new well or production impacts in the Reserve as a result of the Smith Bay discovery because BLM had made all federal parcels adjacent to Smith Bay unavailable for future leasing. 2 E.R. 56; 1 S.E.R. 57-58; 4 S.E.R. 1166; 5 S.E.R. 1192, 1280.[5]

Plaintiffs argue (at 52-54) that BLM should have supplemented its IAP/EIS to address any potential cumulative impacts that might result from these additional

---

[5] BLM noted that the Smith Bay discovery was unsubstantiated because the wells were not "flow-tested," notwithstanding common industry practice to do so, and additional delineation wells had not been drilled. 2 E.R. 56. Moreover, only 30-40% of the oil was anticipated to be technically recoverable due to the characteristics of the oil and the reservoir. *Id.*

discoveries. Cumulative impacts, which an agency must consider under NEPA, are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. BLM acknowledged that the three discoveries had "some potential to cumulatively combine with effects" from leasing and development in the Reserve if the discoveries were "ultimately proved up and developed." 2 E.R. 57. But BLM anticipated the possibility of discoveries near the Reserve and "accounted for their potential cumulative impacts" in the IAP/EIS. *Id.; see also* 3 S.E.R. 671 (describing area used for cumulative impacts analysis); 3 S.E.R. 688-94 (describing oil development through 2012 for Colville-Canning Area and Beaufort Sea State waters); 3 S.E.R. 703-05 (identifying potential development in Beaufort Sea waters); 3 S.E.R. 710-12 (identifying potential conventional and unconventional development in Colville-Canning Area and area east of Reserve); 3 S.E.R. 713-14 (estimating future oil and gas production, and footprint acreage for oil and gas activities on North Slope); 1 S.E.R. 146-72 (tables comparing effects of alternatives, including cumulative impacts). All told, BLM analyzed the potential cumulative impacts of producing approximately 16 *billion* barrels of oil and gas in the area studied between 1977 and 2009 and projected the cumulative impacts of producing 11.24 *billion* barrels of oil between 2012 and 2100. 3 S.E.R. 713.

In light of the foregoing, BLM reasonably concluded that the four new discoveries presented no potential impacts of leasing that were not already analyzed in

the IAP/EIS, which had "already erred on the conservative side and over analyzed likely potential impacts." 2 E.R. 57-58.

### D. The current number of leases does not suggest that there will be more development than BLM anticipated.

Plaintiffs contend (at 54-56) that the number of leases sold in the 2016 lease sale, combined with the fact that almost all of the 2016 leases and all of the 2017 leases were purchased by ConocoPhillips, show that there will be more oil and gas development than BLM anticipated in the IAP/EIS. This argument should be rejected. BLM made aggressive assumptions in the IAP/EIS to avoid underestimating potential impacts. BLM assumed, among other things, that economic conditions (particularly oil and gas prices) would be high enough to support development in northern Alaska; that industry would lease all of the tracts authorized for leasing and aggressively pursue exploration and development in the Reserve; and that several industry groups will independently explore and develop new fields in the NPR-A. *See* 2 S.E.R. 491-93; 2 E.R. 57-58; *see also supra* pp. 10, 38-39. There was actually *more* acreage under lease in the Reserve when the IAP/EIS issued (nearly 1.5 million acres), than there was following the 2016 lease sale, due to the subsequent abandonment of leases. 2 E.R. 57. More than half of the tracts leased in the 2016 lease sale were the same as those that were under lease in 2012 at the time the IAP/EIS was issued. 2 E.R. 57-58. BLM's determination that the IAP/EIS need not be supplemented based on the 2016 lease sale was eminently reasonable.

### E. BLM reasonably determined that it had already studied the likely impact of the leases here on subsistence uses.

Plaintiffs also argue (at 56-58) that BLM should further analyze potential impacts to subsistence uses and needs because it concluded in a supplemental EIS issued in 2014 that a proposal to develop oil and gas in the Greater Mooses Tooth unit (which is not at issue in this suit) could adversely affect subsistence uses. 2 E.R. 58. Although this finding contrasted with BLM's determination in the IAP/EIS that leasing would generally not have such an effect, that contrast does not show that BLM should supplement the IAP/EIS. 2 E.R. 58; 5 S.E.R. 1311-12.

Unlike the leasing decisions at issue in this case, the proposal under BLM's consideration in the 2014 supplemental EIS would result in ground-disturbing activities. In that document, BLM considered whether to authorize a concrete development project that was proposed after the lessee discovered oil and gas resources. 2 E.R. 58. The proposal involved ground-disturbing activities that would occur in a critical area of particular importance for subsistence uses, and BLM ultimately required robust measures to mitigate those impacts. *Id.* Because the proposal was distinct from the leasing decisions at issue here, and because BLM resolved its concerns over those impacts before approving the proposal, BLM acted within its discretion when it determined that it did not need to supplement the IAP/EIS before it issued the leases.

If anything, BLM's approach to the development proposal in the Greater Mooses Tooth unit shows that it is committed to analyzing and mitigating potential impacts at

each stage of its oil and gas leasing program in the Reserve. To the extent that future surface-disturbing exploration and development proposals in the areas leased here might impact subsistence uses in ways that BLM could not anticipate during the leasing process, BLM will similarly be able to analyze such impacts at that time and require appropriate mitigation. BLM will also be able to incorporate into later decisions any findings from the Regional Mitigation Strategy completed last year. *See* https://www.blm.gov/programs/planning-and-nepa/plans-in-development/alaska/npr-a_rms.

* * * * *

Nothing in the information identified by Plaintiffs suggests that the environmental impacts of the lease sale will be significantly different from those that were analyzed in the IAP/EIS. Accordingly, if the Court chooses to address the issue at all, it should defer to BLM's reasoned determination that no supplementation of the IAP/EIS was required.

## III. Were this Court to hold that BLM acted arbitrarily, it should remand without vacatur.

With respect to remedy, Plaintiffs ask (at 65-68) the Court to set aside and vacate BLM's decision to issue the leases. Where an agency "has not offered a satisfactory explanation for its action" and "has not adequately explained its finding[s]," courts typically vacate the agency's decision and "remand to the agency to reconsider the action or provide a fuller explanation." *Humane Society of United States v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010). Courts may instead remand to the agency *without* vacating

the decision when it is "advisable that the agency action remain in force until the action can be reconsidered or replaced." *Id.* at 1053 n.7. Equitable considerations, such as the seriousness of the agency's error and the disruptive consequences of vacatur, should factor into a court's analysis of whether to vacate an agency's decision pending remand. *Pit River Tribe v. U.S. Forest Service*, 615 F.3d 1069, 1080-81 (9th Cir. 2010); *California Communities Against Toxics v. EPA*, 688 F.3d 989, 992, 993-94 (9th Cir. 2012).

BLM maintains that it fully complied with its NEPA obligations prior to issuing the leases. If this Court disagrees, however, it should remand to BLM without vacating the leases to avoid significant disruption while BLM addresses any problems identified by the Court. Vacating the leases would result in the loss of substantial bid monies to the United States and to the State of Alaska (which receives a 50% share). 2 E.R. 64. Vacating the leases is also unnecessary to prevent potential environmental harm because (as this brief has labored to point out) the leases do not authorize any ground-disturbing activities. Moreover, Plaintiffs will have an opportunity to seek judicial review of any permits authorizing such activities if they are ever issued.

Alternatively, this Court should (if it were to rule that BLM violated NEPA) remand to the district court "with instructions to determine the appropriate remedy," after additional "briefing from the parties." *Wilderness Watch v. U.S. Fish & Wildlife Service*, 629 F.3d 1024, 1040 (9th Cir. 2010). The parties will be better situated to brief the question of remedy if this Court identifies an error in BLM's NEPA analysis, and

the district court is best situated to make the kinds of factual determinations necessary to support an equitable remedy.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

s/ Thekla Hansen-Young
JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
JOHN DAVID GUNTER, II
ROMNEY PHILPOTT
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

Of Counsel:

MICHAEL GIERYIC
*Attorney-Advisor*
Office of the Solicitor
U.S. Department of the Interior

August 16, 2019
90-1-4-15333

## STATEMENT OF RELATED CASES

*Natural Resources Defense Council v. Bernhardt*, Ninth Circuit No. 19-35006, is related to this case because it involves a challenge to the same 2017 lease sale at issue here.

**ADDENDUM**

Administrative Procedure Act, 5 U.S.C. § 704 .......... 1a

Administrative Procedure Act, 5 U.S.C. § 706 .......... 2a

National Environmental Policy Act, 42 U.S.C. § 4332 .......... 3a

National Petroleum Reserves Production Act, 42 U.S.C. § 6506a .......... 5a

Pub. L. 94-258 (Apr. 5, 1976), 90 Stat. 303 .......... 9a

40 C.F.R. § 1501.4 .......... 10a

40 C.F.R. § 1502.9 .......... 12a

40 C.F.R. § 1502.20 .......... 14a

40 C.F.R. §§ 1508.7, 1508.9 .......... 15a

43 C.F.R. § 46.120 .......... 17a

43 C.F.R. § 46.140 .......... 18a

43 C.F.R. § 2361.1 .......... 19a

43 C.F.R. §§ 3131.2, 3131.3, 3131.4-1 .......... 21a

43 C.F.R. § 3132.5 .......... 22a

43 C.F.R. § 3135.2 .......... 24a

43 C.F.R. § 3136.3 .......... 26a

43 C.F.R. § 3162.3-1 .......... 27a

Executive Order 3797-A (February 27, 1923) .......... 30a

AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

**§ 801. Congressional review**

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by oper-

Case: 19-35008, 08/16/2019, ID: 11400823, DktEntry: 19, Page 63 of 92



(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification

to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955, provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

"(1) the Department of the Army has issued a permit for the activity; and

"(2) the Army Corps of Engineers has found that the activity has no significant impact."

EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose*. The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition*. As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

## § 4332a. Accelerated decisionmaking in environmental reviews

### (a) In general

In preparing a final environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), if the lead agency modifies the statement in response to comments that are minor and are confined to factual corrections or explanations of why the comments do not warrant additional agency re-

[1] So in original. The period probably should be a semicolon.

other fields as may be necessary, to supply gas at reasonable and equitable rates to the native village of Barrow, and other communities and installations at or near Point Barrow, Alaska, and to installations of the Department of Defense and other agencies of the United States located at or near Point Barrow, Alaska. After such transfer, the Secretary of the Interior shall take such actions as may be necessary to continue such service to such village, communities, installations, and agencies at reasonable and equitable rates."

EFFECTIVE DATE OF 1984 AMENDMENT

Pub. L. 98–366, § 4(b), July 17, 1984, 98 Stat. 470, provided that the amendment made by that section is effective Oct. 1, 1984.

**§ 6505. Executive department responsibility for studies to determine procedures used in development, production, transportation, and distribution of petroleum resources in reserve; reports to Congress by President; establishment of task force by Secretary of the Interior; purposes; membership; report and recommendations to Congress by Secretary; contents**

(a) Omitted

(b)(1) The President shall direct such Executive departments and/or agencies as he may deem appropriate to conduct a study, in consultation with representatives of the State of Alaska, to determine the best overall procedures to be used in the development, production, transportation, and distribution of petroleum resources in the reserve. Such study shall include, but shall not be limited to, a consideration of—

(A) the alternative procedures for accomplishing the development, production, transportation, and distribution of the petroleum resources from the reserve, and

(B) the economic and environmental consequences of such alternative procedures.

(2) The President shall make semiannual progress reports on the implementation of this subsection to the Committees on Interior and Insular Affairs of the Senate and the House of Representatives beginning not later than six months after April 5, 1976, and shall, not later than one year after the transfer of jurisdiction of the reserve, and annually thereafter, report any findings or conclusions developed as a result of such study together with appropriate supporting data and such recommendations as he deems desirable. The study shall be completed and submitted to such committees, together with recommended procedures and any proposed legislation necessary to implement such procedures not later than January 1, 1980.

(c)(1) The Secretary of the Interior shall establish a task force to conduct a study to determine the values of, and best uses for, the lands contained in the reserve, taking into consideration (A) the natives who live or depend upon such lands, (B) the scenic, historical, recreational, fish and wildlife, and wilderness values, (C) mineral potential, and (D) other values of such lands.

(2) Such task force shall be composed of representatives from the government of Alaska, the Arctic slope native community, and such offices and bureaus of the Department of the Interior as the Secretary of the Interior deems appropriate, including, but not limited to, the Bureau of Land Management, the United States Fish and Wildlife Service, the United States Geological Survey, and the United States Bureau of Mines.

(3) The Secretary of the Interior shall submit a report, together with the concurring or dissenting views, if any, of any non-Federal representatives of the task force, of the results of such study to the Committees on Interior and Insular Affairs of the Senate and the House of Representatives within three years after April 5, 1976, and shall include in such report his recommendations with respect to the value, best use, and appropriate designation of the lands referred to in paragraph (1).

(Pub. L. 94–258, title I, § 105, Apr. 5, 1976, 90 Stat. 305; Pub. L. 102–285, § 10(b), May 18, 1992, 106 Stat. 172.)

CODIFICATION

Subsec. (a) of this section amended former section 6244 of this title.

CHANGE OF NAME

"United States Bureau of Mines" substituted for "Bureau of Mines" in subsec. (c)(2) pursuant to section 10(b) of Pub. L. 102–285, set out as a note under section 1 of Title 30, Mineral Lands and Mining. For provisions relating to closure and transfer of functions of the United States Bureau of Mines, see note set out under section 1 of Title 30, Mineral Lands and Mining.

Committee on Interior and Insular Affairs of Senate abolished and replaced by Committee on Energy and Natural Resources of Senate, effective Feb. 11, 1977. See Rule XXV of Standing Rules of Senate, as amended by Senate Resolution No. 4 (popularly cited as the "Committee System Reorganization Amendments of 1977"), approved Feb. 4, 1977.

Committee on Interior and Insular Affairs of the House of Representatives changed to Committee on Natural Resources of the House of Representatives on Jan. 5, 1993, by House Resolution No. 5, One Hundred Third Congress.

**§ 6506. Applicability of antitrust provisions; plans and proposals submitted to Congress to contain report by Attorney General on impact of plans and proposals on competition**

Unless otherwise provided by Act of Congress, whenever development leading to production of petroleum is authorized, the provisions of subsections (g), (h), and (i) of section 7430 of title 10 shall be deemed applicable to the Secretary of the Interior with respect to rules and regulations, plans of development and amendments thereto, and contracts and operating agreements. All plans and proposals submitted to the Congress under this chapter or pursuant to legislation authorizing development leading to production shall contain a report by the Attorney General of the United States on the anticipated effects upon competition of such plans and proposals.

(Pub. L. 94–258, title I, § 106, Apr. 5, 1976, 90 Stat. 306.)

**§ 6506a. Competitive leasing of oil and gas**

**(a) In general**

The Secretary shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act.

**(b) Mitigation of adverse effects**

Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska.

**(c) Land use planning; BLM wilderness study**

The provisions of section 1712 and section 1782 of title 43 shall not be applicable to the Reserve.

**(d) First lease sale**

The;[1] first lease sale shall be conducted within twenty months of December 12, 1980: *Provided*, That the first lease sale shall be conducted only after publication of a final environmental impact statement if such is deemed necessary under the provisions of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

**(e) Withdrawals**

The withdrawals established by section 6502 of this title are rescinded for the purposes of the oil and gas leasing program authorized under this section.

**(f) Bidding systems**

Bidding systems used in lease sales shall be based on bidding systems included in section 205(a)(1)(A) through (H)[2] of the Outer Continental Shelf Lands Act Amendments of 1978 (92 Stat. 629).

**(g) Geological structures**

Lease tracts may encompass identified geological structures.

**(h) Size of lease tracts**

The size of lease tracts may be up to sixty thousand acres, as determined by the Secretary.

**(i) Terms**

**(1) In general**

Each lease shall be issued for an initial period of not more than 10 years, and shall be extended for so long thereafter as oil or gas is produced from the lease in paying quantities, oil or gas is capable of being produced in paying quantities, or drilling or reworking operations, as approved by the Secretary, are conducted on the leased land.

**(2) Renewal of leases with discoveries**

At the end of the primary term of a lease the Secretary shall renew for an additional 10-year term a lease that does not meet the requirements of paragraph (1) if the lessee submits to the Secretary an application for renewal not later than 60 days before the expiration of the primary lease and the lessee certifies, and the Secretary agrees, that hydrocarbon resources were discovered on one or more wells drilled on the leased land in such quantities that a prudent operator would hold the lease for potential future development.

**(3) Renewal of leases without discoveries**

At the end of the primary term of a lease the Secretary shall renew for an additional 10-year term a lease that does not meet the requirements of paragraph (1) if the lessee submits to the Secretary an application for renewal not later than 60 days before the expiration of the primary lease and pays the Secretary a renewal fee of $100 per acre of leased land, and—

(A) the lessee provides evidence, and the Secretary agrees that, the lessee has diligently pursued exploration that warrants continuation with the intent of continued exploration or future potential development of the leased land; or

(B) all or part of the lease—

(i) is part of a unit agreement covering a lease described in subparagraph (A); and

(ii) has not been previously contracted out of the unit.

**(4) Applicability**

This subsection applies to a lease that is in effect on or after August 8, 2005.

**(5) Expiration for failure to produce**

Notwithstanding any other provision of this Act, if no oil or gas is produced from a lease within 30 years after the date of the issuance of the lease the lease shall expire.

**(6) Termination**

No lease issued under this section covering lands capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same due to circumstances beyond the control of the lessee.

**(j) Unit agreements**

**(1) In general**

For the purpose of conservation of the natural resources of all or part of any oil or gas pool, field, reservoir, or like area, lessees (including representatives) of the pool, field, reservoir, or like area may unite with each other, or jointly or separately with others, in collectively adopting and operating under a unit agreement for all or part of the pool, field, reservoir, or like area (whether or not any other part of the oil or gas pool, field, reservoir, or like area is already subject to any cooperative or unit plan of development or operation), if the Secretary determines the action to be necessary or advisable in the public interest. In determining the public interest, the Secretary should consider, among other things, the extent to which the unit agreement will minimize the impact to surface resources of the leases and will facilitate consolidation of facilities.

**(2) Consultation**

In making a determination under paragraph (1), the Secretary shall consult with and provide opportunities for participation by the State of Alaska or a Regional Corporation (as defined in section 1602 of title 43) with respect to the creation or expansion of units that include acreage in which the State of Alaska or the Regional Corporation has an interest in the mineral estate.

**(3) Production allocation methodology**

(A) The Secretary may use a production allocation methodology for each participating area within a unit that includes solely Federal land in the Reserve.

[1] So in original.

[2] See References in Text note below.

(B) The Secretary shall use a production allocation methodology for each participating area within a unit that includes Federal land in the Reserve and non-Federal land based on the characteristics of each specific oil or gas pool, field, reservoir, or like area to take into account reservoir heterogeneity and area variation in reservoir producibility across diverse leasehold interests. The implementation of the foregoing production allocation methodology shall be controlled by agreement among the affected lessors and lessees.

**(4) Benefit of operations**

Drilling, production, and well reworking operations performed in accordance with a unit agreement shall be deemed to be performed for the benefit of all leases that are subject in whole or in part to such unit agreement.

**(5) Pooling**

If separate tracts cannot be independently developed and operated in conformity with an established well spacing or development program, any lease, or a portion thereof, may be pooled with other lands, whether or not owned by the United States, under a communitization or drilling agreement providing for an apportionment of production or royalties among the separate tracts of land comprising the drilling or spacing unit when determined by the Secretary of the Interior (in consultation with the owners of the other land) to be in the public interest, and operations or production pursuant to such an agreement shall be deemed to be operations or production as to each such lease committed to the agreement.

**(k) Exploration incentives**

**(1) In general**

**(A) Waiver, suspension, or reduction**

To encourage the greatest ultimate recovery of oil or gas or in the interest of conservation, the Secretary may waive, suspend, or reduce the rental fees or minimum royalty, or reduce the royalty on an entire leasehold (including on any lease operated pursuant to a unit agreement), whenever (after consultation with the State of Alaska and the North Slope Borough of Alaska and the concurrence of any Regional Corporation for leases that include land that was made available for acquisition by the Regional Corporation under the provisions of section 1431(*o*) of the Alaska National Interest Lands Conservation Act) in the judgment of the Secretary it is necessary to do so to promote development, or whenever in the judgment of the Secretary the leases cannot be successfully operated under the terms provided therein.

**(B) Applicability**

This paragraph applies to a lease that is in effect on or after August 8, 2005..[3]

**(2) Suspension of operations and production**

The Secretary may direct or assent to the suspension of operations and production on any lease or unit.

**(3) Suspension of payments**

If the Secretary, in the interest of conservation, shall direct or assent to the suspension of operations and production on any lease or unit, any payment of acreage rental or minimum royalty prescribed by such lease or unit likewise shall be suspended during the period of suspension of operations and production, and the term of such lease shall be extended by adding any such suspension period to the lease.

**(*l*) Receipts**

All receipts from sales, rentals, bonuses, and royalties on leases issued pursuant to this section shall be paid into the Treasury of the United States: *Provided*, That 50 percent thereof shall be paid by the Secretary of the Treasury semiannually, as soon thereafter as practicable after March 30 and September 30 each year, to the State of Alaska for: (1) planning; (2) construction, maintenance, and operation of essential public facilities; and (3) other necessary provisions of public service: *Provided further*, That in the allocation of such funds, the State shall give priority to use by subdivisions of the State most directly or severely impacted by development of oil and gas leased under this Act.

**(m) Explorations**

Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the National Petroleum Reserve in Alaska which do not interfere with operations under any contract maintained or granted previously. Any information acquired in such explorations shall be subject to the conditions of 43 U.S.C. 1352(a)(1)(A).

**(n) Environmental impact statements**

**(1) Judicial review**

Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.

**(2) Initial lease sales**

The detailed environmental studies and assessments that have been conducted on the exploration program and the comprehensive land-use studies carried out in response to sections[4] 6505(b) and (c) of this title shall be deemed to have fulfilled the requirements of section 102(2)(c)[5] of the National Environmental Policy Act (Public Law 91–190) [42 U.S.C. 4332(2)(C)], with regard to the first two oil and gas lease sales in the National Petroleum Reserve-Alaska: *Provided*, That not more than a total of 2,000,000 acres may be leased in these two sales: *Provided further*, That any exploration or production undertaken pursuant

[3] So in original.

[4] So in original. Probably should be "section".

[5] So in original. Probably should be "102(2)(C)".

to this section shall be in accordance with section 6504(a) of this title.

**(o) Regulations**

As soon as practicable after August 8, 2005, the Secretary shall issue regulations to implement this section.

**(p) Waiver of administration for conveyed lands**

**(1) In general**

Notwithstanding section 1613(g) of title 43—

(A) the Secretary of the Interior shall waive administration of any oil and gas lease to the extent that the lease covers any land in the Reserve in which all of the subsurface estate is conveyed to the Arctic Slope Regional Corporation (referred to in this subsection as the "Corporation");

(B)(i) in a case in which a conveyance of a subsurface estate described in subparagraph (A) does not include all of the land covered by the oil and gas lease, the person that owns the subsurface estate in any particular portion of the land covered by the lease shall be entitled to all of the revenues reserved under the lease as to that portion, including, without limitation, all the royalty payable with respect to oil or gas produced from or allocated to that portion;

(ii) in a case described in clause (i), the Secretary of the Interior shall—

(I) segregate the lease into 2 leases, 1 of which shall cover only the subsurface estate conveyed to the Corporation; and

(II) waive administration of the lease that covers the subsurface estate conveyed to the Corporation; and

(iii) the segregation of the lease described in clause (ii)(I) has no effect on the obligations of the lessee under either of the resulting leases, including obligations relating to operations, production, or other circumstances (other than payment of rentals or royalties); and

(C) nothing in this subsection limits the authority of the Secretary of the Interior to manage the federally-owned surface estate within the Reserve.

(Pub. L. 94–258, title I, § 107, formerly Pub. L. 96–514, title I, Dec. 12, 1980, 94 Stat. 2964; Pub. L. 98–620, title IV, § 402(41), Nov. 8, 1984, 98 Stat. 3360; Pub. L. 105–83, title I, § 128, Nov. 14, 1997, 111 Stat. 1568; renumbered Pub. L. 94–258, title I, § 107, and amended Pub. L. 109–58, title III, § 347(a)(2), (b), Aug. 8, 2005, 119 Stat. 704.)

REFERENCES IN TEXT

This Act, referred to in subsecs. (a), (b), (i)(5), and (*l*) is Pub. L. 94–258, Apr. 5, 1976, 90 Stat. 303, known as the Naval Petroleum Reserves Production Act of 1976, which enacted this chapter and section 7420 of Title 10, Armed Forces, and amended section 6244 of this title and sections 7421 to 7436 and 7438 of Title 10. For complete classification of this Act to the Code, see Short Title note set out under section 6501 of this title and Tables.

December 12, 1980, referred to in subsec. (d), was in the original "the date of enactment of this Act", which was translated as meaning the date of enactment of Pub. L. 96–514, which enacted this section, to reflect the probable intent of Congress.

The National Environmental Policy Act of 1969, referred to in subsec. (d), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§ 4321 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of this title and Tables.

Section 205(a)(1)(A) through (H) of the Outer Continental Shelf Lands Act Amendments of 1978, referred to in subsec. (f), probably should have been a reference to section 8(a)(1)(A) through (H) of the Outer Continental Shelf Lands Act (act Aug. 7, 1953, ch. 345), as amended by section 205(a) of the Outer Continental Shelf Lands Act Amendments of 1978 (Pub. L. 95–372), which is classified to section 1337(a)(1)(A)–(H) of Title 43, Public Lands. Subpar. (H) of section 8(a)(1) of act Aug. 7, 1953, was redesignated subpar. (I) and a new subpar. (H) was added by Pub. L. 104–58, title III, § 303, Nov. 28, 1995, 109 Stat. 565.

Section 1431(*o*) of the Alaska National Interest Lands Conservation Act, referred to in subsec. (k)(1)(A), is section 1431(*o*) of title XIV of Pub. L. 96–487, Dec. 2, 1980, 94 Stat. 2542, which was not classified to the Code.

CODIFICATION

Section, which consisted of the matter under the heading "Exploration of National Petroleum Reserve in Alaska" in title I of Pub. L. 96–514, as amended, prior to being renumbered section 107 of Pub. L. 94–258, was formerly classified to section 6508 of this title.

PRIOR PROVISIONS

A prior section 107 of Pub. L. 94–258 was renumbered 108 and is classified to section 6507 of this title.

AMENDMENTS

2005—Pub. L. 109–58 amended section catchline and revised and restructured text into subsecs. (a) to (p). Amendments by Pub. L. 109–58, § 347(b)(2) to (7), were executed by disregarding the second set of closed quotation marks in each such paragraph to reflect the probable intent of Congress. Prior to amendment, text related to competitive leasing of oil and gas and consisted of four undesignated pars.

1997—Pub. L. 105–83, in first par., substituted cls. (8) to (11) and two concluding provisos for "(8) each lease shall be issued for an initial period of up to ten years, and shall be extended for so long thereafter as oil or gas is produced from the lease in paying quantities, or as drilling or reworking operations, as approved by the Secretary, are conducted thereon; and (9) all receipts from sales, rentals, bonuses, and royalties on leases issued pursuant to this Act shall be paid into the Treasury of the United States: *Provided*, That 50 per centum thereof shall be paid by the Secretary of the Treasury semiannually, as soon as practicable after March 30 and September 30 each year, to the State of Alaska for (a) planning, (b) construction, maintenance, and operation of essential public facilities, and (c) other necessary provisions of public service: *Provided further*, That in the allocation of such funds, the State shall give priority to use by subdivisions of the State most directly or severely impacted by development of oil and gas leased under this Act."

1984—Pub. L. 98–620 struck out provision in third par. that required that any proceeding on such action be assigned for hearing at the earliest possible date and be expedited by the Court.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620, set out as an Effective Date note under section 1657 of Title 28, Judiciary and Judicial Procedure.

**§ 6507. Authorization of appropriations; Federal financial assistance for increased municipal services and facilities in communities located on or near reserve resulting from authorized exploration and study activities**

(a) There are authorized to be appropriated to the Department of the Interior such sums as

# Public Law 94-258
# 94th Congress

## An Act

To authorize the Secretary of the Interior to establish on certain public lands of the United States national petroleum reserves the development of which needs to be regulated in a manner consistent with the total energy needs of the Nation, and for other purposes.

Apr. 5, 1976
[H.R. 49]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That this Act may be cited as the "Naval Petroleum Reserves Production Act of 1976".

Naval Petroleum Reserves Production Act of 1976.
42 USC 6501 note.

## TITLE I—NATIONAL PETROLEUM RESERVE IN ALASKA

### DEFINITION

42 USC 6501.

SEC. 101. As used in this title, the term "petroleum" includes crude oil, gases (including natural gas), natural gasoline, and other related hydrocarbons, oil shale, and the products of any of such resources.

### DESIGNATION OF THE NATIONAL PETROLEUM RESERVE IN ALASKA

SEC. 102. The area known as Naval Petroleum Reserve Numbered 4, Alaska, established by Executive order of the President, dated February 27, 1923, except for tract Numbered 1 as described in Public Land Order 2344, dated April 24, 1961, shall be transferred to and administered by the Secretary of the Interior in accordance with the provisions of this Act. Effective on the date of transfer all lands within such area shall be redesignated as the "National Petroleum Reserve in Alaska" (hereinafter in this title referred to as the "reserve"). Subject to valid existing rights, all lands within the exterior boundaries of such reserve are hereby reserved and withdrawn from all forms of entry and disposition under the public land laws, including the mining and mineral leasing laws, and all other Acts; but the Secretary is authorized to (1) make dispositions of mineral materials pursuant to the Act of July 31, 1947 (61 Stat. 681), as amended (30 U.S.C. 601), for appropriate use by Alaska Natives, (2) make such dispositions of mineral materials and grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act, and (3) convey the surface of lands properly selected on or before December 18, 1975, by Native village corporations pursuant to the Alaska Native Claims Settlement Act. All other provisions of law heretofore enacted and actions heretofore taken reserving such lands as a Naval Petroleum Reserve shall remain in full force and effect to the extent not inconsistent with this Act.

42 USC 6502.
43 CFR app.
43 USC 1601 note.

### TRANSFER OF JURISDICTION

SEC. 103. (a) Jurisdiction over the reserve shall be transferred by the Secretary of the Navy to the Secretary of the Interior on June 1, 1977.

42 USC 6503.

(b) With respect to any activities related to the protection of environmental, fish and wildlife, and historical or scenic values, the Secretary of the Interior shall assume all responsibilities as of the date

**§ 1501.2 Apply NEPA early in the process.**

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

**§ 1501.3 When to prepare an environmental assessment.**

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

**§ 1501.4 Whether to prepare an environmental impact statement.**

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

### § 1501.5 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1501.6 Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

**§ 1502.5 Timing.**

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

**§ 1502.6 Interdisciplinary preparation.**

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

**§ 1502.7 Page limits.**

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

**§ 1502.8 Writing.**

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

**§ 1502.9 Draft, final, and supplemental statements.**

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

**§ 1502.10 Recommended format.**

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.
(b) Summary.
(c) Table of contents.
(d) Purpose of and need for action.
(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).
(f) Affected environment.
(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).
(h) List of preparers.
(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.
(j) Index.
(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11 through 1502.18, in any appropriate format.

**§ 1502.11 Cover sheet.**

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

**§ 1502.12 Summary.**

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

**§ 1502.17 List of preparers.**

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

**§ 1502.18 Appendix.**

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

**§ 1502.19 Circulation of the environmental impact statement.**

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

**§ 1502.20 Tiering.**

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

**§ 1502.21 Incorporation by reference.**

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

Case: 19-35008, 08/16/2019, ID: 11400823, DktEntry: 19, Page 75 of 92



**§ 1508.6 Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7 Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8 Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9 Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10 Environmental document.**

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

**§ 1508.11 Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12 Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13 Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

be analyzed in an environmental impact statement. The no action alternative looks at effects of not approving the action under consideration.

*Proposed action.* This term refers to the bureau activity under consideration. It includes the bureau's exercise of discretion over a non-Federal entity's planned activity that falls under a Federal agency's authority to issue permits, licenses, grants, rights-of-way, or other common Federal approvals, funding, or regulatory instruments. The proposed action:

(1) Is not necessarily, but may become, during the NEPA process, the bureau preferred alternative or (in a record of decision for an environmental impact statement, in accordance with 40 CFR 1505.2) an environmentally preferable alternative; and

(2) Must be clearly described in order to proceed with NEPA analysis.

*Reasonably foreseeable future actions* include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision. These federal and non-federal activities that must be taken into account in the analysis of cumulative impact include, but are not limited to, activities for which there are existing decisions, funding, or proposals identified by the bureau. Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.

*Responsible Official* is the bureau employee who is delegated the authority to make and implement a decision on a proposed action and is responsible for ensuring compliance with NEPA.

## Subpart B—Protection and Enhancement of Environmental Quality

### § 46.100 Federal action subject to the procedural requirements of NEPA.

(a) A bureau proposed action is subject to the procedural requirements of NEPA if it would cause effects on the human environment (40 CFR 1508.14), and is subject to bureau control and responsibility (40 CFR 1508.18). The determination of whether a proposed action is subject to the procedural requirements of NEPA depends on the extent to which bureaus exercise control and responsibility over the proposed action and whether Federal funding or approval are necessary to implement it. If Federal funding is provided with no Federal agency control as to the expenditure of such funds by the recipient, NEPA compliance is not necessary. The proposed action is not subject to the procedural requirements of NEPA if it is exempt from the requirements of section 102(2) of NEPA.

(b) A bureau shall apply the procedural requirements of NEPA when the proposal is developed to the point that:

(1) The bureau has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal; and

(2) The effects of the proposed action can be meaningfully evaluated (40 CFR 1508.23).

### § 46.105 Using a contractor to prepare environmental documents.

A Responsible Official may use a contractor to prepare any environmental document in accordance with the standards of 40 CFR 1506.5(b) and (c). If a Responsible Official uses a contractor, the Responsible Official remains responsible for:

(a) Preparation and adequacy of the environmental documents; and

(b) Independent evaluation of the environmental documents after their completion.

### § 46.110 Incorporating consensus-based management.

(a) Consensus-based management incorporates direct community involvement in consideration of bureau activities subject to NEPA analyses, from initial scoping to implementation of the bureau decision. It seeks to achieve agreement from diverse interests on the goals of, purposes of, and needs for bureau plans and activities, as well as the methods anticipated to carry out those plans and activities. For the purposes of this Part, consensus-based management involves outreach to persons, organizations or communities who may be interested in or affected by a proposed action with an assurance

that their input will be given consideration by the Responsible Official in selecting a course of action.

(b) In incorporating consensus-based management in the NEPA process, bureaus should consider any consensus-based alternative(s) put forth by those participating persons, organizations or communities who may be interested in or affected by the proposed action. While there is no guarantee that any particular consensus-based alternative will be considered to be a reasonable alternative or be identified as the bureau's preferred alternative, bureaus must be able to show that the reasonable consensus-based alternative, if any, is reflected in the evaluation of the proposed action and discussed in the final decision. To be selected for implementation, a consensus-based alternative must be fully consistent with NEPA, the CEQ regulations, and all applicable statutory and regulatory provisions, as well as Departmental and bureau written policies and guidance.

(c) The Responsible Official must, whenever practicable, use a consensus-based management approach to the NEPA process.

(d) If the Responsible Official determines that the consensus-based alternative, if any, is not the preferred alternative, he or she must state the reasons for this determination in the environmental document.

(e) When practicing consensus-based management in the NEPA process, bureaus must comply with all applicable laws, including any applicable provisions of the Federal Advisory Committee Act (FACA).

### §46.115 Consideration of past actions in the analysis of cumulative effects.

When considering the effects of past actions as part of a cumulative effects analysis, the Responsible Official must analyze the effects in accordance with 40 CFR 1508.7 and in accordance with relevant guidance issued by the Council on Environmental Quality, such as "The Council on Environmental Quality Guidance Memorandum on Consideration of Past Actions in Cumulative Effects Analysis" dated June 24, 2005, or any superseding Council on Environmental Quality guidance.

### §46.120 Using existing environmental analyses prepared pursuant to NEPA and the Council on Environmental Quality regulations.

(a) When available, the Responsible Official should use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives. Procedures for adoption or incorporation by reference of such analyses must be followed where applicable.

(b) If existing NEPA analyses include data and assumptions appropriate for the analysis at hand, the Responsible Official should use these existing NEPA analyses and/or their underlying data and assumptions where feasible.

(c) An existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

(d) Responsible Officials should make the best use of existing NEPA documents by supplementing, tiering to, incorporating by reference, or adopting previous NEPA environmental analyses to avoid redundancy and unnecessary paperwork.

### §46.125 Incomplete or unavailable information.

In circumstances where the provisions of 40 CFR 1502.22 apply, bureaus must consider all costs to obtain information. These costs include monetary costs as well as other non-monetized costs when appropriate, such as social costs, delays, opportunity costs, and non-fulfillment or non-timely fulfillment of statutory mandates.

### §46.130 Mitigation measures in analyses.

(a) Bureau proposed action. The analysis of the proposed action and any alternatives must include an analysis of

the effects of the proposed action or alternative as well as analysis of the effects of any appropriate mitigation measures or best management practices that are considered. The mitigation measures can be analyzed either as elements of alternatives or in a separate discussion of mitigation.

(b) Applicant proposals (*i.e.*, bureau decision-making on such proposals is the proposed action). An applicant's proposal presented to the bureau for analysis must include any ameliorative design elements (including stipulations, conditions, or best management practices), required to make the proposal conform to applicable legal requirements, as well as any voluntary ameliorative design element(s). The effects of any mitigation measures other than the ameliorative design elements included in the applicant's proposal must also be analyzed. The analysis of these mitigation measures can be structured as a matter of consideration of alternatives to approving the applicant's proposal or as separate mitigation measures to be imposed on any alternative selected for implementation.

**§ 46.135 Incorporation of referenced documents into NEPA analysis.**

(a) The Responsible Official must determine that the analysis and assumptions used in the referenced document are appropriate for the analysis at hand.

(b) Citations of specific information or analysis from other source documents should include the pertinent page numbers or other relevant identifying information.

(c) Publications incorporated into NEPA analysis by reference must be listed in the bibliography. Such publications must be readily available for review and, when not readily available, they must be made available for review as part of the record supporting the proposed action.

**§ 46.140 Using tiered documents.**

A NEPA document that tiers to another broader NEPA document in accordance with 40 CFR 1508.28 must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions.

(a) Where the impacts of the narrower action are identified and analyzed in the broader NEPA document, no further analysis is necessary, and the previously prepared document can be used for purposes of the pending action.

(b) To the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis.

(c) An environmental assessment prepared in support of an individual proposed action can be tiered to a programmatic or other broader-scope environmental impact statement. An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, whether direct, indirect, or cumulative, if the environmental assessment is tiered to a broader environmental impact statement which fully analyzed those significant effects. Tiering to the programmatic or broader-scope environmental impact statement would allow the preparation of an environmental assessment and a finding of no significant impact for the individual proposed action, so long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also be called a "finding of no *new* significant impact."

**§ 46.145 Using adaptive management.**

Bureaus should use adaptive management, as appropriate, particularly in circumstances where long-term impacts may be uncertain and future monitoring will be needed to make adjustments in subsequent implementation decisions. The NEPA analysis conducted in the context of an adaptive management approach should identify the range of management options that may be taken in response to the results of monitoring and should analyze the effects of such options. The environmental effects of any adaptive management strategy must be evaluated in this or subsequent NEPA analysis.

may be necessary to supply gas at reasonable and equitable rates to the Native village of Barrow and other communities and installations at or near Point Barrow, Alaska, and to installations of the Department of Defense and other agencies of the U.S. located at or near Point Barrow, Alaska.

**§2361.0–5 Definitions.**

As used in this subpart, the following terms shall have the following meanings:

(a) *Act* means the Naval Petroleum Reserves Production Act of 1976 (90 Stat. 303, 42 U.S.C. 6501, *et seq.*).

(b) *Authorized officer* means any employee of the Bureau of Land Management who has been delegated the authority to perform the duties of this subpart.

(c) *Exploration* means activities conducted on the Reserve for the purpose of evaluating petroleum resources which include crude oil, gases of all kinds (natural gas, hydrogen, carbon dioxide, helium, and any others), natural gasoline, and related hydrocarbons (tar sands, asphalt, propane butane, etc.), oil shale and the products of such resources.

(d) *Reserve* means those lands within the National Petroleum Reserve in Alaska (prior to June 1, 1977, designated Naval Petroleum Reserve No. 4) which was established by Executive order of the President, dated February 27, 1923, except for tract Numbered 1 as described in Public Land Order 2344 (the Naval Arctic Research Laboratory—surface estate only) dated April 24, 1961.

(e) *Secretary* means the Secretary of the Interior.

(f) *Special areas* means areas within the reserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve.

(g) *Use authorization* means a written approval of a request for use of land or resources.

**§2361.0–6 [Reserved]**

**§2361.0–7 Effect of law.**

(a) Subject to valid existing rights, all lands within the exterior boundaries of the Reserve are reserved and withdrawn from all forms of entry and disposition under the public land laws, including the mining and mineral leasing laws, and all other Acts.

(b) Notwithstanding the provisions of paragraph (a) of this section, the Secretary is authorized to:

(1) Make dispositions of mineral materials pursuant to the Act of July 31, 1947 (61 Stat. 681), as amended (30 U.S.C. 601), for appropriate use by Alaska Natives.

(2) Make such dispositions of mineral materials and grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under the Act.

(3) Convey the surface of lands properly selected on or before December 18, 1975, by Native village corporations pursuant to the Alaska Native Claims Settlement Act, as amended (43 U.S.C. 1601, *et seq.*).

(c) All other provisions of law heretofore enacted and actions heretofore taken reserving such lands as a Reserve shall remain in full force and effect to the extent not inconsistent with the Act.

(d) To the extent not inconsistent with the Act, all other public land laws are applicable.

**§2361.1 Protection of the environment.**

(a) The authorized officer shall take such action, including monitoring, as he deems necessary to mitigate or avoid unnecessary surface damage and to minimize ecological disturbance throughout the reserve to the extent consistent with the requirements of the Act for the exploration of the reserve.

(b) The Cooperative Procedures of January 18, 1977, for National Petroleum Reserve in Alaska between the Bureau of Land Management (BLM) and the U.S. Geological Survey (GS) (42 FR 4542, January 25, 1977) provides the procedures for the mutual cooperation

and interface of authority and responsibility between GS and BLM concerning petroleum exploration activities (i.e., geophysical and drilling operations), the protection of the environment during such activities in the Reserve, and other related activities.

(c) Maximum protection measures shall be taken on all actions within the Utikok River Uplands, Colville River, and Teshekpuk Lake special areas, and any other special areas identified by the Secretary as having significant subsistence, recreational, fish and wildlife, or historical or scenic value. The boundaries of these areas and any other special areas identified by the Secretary shall be identified on maps and be available for public inspection in the Fairbanks District Office. In addition, the legal description of the three special areas designated herein and any new areas identified hereafter will be published in the FEDERAL REGISTER and appropriate local newspapers. Maximum protection may include, but is not limited to, requirements for:

(1) Rescheduling activities and use of alternative routes, (2) types of vehicles and loadings, (3) limiting types of aircraft in combination with minimum flight altitudes and distances from identified places, and (4) special fuel handling procedures.

(d) Recommendations for additional special areas may be submitted at any time to the authorized officer. Each recommendation shall contain a description of the values which make the area special, the size and location of the area on appropriate USGS quadrangle maps, and any other pertinent information. The authorized officer shall seek comments on the recommendation(s) from interested public agencies, groups, and persons. These comments shall be submitted along with his recommendation to the Secretary. Pursuant to section 104(b) of the Act, the Secretary may designate that area(s) which he determines to have special values requiring maximum protection. Any such designated area shall be identified in accordance with the provision of § 2361.1(c) of this subpart.

(e)(1) To the extent consistent with the requirements of the Act and after consultation with appropriate Federal, State, and local agencies and Native organizations, the authorized officer may limit, restrict, or prohibit use of and access to lands within the Reserve, including special areas. On proper notice as determined by the authorized officer, such actions may be taken to protect fish and wildlife breeding, nesting, spawning, lambing of calving activity, major migrations of fish and wildlife, and other environmental, scenic, or historic values.

(2) The consultation requirement in § 2361.1(e)(1) of this subpart is not required when the authorized officer determines that emergency measures are required.

(f) No site, structure, object, or other values of historical archaelogical, cultural, or paleontological character, including but not limited to historic and prehistoric remains, fossils, and artifacts, shall be injured, altered, destroyed, or collected without a current Federal Antiquities permit.

**§ 2361.2 Use authorizations.**

(a) Except for petroleum exploration which has been authorized by the Act, use authorizations must be obtained from the authorized officer prior to any use within the Reserve. Only those uses which are consistent with the purposes and objectives of the Act will be authorized.

(b) Except as may be limited, restricted, or prohibited by the authorized officer pursuant to § 2361.1 of this subpart or otherwise, use authorizations are not required for (1) subsistence uses (e.g., hunting, fishing, and berry picking) and (2) recreational uses (e.g., hunting, fishing, backpacking, and wildlife observation).

(c) Applications for use authorizations shall be filed in accordance with applicable regulations in this chapter. In the absence of such regulation, the authorized officer may make such dispositions absence of such regulations, the author-of mineral materials and grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under the Act.

(d) In addition to other statutory or regulatory requirements, approval of applications for use authorizations

**§ 3130.5 *Bona fide* purchasers.**

The provisions of § 3108.4 of this title shall apply to *bona fide* purchasers of leases within NPR-A.

[46 FR 55497, Nov. 9, 1981, as amended at 53 FR 17358, May 16, 1988]

**§ 3130.6 Leasing maps and land descriptions.**

**§ 3130.6–1 Leasing maps.**

The Bureau shall prepare leasing maps showing the tracts to be offered for lease sale.

**§ 3130.6–2 Land descriptions.**

(a) All tracts shall be composed of entire sections either surveyed or protracted, whichever is applicable, except that if the tracts are adjacent to upland navigable water areas, they may be adjusted on the basis of subdivisional parts of the sections.

(b) Leased lands shall be described according to section, township and range in accordance with the official survey or protraction diagrams.

## Subpart 3131—Leasing Program

**§ 3131.1 Receipt and consideration of nominations; public notice and participation.**

During preparation of a proposed leasing schedule, the Secretary shall invite and consider suggestions and relevant information for such program from the Governor of Alaska, local governments, Native corporations, industry, other Federal agencies, including the Attorney General and all interested parties, including the general public. This request for information shall be issued as a notice in the FEDERAL REGISTER.

**§ 3131.2 Tentative tract selection.**

(a) The State Director Alaska, Bureau of Land Management, shall issue calls for Nominations and Comments on tracts for leasing for oil and gas in specified areas. The call for Nominations and Comments shall be published in the FEDERAL REGISTER and may be published in other publications as desired by the State Director. Nominations and Comments on tracts shall be addressed to the State Director Alaska, Bureau of Land Management. The State Director shall also request comments on tracts which should receive special concern and analysis.

(b) The State Director, after completion of the required environmental analysis (see 40 CFR 1500–1508), shall select tracts to be offered for sale. In making the selection, the State Director shall consider available environmental information, multiple-use conflicts, resource potential, industry interest, information from appropriate Federal agencies and other available information. The State Director shall develop measures to mitigate adverse impacts, including lease stipulations and information to lessees. These mitigating measures shall be made public in the notice of sale.

[46 FR 55497, Nov. 9, 1981, as amended at 53 FR 17358, May 16, 1988]

**§ 3131.3 Special stipulations.**

Special stipulations shall be developed to the extent the authorized officer deems necessary and appropriate for mitigating reasonably foreseeable and significant adverse impacts on the surface resources. Special Areas stipulations for exploration or production shall be developed in accordance with section 104 of the Naval Petroleum Reserves Production Act of 1976. Any special stipulations and conditions shall be set forth in the notice of sale and shall be attached to and made a part of the lease, if issued. Additional stipulations needed to protect surface resources and special areas may be imposed at the time the surface use plan and permit to drill are approved.

**§ 3131.4 Lease sales.**

**§ 3131.4–1 Notice of sale.**

(a) The State Director Alaska, Bureau of Land Management, shall publish the notice of sale in the FEDERAL REGISTER, and may publish the notice in other publications if he/she deems it appropriate. The publication in the FEDERAL REGISTER shall be at least 30 days prior to the date of the sale. The notice shall state the place and time at which bids are to be filed, and the place, date and hour at which bids are to be opened.

(b) Tracts shall be offered for lease by competitive sealed bidding under conditions specified in the notice of lease sale and in accordance with all applicable laws and regulations. Bidding systems used in sales shall be based on bidding systems included in section (205)(a)(1)(A) through (H) of the Outer Continental Shelf Lands Act Amendments of 1978 (43 U.S.C. 1801 *et seq.*).

(c) A detailed statement of the sale, including a description of the areas to be offered for lease, the lease terms, conditions and special stipulations and how and where to submit bids shall be made available to the public immediately after publication of the notice of sale.

## Subpart 3132—Issuance of Leases

### §3132.1 Who may hold a lease.

Leases issued pursuant to this subpart may be held only by:

(a) Citizens and nationals of the United States;

(b) Aliens lawfully admitted for permanent residence in the United States as defined in 8 U.S.C. 1101(a)(20);

(c) Private, public or municipal corporations organized under the laws of the United States or of any State or of the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa or any of its territories; or

(d) Associations of such citizens, nationals, resident aliens or private, public or municipal corporations.

### §3132.2 Submission of bids.

(a) A separate sealed bid shall be submitted for each tract in the manner prescribed. A bid shall not be submitted for less than an entire tract.

(b) Each bidder shall submit with the bid a certified or cashier's check, bank draft, U.S. currency or any other form of payment approved by the Secretary for one-fifth of the amount of the cash bonus, unless stated otherwise in the notice of sale.

(c) Each bid shall be accompanied by statements of qualifications prepared in accordance with §3132.4 of this title.

(d) Bidders are bound by the provisions of 18 U.S.C. 1860 prohibiting unlawful combination or intimidation of bidders.

### §3132.3 Payments.

(a) Make payments of bonuses, including deferred bonuses, first year's rental, other payments due upon lease issuance, and fees, to BLM's Alaska State Office. Before we issue a lease, the highest bidder must pay the processing fee for competitive lease applications found in the fee schedule in §3000.12 of this chapter in addition to other remaining bonus and rental payments. All payments shall be made by certified or cashier's check, bank draft, U.S. currency or any other form of payment approved by the Secretary. Payments shall be made payable to the Department of the Interior, Bureau of Land Management, unless otherwise directed.

(b) All other payments required by a lease or the regulations in this part shall be payable to the Department of the Interior, Minerals Management Service.

[46 FR 55497, Nov. 9, 1981, as amended at 53 FR 17358, May 16, 1988; 70 FR 58875, Oct. 7, 2005]

### §3132.4 Qualifications.

Submission of a lease bid constitutes certification of compliance with the regulations of this part. Anyone seeking to acquire, or anyone holding, a Federal oil and gas lease or interest therein may be required to submit additional information to show compliance with the regulations of this part.

[47 FR 8546, Feb. 26, 1982]

### §3132.5 Award of leases.

(a) Sealed bids received in response to the notice of lease sale shall be opened at the place, date and hour specified in the notice of sale. The opening of bids is for the sole purpose of publicly announcing and recording the bids received. No bids shall be accepted or rejected at that time.

(b) The United States reserves the right to reject any and all bids received for any tract, regardless of the amount offered.

(c) In the event the highest bids are tie bids, the tying bidders shall be allowed to submit within 15 days of the public announcement of a tie bid additional sealed bids to break the tie. The

additional bids shall include any additional amount necessary to bring the amount tendered with his/her bid to one-fifth of the additional bid. Additional bids to break tie bids shall be processed in accordance with paragraph (a) of this section.

(d) If the authorized officer fails to accept the highest bid for a lease within 90 days or a lesser period of time as specified in the notice of sale, the highest bid for that lease shall be considered rejected. This 90-day period or lesser period as specified in the notice of sale shall not include any period of time during which acceptance, rejection or other processing of bids and lease issuance by the Department of the Interior are enjoined or prohibited by court order.

(e) Written notice of the final decision on the bids shall be transmitted to those bidders whose deposits have been held in accordance with instructions set forth in the notice of sale. If a bid is accepted, 2 copies of the lease shall be transmitted with the notice of acceptance to the successful bidder. The bidder shall, not later than the 15th day after receipt of the lease, sign both copies of the lease and return them, together with the first year's rental and the balance of the bonus bid, unless deferred, and shall file a bond, if required to do so. Deposits shall be refunded on rejected bids.

(f) If the successful bidder fails to execute the lease within the prescribed time or otherwise to comply with the applicable regulations, the deposit shall be forfeited and disposed of as other receipts under the Act.

(g) If the awarded lease is executed by an attorney-in-fact acting on behalf of the bidder, the lease shall be accompanied by evidence that the bidder authorized the attorney-in-fact to execute the lease on his/her behalf. Reference may be made to the serial number of the record and the office of the Bureau of Land Management in which such evidence has already been filed.

(h) When the executed lease is returned to the authorized officer, he/she shall within 15 days of receipt of the material required by paragraph (e) of this section, execute the lease on behalf of the United States. A copy of the fully executed lease shall be transmitted to the lessee.

### § 3132.5–1 Forms.

Leases shall be issued on forms approved by the Director.

### § 3132.5–2 Dating of leases.

All leases issued under the regulations in this part shall become effective as of the first day of the month following the date they are signed on behalf of the United States. When prior written request is made, a lease may become effective as of the first day of the month within which it is signed on behalf of the United States.

## Subpart 3133—Rentals and Royalties

### § 3133.1 Rentals.

(a) An annual rental shall be due and payable at the rate prescribed in the notice of sale and the lease, but in no event shall such rental be less than $3 per acre, or fraction thereof. Payment shall be made on or before the first day of each lease year prior to discovery of oil or gas on the lease.

(b) If there is no actual or allocated production on the portion of a lease that has been segregated from a producing lease, the owner of such segregated lease shall pay an annual rental for such segregated portion at the rate per acre specified in the original lease. This rental shall be payable each lease year following the year in which the segregation became effective and prior to discovery of oil or gas on such segregated portion.

(c) Annual rental paid in any year prior to discovery of oil or gas on the lease shall be in addition to, and shall not be credited against, any royalties due from production.

[46 FR 55497, Nov. 9, 1981, as amended at 53 FR 17358, May 16, 1988]

### § 3133.2 Royalties.

Royalties on oil and gas shall be at the rate specified in the notice of sale as to the tracts, if appropriate, and in the lease, unless the Secretary, in order to promote increased production

data prior to the end of the primary term.

(c) *Renewed lease.* The renewed lease will be subject to the terms and conditions applicable to new oil and gas leases issued under the Integrated Activity Plan in effect on the date that the BLM issues the decision to renew the lease.

[73 FR 6442, Feb. 4, 2008]

### §3135.1–7 Consolidation of leases.

(a) Leases may be consolidated upon written request of the lessee filed with the State Director Alaska, Bureau of Land Management. The request shall identify each lease involved by serial number and shall explain the factors which justify the consolidation. Include with each request for a consolidation of leases the processing fee found in the fee schedule in §3000.12 of this chapter.

(b) All parties holding any undivided interest in any lease involved in the consolidation shall agree to enter into the same lease consolidation.

(c) Consolidation of leases not to exceed 60,000 acres may be approved by the State Director, Alaska if it is determined that the consolidation is justified.

(d) The effective date, the anniversary date, and the primary term of the consolidated lease will be those of the oldest original lease involved in the consolidation. The term of a consolidated lease may be extended, or renewed, as appropriate, beyond the primary lease term under §3135.1–5 or §3135.1–6.

(e) Royalty, rental, special lease stipulations and other terms and conditions of each original lease except the effective date, anniversary date and the primary term shall continue to apply to that lease or any portion thereof regardless of the lease becoming a part of a consolidated lease. The highest royalty and rental rates of the original leases shall apply to the consolidated lease.

[48 FR 413, Jan. 5, 1983, as amended at 70 FR 58875, Oct. 7, 2005. Redesignated and amended at 73 FR 6442, 6443, Feb. 4, 2008]

### §3135.1–8 Termination of administration for conveyed lands and segregation.

(a) If all of the mineral estate is conveyed to a regional corporation, the regional corporation will assume the lessor's obligation to administer any oil and gas lease.

(b) If a conveyance of the mineral estate does not include all of the land covered by an oil and gas lease, the lease will be segregated into two leases, one of which will cover only the mineral estate conveyed. The regional corporation will assume administration of the lease covering the conveyed mineral estate.

(c) If the regional corporation assumes administration of a lease under paragraph (a) or (b) of this section, all lease terms, BLM regulations, and BLM orders in effect on the date of assumption continue to apply to the lessee under the lease. All such obligations will be enforceable by the regional corporation as the lessor until the lease terminates.

(d) In a case in which a conveyance of a mineral estate described in paragraph (b) of this section does not include all of the land covered by the oil and gas lease, the owner of the mineral estate in any particular portion of the land covered by the lease is entitled to all of the revenues reserved under the lease as to that portion including all of the royalty payable with respect to oil or gas produced from or allocated to that portion.

[73 FR 6443, Feb. 4, 2008]

### §3135.2 Under what circumstances will BLM require a suspension of operations and production or approve my request for a suspension of operations and production for my lease?

(a) BLM will require a suspension of operations and production or approve your request for a suspension of operations and production for your lease(s) if BLM determines that—

(1) It is in the interest of conservation of natural resources;

(2) It encourages the greatest ultimate recovery of oil and gas, such as by encouraging the planning and construction of a transportation system to a new area of discovery; or

(3) It mitigates reasonably foreseeable and significantly adverse effects on surface resources.

(b) BLM will suspend operations and production for your lease if it determines that, despite the exercise of due care and diligence, you can't comply with your lease requirements for reasons beyond your control.

(c) If BLM requires a suspension of operations and production or approves your request for a suspension of operations and production, the suspension—

(1) Stops the running of your lease term and prevents it from expiring for as long as the suspension is in effect;

(2) Relieves you of your obligation to pay rent, royalty, or minimum royalty during the suspension; and

(3) Prohibits you from operating on, producing from, or having any other beneficial use of your lease during the suspension. However, you must continue to perform necessary maintenance and safety activities.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.3 How do I apply for a suspension of operations and production?**

(a) You must submit to BLM an application stating the circumstances that are beyond your reasonable control that prevent you from operating or producing your lease(s).

(b) Your suspension application must be signed by—

(1) All record title holders of the lease; or

(2) The operator on behalf of the record title holders of the leases committed to an approved agreement.

(c) You must submit your application to BLM before your lease expires.

(d) Your application must be for your entire lease.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.4 When is a suspension of operations and production effective?**

A suspension of operations and production is effective—

(a) The first day of the month in which you file the application for suspension or BLM requires the suspension; or

(b) Any other date BLM specifies in the decision document.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.5 When should I stop paying rental or royalty after BLM requires or approves a suspension of operations and production ?**

You should stop paying rental or royalty on the first day of the month that the suspension is effective. However, if there is any production sold or removed during that month, you must pay royalty on that production.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.6 When will my suspension terminate?**

(a) Your suspension terminates—

(1) On the first day of the month in which you begin to operate or produce on your lease with BLM approval; or

(2) The date BLM specifies in a written notice to you.

(b) You must notify BLM at least 24 hours before you begin operations or production under paragraph (a)(1) of this section.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.7 What effect does a suspension of operations and production have on the term of my lease?**

(a) *Primary term.* If BLM grants a suspension of operations and production for your lease, the suspension stops the running of the primary term of your lease for the period of the suspension.

(b) *Extended term.* If your lease is in its extended term, a suspension holds your lease in its extended term for the period of the suspension as if it were in production.

[67 FR 17886, Apr. 11, 2002]

**§ 3135.8 If BLM requires a suspension or grants my request for a suspension of operations and production for my lease, when must I next pay advance annual rental, royalty, or minimum royalty?**

(a) You are not required to submit your next rental or minimum royalty payment until the date the suspension terminates. Therefore, if your suspension begins in month 3 of lease year A and ends in month 2 of lease year B, you must submit your rental payment

for lease year B when your suspension ends. BLM will send a written notice to the lessee and operator stating that the suspension is terminated and the date your rental payment for lease year B is due to MMS. BLM's notice also will state when you must pay any minimum royalty due for lease year A. Your minimum royalty for lease year B will be due at the end of that year.

(b) If you remove or sell any production from the lease during the term of the suspension, you must pay royalty on that production.

[67 FR 17886, Apr. 11, 2002]

## Subpart 3136—Relinquishments, Terminations and Cancellations of Leases

### §3136.1 Relinquishment of leases or parts of leases.

A lease may be surrendered in whole or in part by the lessee by filing a written relinquishment, in triplicate, with the Alaska State Office of the Bureau. No filing fee is required. In the case of partial relinquishments, neither the relinquished lands nor the retained lands shall be less than a compact tract of not less than 640 acres. A relinquishment shall take effect on the date it is filed subject to the continued obligation of lessee and the surety to make all payments due, including any accrued rental, royalties and deferred bonuses and to abandon all wells, and condition or remove other facilities on the lands to be relinquished to the satisfaction of the authorized officer.

[46 FR 55497, Nov. 9, 1981, as amended at 53 FR 17359, May 16, 1988]

### §3136.2 Terminations.

Any lease on which there is no well capable of producing oil or gas in paying quantities shall terminate if the lessee fails to pay the annual rental in full on or before the anniversary date of such lease and such failure continues for more than 30 days after the notice of delinquent rental has been delivered by registered or certified mail to the lease owner's record post office address.

### §3136.3 Cancellation of leases.

(a) Any nonproducing lease may be canceled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in §3130.0–3 of this title, of the regulations issued thereunder or of the lease, if such failure to comply continues for 30-days after a notice thereof has been delivered by registered or certified mail to the lease owner's record post office address.

(b) Producing leases or leases known to contain valuable deposits of oil or gas may be canceled only by court order.

## Subpart 3137—Unitization Agreements—National Petroleum Reserve-Alaska

SOURCE: 67 FR 17886, Apr. 11, 2002, unless otherwise noted.

### §3137.5 What terms do I need to know to understand this subpart?

As used in this subpart—

*Actual drilling* means operations you conduct that are similar to those that a person seriously looking for oil or gas could be expected to conduct in that particular area, given the existing knowledge of geologic and other pertinent facts about the area to be drilled. The term includes the testing, completing, or equipping of the drill hole (casing, tubing, packers, pumps, etc.) so that it is capable of producing oil or gas. Actual drilling operations do not include preparatory or preliminary work such as grading roads and well sites, or moving equipment onto the lease.

*Actual production* means oil or gas flowing from the wellbore into treatment or sales facilities.

*Actual reworking operations* means reasonably continuous well-bore operations such as fracturing, acidizing, and tubing repair.

*Committed tract* means—

(1) A Federal lease where all record title holders and all operating rights owners have agreed to the terms and conditions of a unit agreement, committed their interest to the unit; or

(2) A State lease or private parcel of land where all oil and gas lessees and

**§ 3162.2–14 May I appeal BLM's decision to require drainage protective measures?**

You may appeal any BLM decision requiring you take drainage protective measures. You may request BLM State Director review under 43 CFR 3165.3 and/or appeal to the Interior Board of Land Appeals under 43 CFR part 4 and subpart 1840.

[66 FR 1894, Jan. 10, 2001]

**§ 3162.2–15 Who has the burden of proof if I appeal BLM's drainage determination?**

BLM has the burden of establishing a *prima facie* case that drainage is occurring and that you knew of such drainage. Then the burden of proof shifts to you to refute the existence of drainage or to prove there was not sufficient information to put you on notice of the need for drainage protection. You also have the burden of proving that drilling and producing from a protective well would not be economically feasible.

[66 FR 1894, Jan. 10, 2001]

**§ 3162.3 Conduct of operations.**

(a) Whenever a change in operator occurs, the authorized officer shall be notified promptly in writing, and the new operator shall furnish evidence of sufficient bond coverage in accordance with § 3106.6 and subpart 3104 of this title.

(b) A contractor on a leasehold shall be considered the agent of the operator for such operations with full responsibility for acting on behalf of the operator for purposes of complying with applicable laws, regulations, the lease terms, NTL's, Onshore Oil and Gas Orders, and other orders and instructions of the authorized officer.

[53 FR 17363, May 16, 1988; 53 FR 31959, Aug. 22, 1988]

**§ 3162.3–1 Drilling applications and plans.**

(a) Each well shall be drilled in conformity with an acceptable well-spacing program at a surveyed well location approved or prescribed by the authorized officer after appropriate environmental and technical reviews (see § 3162.5–1 of this title). An acceptable well-spacing program may be either (1) one which conforms with a spacing order or field rule issued by a State Commission or Board and accepted by the authorized officer, or (2) one which is located on a lease committed to a communitized or unitized tract at a location approved by the authorized officer, or (3) any other program established by the authorized officer.

(b) Any well drilled on restricted Indian land shall be subject to the location restrictions specified in the lease and/or Title 25 of the CFR.

(c) The operator shall submit to the authorized officer for approval an Application for Permit to Drill for each well. No drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to the authorized officer's approval of the permit.

(d) The Application for Permit to Drill process shall be initiated at least 30 days before commencement of operations is desired. Prior to approval, the application shall be administratively and technically complete. A complete application consists of Form 3160–3 and the following attachments:

(1) A drilling plan, which may already be on file, containing information required by paragraph (e) of this section and appropriate orders and notices.

(2) A surface use plan of operations containing information required by paragraph (f) of this section and appropriate orders and notices.

(3) Evidence of bond coverage as required by the Department of the Interior regulations, and

(4) Such other information as may be required by applicable orders and notices.

(e) Each drilling plan shall contain the information specified in applicable notices or orders, including a description of the drilling program, the surface and projected completion zone location, pertinent geologic data, expected hazards, and proposed mitigation measures to address such hazards. A drilling plan may be submitted for a single well or for several wells proposed to be drilled to the same zone within a field or area of geological and environmental similarity. A drilling plan may be modified from time to time as circumstances may warrant,

with the approval of the authorized officer.

(f) The surface use plan of operations shall contain information specified in applicable orders or notices, including the road and drillpad location, details of pad construction, methods for containment and disposal of waste material, plans for reclamation of the surface, and other pertinent data as the authorized officer may require. A surface use plan of operations may be submitted for a single well or for several wells proposed to be drilled in an area of environmental similarity.

(g) For Federal lands, upon receipt of the Application for Permit to Drill or Notice of Staking, the authorized officer shall post the following information for public inspection at least 30 days before action to approve the Application for Permit to Drill: the company/operator name; the well name/number; the well location described to the nearest quarter-quarter section (40 acres), or similar land description in the case of lands described by metes and bounds, or maps showing the affected lands and the location of all tracts to be leased and of all leases already issued in the general area; and any substantial modifications to the lease terms. Where the inclusion of maps in such posting is not practicable, maps of the affected lands shall be made available to the public for review. This information also shall be provided promptly by the authorized officer to the appropriate office of the Federal surface management agency, for lands the surface of which is not under Bureau jurisdiction, requesting such agency to post the proposed action for public inspection for at least 30 days. The posting shall be in the office of the authorized officer and in the appropriate surface managing agency if other than the Bureau. The posting of an Application for Permit to Drill is for information purposes only and is not an appealable decision.

(h) Upon initiation of the Application for Permit to Drill process, the authorized officer shall consult with the appropriate Federal surface management agency and with other interested parties as appropriate and shall take one of the following actions as soon as practical, but in no event later than 5 working days after the conclusion of the 30-day notice period for Federal lands, or within 30 days from receipt of the application for Indian lands:

(1) Approve the application as submitted or with appropriate modifications or conditions;

(2) Return the application and advise the applicant of the reasons for disapproval; or

(3) Advise the applicant, either in writing or orally with subsequent written confirmation, of the reasons why final action will be delayed along with the date such final action can be expected.

The surface use plan of operations for National Forest System lands shall be approved by the Secretary of Agriculture or his/her representative prior to approval of the Application for Permit to Drill by the authorized officer. Appeals from the denial of approval of such surface use plan of operations shall be submitted to the Secretary of Agriculture.

(i) Approval of the Application for Permit to Drill does not warrant or certify that the applicant holds legal or equitable title to the subject lease(s) which would entitle the applicant to conduct drilling operations.

(j) When submitting an Application for Permit to Drill an oil well, the operator must also submit a plan to minimize waste of natural gas from that well. The waste minimization plan must accompany, but would not be part of, the Application for Permit to Drill. The waste minimization plan must set forth a strategy for how the operator will comply with the requirements of 43 CFR subpart 3179 regarding control of waste from venting and flaring, and must explain how the operator plans to capture associated gas upon the start of oil production, or as soon thereafter as reasonably possible, including an explanation of why any delay in capture of the associated gas would be required. Failure to submit a complete and adequate waste minimization plan is grounds for denying or disapproving an Application for Permit to Drill. The waste minimization plan must include the following information:

(1) The anticipated completion date of the proposed well(s);

(2) A description of anticipated production, including:

(i) The anticipated date of first production;

(ii) The expected oil and gas production rates and duration from the proposed well. If the proposed well is on a multi-well pad, the plan should include the total expected production for all wells being completed;

(iii) The expected production decline curve of both oil and gas from the proposed well; and

(iv) The expected Btu value for gas production from the proposed well.

(3) Certification that the operator has provided one or more midstream processing companies with information about the operator's production plans, including the anticipated completion dates and gas production rates of the proposed well or wells;

(4) Identification of a gas pipeline to which the operator plans to connect, with sufficient capacity to accommodate the anticipated production of the proposed well(s), and information on the pipeline, including, to the extent that the operator can obtain it, the following information:

(i) Maximum current daily capacity of the pipeline;

(ii) Current throughput of the pipeline;

(iii) Anticipated daily capacity of the pipeline at the anticipated date of first gas sales from the proposed well;

(iv) Anticipated throughput of the pipeline at the anticipated date of first gas sales from the proposed well; and

(v) Any plans known to the operator for expansion of pipeline capacity for the area that includes the proposed well; and

(5) If an operator cannot identify a gas pipeline with sufficient capacity to accommodate the anticipated production of the proposed well(s), the waste minimization plan must also include:

(i) A gas pipeline system location map of sufficient detail, size, and scale as to show the field in which the proposed well will be located, and all existing gas trunklines within 20 miles of the well. The map should also contain:

(A) The name and location of the gas processing plant(s) closest to the proposed well(s), and of the intended destination processing plant, if different;

(B) The location and name of the operator of each gas trunkline within 20 miles of the proposed well;

(C) The proposed route and tie-in point that connects or could connect the subject well to an existing gas trunkline;

(ii) The total volume of produced gas, and percentage of total produced gas, that the operator is currently flaring or venting from wells in the same field and any wells within a 20-mile radius of that field; and

(iii) A detailed evaluation, including estimates of costs and returns, of opportunities for on-site capture approaches, such as compression or liquefaction of natural gas, removal of natural gas liquids, or generation of electricity from gas.

[47 FR 47765, Oct. 27, 1982. Redesignated and amended at 48 FR 36583, Aug. 12, 1983, further amended at 52 FR 5391, Feb. 20, 1987; 53 FR 17363, May 16, 1988; 53 FR 22846, June 17, 1988; 53 FR 31958, Aug. 22, 1988; 81 FR 83078, Nov. 18, 2016]

## § 3162.3–2 Subsequent well operations.

(a) A proposal for further well operations must be submitted by the operator on a Sundry Notice and Report on Wells (Form 3160–5) as a Notice of Intent for approval by the authorized officer prior to commencing operations to redrill, deepen, perform casing repairs, plug-back, alter casing, recomplete in a different interval, perform water shut off, combine production between zones, and/or convert to injection. If there is additional surface disturbance, the proposal shall include a surface use plan of operations. A subsequent report on these operations also will be filed on Form 3160–5. The authorized officer may prescribe that each proposal contain all or a portion of the information set forth in § 3162.3–1 of this title.

(b) Unless additional surface disturbance is involved and if the operations conform to the standard of prudent operating practice, prior approval is not required for acidizing jobs or recompletion in the same interval; however, a subsequent report on these operations must be filed using a Sundry Notice and Report on Wells (Form 3160–5).

(c) No prior approval or a subsequent report is required for well cleanout

549555
Justice
Lot 9
55

REF
J
80
.A68
3700-3949

U.S. President

# EXECUTIVE ORDERS

Nos. 3700 - 3949

June 27, 1922 - January 28, 1924

Government Printing Office
Washington: 1922-24

# Executive Order

WHEREAS there are large seepages of petroleum along the Arctic Coast of Alaska and conditions favorable to the occurrence of valuable petroleum fields on the Arctic Coast and,

WHEREAS the present laws designed to promote development seem imperfectly applicable in the region because of its distance, difficulties, and large expense of development and,

WHEREAS the future supply of oil for the Navy is at all times a matter of national concern,

NOW, THEREFORE, I, WARREN G. HARDING, President of the United States of America, by virtue of the power in me vested by the laws of the United States, do hereby set apart as a Naval Petroleum Reserve all of the public lands within the following described area not now covered by valid entry, lease or application:

Commencing at the most northwestern extremity of the point of land shown on the maps of Alaska as Icy Cape, approximately lat. 70° 21′, long. 161° 46′; thence extending in a true south course to the crest of the range of mountains forming the watershed between the Noatak River and its northern tributaries and the streams flowing into the Arctic Ocean; thence eastward along the crest of this range of mountains to a peak at the head of the northermost of the two eastern forks of Midas Creek (Pl. 1, U.S.G.S., Bull. 536), at approximately lat. 67° 50′, long. 156° 08′; thence in a true north course to a point at the highest high water on the western or right bank of the Colville River; thence following said highest highwater mark downstream along said Colville River and the western bank of the most western slough at its mouth to the highest highwater mark on the Arctic coast. From here, following the highest highwater mark westward to the point of beginning.

The coast line to be followed shall be that of the ocean side of the sandspits and islands forming the barrier reefs and extending across small lagoons from point to point, where such barrier reefs are not over three miles off shore, except in the case of Plover Islands, from Point Tangent to Point Barrow (Pl. 3, U.S.G.S., P.P. 109), long. approximately 154° 50′, where it shall be the highest highwater mark on the outer shore of the islands forming the groups and extending between the most adjacent points of these islands and the sandspits at either end. In cases where the barrier reef is over three miles off shore the boundary shall be the highest highwater mark of the coast of the mainland.

Said lands to be so reserved for six years for classification, examination, and preparation of plans for development and until otherwise ordered by the Congress or the President.

The reservation hereby established shall be for oil and gas only and shall not interfere with the use of the lands or waters within the area indicated for any legal purpose not inconsistent therewith.

WARREN G HARDING

THE WHITE HOUSE,
*Feby. 27, 1923.*

[No. 3797–A.]

GOVERNMENT PRINTING OFFICE

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 19-35008

I am the attorney or self-represented party.

**This brief contains 12,648 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Thekla Hansen-Young

**Date** August 16, 2019