No. 19-35008

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA WILDERNESS LEAGUE, DEFENDERS OF WILDLIFE, THE SIERRA CLUB, AND THE WILDERNESS SOCIETY,

*Plaintiff-Appellants*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, DAVID BERNHARDT, Secretary of the Interior, and BRIAN STEED, in his official capacity as the official exercising the authority of the Director of the Bureau of Land Management,

*Defendant-Appellees*,

and

CONOCOPHILLIPS ALASKA, INC.,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Alaska
No. 3:18-cv-00030-SLG
Hon. Sharon L. Gleason

**APPELLANTS' REPLY BRIEF**

Suzanne Bostrom
Brook Brisson
Valerie Brown
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
*Attorneys for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................1

TABLE OF AUTHORITIES ..................................................................3

TABLE OF ABBREVIATIONS AND ACRONYMS ...............................6

INTRODUCTION ..............................................................................7

ARGUMENT ......................................................................................8

I. BLM Violated NEPA and the NPRPA by Failing to Take a Hard Look at the Impacts of the Lease Sale in a NEPA Analysis..........................................................8

A. Northern Center Was Not Required to Bring a Supplemental NEPA Claim. ..........................................8

B. BLM Failed to Take a Hard Look at the Impacts of the Lease Sale.......................................................13

1. BLM Failed to Take a Hard Look at New Information Related to the USGS Report and New Discoveries Around the Reserve...........................16

2. BLM Failed to Take a Hard Look at New Information Related to Willow......................................18

3. BLM Failed to Take a Hard Look at New Information Related to Other New Discoveries Around the Reserve. ......................................................20

4. BLM Failed to Take a Hard Look at New Information Related to the 2016 Lease Sale. .................23

5. BLM Failed to Take a Hard Look at New Information Related to the GMT-1 Project and the RMS. ....24

II. The District Court Erred in Holding BLM Did Not Need to Conduct a Site-Specific Analysis. ....26

A. Northern Center's Claim Is Not Time Barred. ....26

B. BLM Was Required to Conduct a Site-Specific Analysis for the Lease Sale. ....28

III. The Court Should Vacate the Decision Documents and Leases. ....37

CONCLUSION ....41

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ....................37

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) .................... 12, 36

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
688 F.3d 989 (9th Cir. 2012).................... 38, 40

*California v. Block*,
690 F.2d 753 (9th Cir. 1982).................... passim

*California v. Bureau of Land Mgmt.*,
277 F. Supp. 3d 1106 (N.D. Cal. 2017) ....................38

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ....................41

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .................... passim

*Dent v. Holder*,
627 F.3d 365 (9th Cir. 2010)....................29

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003).................... 11, 12, 27, 36

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
673 F.3d 518 (7th Cir. 2012)....................22

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004).................... 9, 16, 27

*Idaho Sporting Cong. Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2002)....................14

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004)....................14

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) .................... 38, 40

*Mayo v. Reynolds*,
875 F.3d 11 (D.C. Cir. 2017) ........................................................................36

*N. Alaska Envtl. Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006)............................................................ 32, 33

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)...................................................................... 11, 12

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) ........................................................................39

*Native Vill. of Point Hope v. Jewell*,
(*Point Hope*), 740 F.3d 489 (9th Cir. 2014) ............................................. 34, 35

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) ........................................................................24

*New Mexico ex. rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ..................................................... 10, 37

*Pacific Rivers Council v. U.S. Forest Service*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013)...........................................................39

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*,
377 F.3d 1147 (10th Cir. 2004) ......................................................................10

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006)........................................................... passim

*Pollinator Stewardship Council v. Envtl. Prot. Agency*,
806 F.3d 520 (9th Cir. 2015)...........................................................................40

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).........................................................................................25

*Salmon River Concerned Citizens v. Robertson*,
32 F.3d 1346 (9th Cir. 1994)...........................................................................35

*Vill. of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984)...........................................................................34

**Statutes**

5 U.S.C. § 706(2) ....................37
42 U.S.C. § 6503 ....................11
42 U.S.C. § 6504(a) ....................11
42 U.S.C. § 6506a(b) ....................11
42 U.S.C. § 6506a(n)(1) ....................26

**Regulations**

40 C.F.R. §§ 1500–1508 ....................10
40 C.F.R. § 1501.4 ....................14
40 C.F.R. § 1502.5 ....................39
40 C.F.R. § 1508.9 ....................14
40 C.F.R. § 1508.18 ....................10
40 C.F.R. § 1508.27 ....................14
40 C.F.R. § 1508.27(b)(7) ....................24
43 C.F.R. § 46.120 ....................12
43 C.F.R. § 46.140(b) ....................14
43 C.F.R. § 46.140(c) .................... 14, 35
43 C.F.R. § 3131.1–.4 .................... 10, 11
43 C.F.R. § 3131.2(b) .................... 10, 15
43 C.F.R. § 3132.5 ....................11
Implementation of the National Environmental Policy Act of 1969,
73 Fed. Reg. 61292 (Oct. 15, 2008) ....................12
Procedures for Leasing of Oil & Gas in the Nat'l Petroleum
Reserve; Alaska,
46 Fed. Reg. 55494 (Nov. 9, 1981) ....................10

TABLE OF ABBREVIATIONS AND ACRONYMS

| **Abbreviation/Acronym** | **Explanation** |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| DNA | Determination of NEPA Adequacy |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| GMT | Greater Mooses Tooth |
| GMT-1 | Greater Mooses Tooth 1 |
| IAP | Integrated Activity Plan |
| NEPA | National Environmental Policy Act |
| Northern Center | Northern Alaska Environmental Center |
| NPRPA | Naval Petroleum Reserves Production Act |
| NSO | No Surface Occupancy |
| Reserve | National Petroleum Reserve–Alaska |
| RMS | Regional Mitigation Strategy |
| USGS | U.S. Geological Survey |

## INTRODUCTION

This case is about the Bureau of Land Management (BLM) bypassing critical review of the impacts of oil and gas activities in the National Petroleum Reserve–Alaska (Reserve) at the stage when the agency committed itself to allow extensive activities for potentially decades — the lease sale stage. BLM and ConocoPhillips Alaska, Inc. (ConocoPhillips) assert, contrary to the National Environmental Policy Act (NEPA), that BLM was not required to do any further environmental analysis for the lease sale. Instead, BLM seeks to rely on the generalized, programmatic analysis done at the management planning step for the entire Reserve to meet its NEPA obligations for the lease sale, while also promising it can remedy any problems by doing an in-depth analysis later on when companies propose projects.

This violates NEPA. NEPA ensures the agency takes a hard look at the impacts of its decision prior to taking action and that the public is involved. The promise that the agency will engage in later analysis is meaningless if the agency issues leases but fails to retain the full suite of options to prevent impacts, as it did here.

The District Court erred by dismissing Northern Center's hard look claim on the ground that it needed to be brought as a supplemental NEPA claim and by holding BLM was not required to conduct a site-specific analysis. BLM's failure to

conduct any additional NEPA analysis for this lease sale considering the impacts, including site-specific impacts, violates NEPA and BLM's regulations under the Naval Petroleum Reserves Production Act (NPRPA). Accordingly, this Court should reverse the decision of the District Court, hold BLM violated NEPA and the NPRPA, and set aside the leases and related decision documents.

## ARGUMENT

### I. BLM VIOLATED NEPA AND THE NPRPA BY FAILING TO TAKE A HARD LOOK AT THE IMPACTS OF THE LEASE SALE IN A NEPA ANALYSIS.

The District Court erred in dismissing Northern Center's hard look claims on the ground that they should have been brought as a supplemental NEPA claim. Supplementation is not the correct framework. As discussed below, the lease sale is in itself a major federal action subject to NEPA, distinct from the adoption of the management plan. BLM was required to take a hard look at the impacts of the lease sale in a NEPA analysis, including at relevant information indicating the impacts were greater than anticipated in the Integrated Activity Plan (IAP), the management plan for the Reserve. Its failure to do so violates NEPA and the NPRPA.

#### A. Northern Center Was Not Required to Bring a Supplemental NEPA Claim.

The District Court erred in holding BLM was only obligated to conduct additional NEPA analysis if new information rose to the level requiring

supplementation of the IAP.[1] Despite BLM's and ConocoPhillips' assertions to the contrary,[2] supplementation is not the correct framework for analyzing BLM's NEPA obligations for this lease sale.

The question was whether BLM was obligated to conduct an independent NEPA analysis for a later, distinct decision: the lease sale.[3] The question was not whether BLM needed to amend its management plan. The IAP is a management plan for the entire, 23-million-acre Reserve.[4] Despite BLM's arguments about the nature of the IAP,[5] it was not focused on only oil and gas leasing; the IAP looked at a broad range of management issues for the Reserve, including how to protect a range of other values.[6] The IAP laid out general areas BLM could offer for lease at a later point in time.[7] It did not contain the details of the later leasing decisions, specify tracts that would be offered in later lease sales, or obligate the agency to offer areas in subsequent lease sales. Stated differently, the IAP was not an implementation decision binding BLM to a specific course of action for later lease

---

[1] ER 12.
[2] Answering Br. for the Fed. Appellees at 34–36 [hereinafter BLM Br.]; Answering Br. for ConocoPhillips Alaska, Inc. at 32–37 [hereinafter CPAI Br.].
[3] *Cf. High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (recognizing plaintiffs were challenging "specific discrete agency actions," separate from the agency's adoption of a programmatic-level management plan).
[4] ER 171.
[5] *See, e.g.*, ER 33–35.
[6] *See, e.g.*, ER 171, 177.
[7] *See, e.g.*, ER 179.

sales. That decision came later, when BLM held the lease sale and issued the leases.

BLM's and ConocoPhillips' arguments conflate two distinct stages of the oil and gas process. Oil and gas decisions follow a tiered process, with the earliest stage involving adoption of a land use plan, such as the IAP.[8] BLM then separately holds lease sales and issues leases for specific areas.[9] The lease sale is itself a major federal action, distinct from BLM's adoption of the management plan.[10] Both of these stages are subject to NEPA, with the level of detail required in the analysis dependent on the nature and scope of the specific action.[11] Contrary to BLM's assertion that the IAP is the NEPA analysis contemplated by its regulations,[12] BLM's regulations and the Federal Register adopting those regulations confirm that the lease sale and tract selection process — which involve a distinct process set out in the regulations — are themselves subject to NEPA.[13]

---

[8] *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).

[9] *New Mexico ex. rel. Richardson v. Bureau of Land Mgmt.* (*Richardson*), 565 F.3d 683, 716 (10th Cir. 2009); 43 C.F.R. § 3131.1–.4.

[10] *See* 43 C.F.R. § 3131.2(b); 40 C.F.R. § 1508.18.

[11] *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

[12] BLM Br. at 36.

[13] 43 C.F.R. § 3131.2(b); Procedures for Leasing of Oil & Gas in the Nat'l Petroleum Reserve; Alaska, 46 Fed. Reg. 55494, 55495 (Nov. 9, 1981) ("[T]he [regulation] has been changed to make it clear that the tract selection process will include the environmental analysis process required by the National Environmental Policy Act and the regulations in 40 CFR 1500–1508.). The regulations outline the

BLM's and ConocoPhillips' attempts to distinguish the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*) on the ground that it involved a different type of management plan are unavailing.[14] While that case related to a management plan developed pursuant to the Federal Land Policy and Management Act (FLPMA), the principles articulated by the Supreme Court are reflective of how agencies must implement NEPA broadly and instruct that supplementation is not the applicable framework here.[15] The action at issue in the IAP was management of the entire Reserve.[16] The IAP is the guide for how BLM manages a wide range of resources and activities in the Reserve other than oil and gas, including subsistence, fish and wildlife, historic and scenic values, and important habitat areas.[17] The IAP is analogous to the management plan at issue in *SUWA*, as both provided a broad guide for the agencies' management of an array of resources and for future actions, but were not implementation decisions for

---

steps for this lease-sale-specific process, which is separate from the agency's adoption of the IAP. 43 C.F.R. §§ 3131.1–.4, 3132.5.

[14] 542 U.S. 55 (2004); BLM Br. at 34–35; CPAI Br. at 34–35.

[15] *See, e.g.*, *Friends of Yosemite Valley v. Norton* (*Yosemite Valley*), 348 F.3d 789, 800 (9th Cir. 2003) (discussing how management plans determine what future uses will be considered in an area, but are distinct from later implementation decisions).

[16] *See, e.g.*, ER 138–40, 171.

[17] ER 138–50, 171; *see also* 42 U.S.C. §§ 6503, 6504(a), 6506a(b) (identifying BLM's range of management responsibilities as including protection of fish and wildlife and other values).

future actions.[18] *SUWA* therefore instructs that a management plan like the IAP is not generally subject to supplementation, absent a need to amend that plan.[19] Here, Northern Center did not argue BLM needed to amend the IAP. Northern Center argues BLM's later lease sale requires its own separate NEPA analysis. As discussed below, the IAP was not adequate to satisfy NEPA's requirement for an analysis of this lease sale.

ConocoPhillips also misconstrues the NEPA regulation at 43 C.F.R. § 46.120.[20] That provision, in tandem with other regulations, explains how the agency can tier and incorporate existing NEPA analyses to avoid duplication;[21] it does not exempt the agency from having to conduct any NEPA analysis at later stages.[22]

---

[18] *SUWA*, 542 U.S. at 69–70.
[19] *Id.* at 73.
[20] CPAI Br. at 33.
[21] 43 C.F.R. § 46.120; *see also* Implementation of the National Environmental Policy Act of 1969, 73 Fed. Reg. 61292, 61298 (Oct. 15, 2008) (adopting the regulation to "explain[] how to incorporate existing environmental analysis previously prepared pursuant to NEPA and the CEQ regulations *into the analysis being prepared*" (emphasis added)).
[22] *See Blue Mountains Biodiversity Project v. Blackwood* (*Blue Mountains*), 161 F.3d 1208, 1214 (9th Cir. 1998) (adopting a management plan that contemplates certain actions might occur does not exempt those future actions from further NEPA review); *Yosemite Valley*, 348 F.3d at 800–01 (recognizing the agency would need to prepare appropriate NEPA analyses for future actions guided by the management plan).

In sum, Northern Center did not need to bring a supplementation claim because this is not a challenge to BLM's failure to update the IAP. This is a challenge to BLM's failure to do any NEPA analysis for a separate decision: the lease sale. BLM was obligated to comply with NEPA at the lease sale stage by preparing a NEPA analysis taking a hard look at the impacts of that independent decision. It failed to do so.

### B. BLM Failed to Take a Hard Look at the Impacts of the Lease Sale.

BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the lease sale in a NEPA analysis. The lease sale was in itself a major federal action subject to NEPA.[23] Despite this, BLM failed to prepare an environmental analysis to evaluate the impacts of this specific lease sale, even though relevant new information indicated the impacts would be far greater than previously analyzed.

BLM instead relied on the programmatic-level NEPA analysis from the Reserve-wide IAP. For the decision to hold the lease sale and enter into those leases, BLM prepared only a non-NEPA document: a Determination of NEPA Adequacy (DNA). A DNA is not a NEPA document and cannot contain NEPA

---

[23] *See supra* Part I.A.

analysis.[24] As explained above, this is not a supplemental NEPA case. As such, it does not fall within the limited circumstances related to supplementation where the Ninth Circuit has allowed the use of DNAs.[25] BLM's analysis of the significance of the new information presented by Northern Center is precisely the type of analysis (in combination with additional analysis) that should have taken place in at least an environmental assessment (EA).[26]

Regardless, the original DNA provided no indication the agency took a hard look at any of the information identified by Northern Center; it contained only conclusory statements that there was no new information that would change the analysis and conclusions in the IAP.[27] This is not sufficient to show the agency took a hard look at the impacts of the lease sale.[28]

---

[24] Appellants' Opening Br. at 41–42 [hereinafter Opening Br.]; *see Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2002).
[25] *See Idaho Sporting Cong.*, 222 F.3d at 566.
[26] Opening Br. at 42; 40 C.F.R. §§ 1501.4, 1508.9, 1508.27. Under the tiering regulations, an agency may only be required to prepare an EA where an action has significant impacts if it tiers to a "broader [EIS] which fully analyzed those significant effects." 43 C.F.R. § 46.140(c).The tiering regulations do not exempt the agency from having to do any NEPA analysis. *Id.* § 46.140(b).
[27] ER 52–56; Opening Br. at 45.
[28] *See, e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004) (indicating conclusory statements do not constitute a hard look).

It was not until Northern Center filed this litigation that BLM provided an after-the-fact rationale in its revised DNA.[29] BLM's and ConocoPhillips' arguments about the sufficiency of the revised DNA misinterpret BLM's regulations, which require the agency to comply with NEPA and conduct the necessary environmental analysis prior to the lease sale and as part of the tract selection process.[30] BLM cannot fix the violation of its leasing regulations by rewriting its DNA after the lease sale. Even if it were legally sufficient to do so in a DNA, which it is not, here the agency conducted the additional analysis at a time when that analysis could no longer inform the agency's tract selection process or whether to impose additional mitigation measures.[31]

Even if the court looks to the revised DNA, BLM's rationale for dismissing the new information is not reasonable and is not subject to the high level of deference claimed by BLM and ConocoPhillips.[32] Although an agency decision not to prepare an environmental impact statement (EIS) is normally reviewed under the arbitrary and capricious standard, BLM is subject to a lower reasonableness standard here because it did not take the initial step of preparing an EA for the

---

[29] ER 52–60; Fed. Defs.' Resp. to Pls.' Mot. for Summ. J. at 27 n.8, D. Ct. ECF No. 47 [hereinafter BLM D. Ct. Br.].
[30] 43 C.F.R. § 3131.2(b); *see supra* note 13.
[31] 43 C.F.R. § 3131.2(b).
[32] *See* BLM Br. at 36; CPAI Br. at 37.

lease sale.[33] BLM's dismissal of the information in a non-NEPA document was unreasonable and contrary to NEPA.

#### 1. *BLM Failed to Take a Hard Look at New Information Related to the USGS Report and New Discoveries Around the Reserve.*

BLM's dismissal of relevant new information related to the U.S. Geological Survey (USGS) report and other discoveries was unreasonable. BLM points to various assumptions in the IAP related to development and exploration to support its argument that the IAP adequately considered impacts,[34] but omits any reference to one of the most fundamental assumptions: that "few, if any, new high-potential plays would be discovered."[35] A key assumption underpinning BLM's analysis in the IAP was that high-potential discoveries were unlikely. In the IAP, BLM recognized that one of the overarching factors informing its assumption was the decreased potential for oil and gas in the Reserve.[36] The IAP also recognized that, if new exploration indicated more oil could be recovered, BLM would need to reconsider the balance between development and protection of surface resources.[37]

---

[33] *High Sierra Hikers*, 390 F.3d at 640.
[34] BLM Br. 38–39.
[35] ER 217.
[36] ER 157.
[37] ER 157.

BLM's dismissal of the USGS information on the ground that the IAP's estimates are based on what would be economically recoverable instead of technically recoverable is also contrary to the record.[38] The IAP acknowledged both the technically and economically recoverable oil estimates were important and there was a link between those estimates and the likely scale of development.[39] BLM's current dismissal of the information on the ground that the USGS report covered a broader area than just the Reserve also ignores the fact that the USGS revision related largely to the Reserve and was based on several major oil discoveries that occurred in and immediately adjacent to the Reserve, including Willow.[40]

All this information was directly relevant to the question of what the impacts would be from further leasing, and BLM's dismissal of the information was unreasonable. USGS's increase of the oil estimates by nearly six-fold, from approximately 1.5 billion up to 8.7 billion barrels of technically recoverable resources, was a substantial increase going to the heart of BLM's assumptions about how much development might occur in the region. These estimates were key to BLM's analysis of the potential development and impacts in the Reserve, and

---

[38] BLM Br. 39–40.
[39] ER 157, 170, 206.
[40] ER 65.

the substantial revision to those numbers raised serious questions about the likely impact of further leasing and development. The record does not support BLM's current litigation position; instead, it demonstrates BLM failed to take a hard look at this new information in a NEPA analysis and failed to provide a reasoned explanation for dismissing the information, in violation of NEPA.

*2. BLM Failed to Take a Hard Look at New Information Related to Willow.*

Northern Center raised substantial questions related to the potential direct, indirect, and cumulative impacts in light of ConocoPhillips' Willow discovery. BLM and ConocoPhillips claim the IAP fully accounted for Willow as part of its Greater Mooses Tooth analysis.[41] This is contrary to BLM's concession in the District Court that the IAP did not consider infrastructure at the location of the Willow discovery.[42] It is also contrary to the record because the Willow discovery did not merely validate anticipated oil reservoirs in the Greater Mooses Tooth and Bear Tooth Units — it vastly expanded what BLM anticipated might be discovered and developed in that region.[43] In the IAP, BLM estimated a total of 128 million barrels of undiscovered economically recoverable oil might be found in the

[41] ER 56; BLM Br. at 42; CPAI Br. 42–43.
[42] BLM D. Ct. Br. at 43 n.17.
[43] ER 217.

northeast corner of the Reserve and assumed the total amount of undiscovered economically recoverable oil for the entire Reserve was 491 million barrels.[44] The Willow discovery alone accounts for roughly two-thirds of this total for the *entire* Reserve and is well above what BLM assumed might be developed in the northeast corner of the Reserve.[45]

Contrary to BLM's assertions, the IAP did not account for development on this scale or in such a concentrated area near existing development.[46] The impacts from the development of 491 million barrels of oil spread out across the entire Reserve, as considered in the IAP, are very different from development of much of that amount in a concentrated area around Willow and existing development. The IAP's generalized consideration of hypothetical oil and gas developments that might occur did not take into account the compounding effects development on Willow's scale would have on subsistence and other values in that concentrated area.[47] BLM's assertion that it will comply with NEPA by analyzing the impacts at a later stage is also meaningless if the agency no longer retains the ability to fully deny a development proposal, even where the impacts are substantial.[48] BLM's

---

[44] ER 229 & fig.4-12.
[45] *See* ER 229 & fig.4-12.
[46] BLM Br. at 42–43.
[47] *See infra* Part I.B.2, .5.
[48] BLM Br. at 43 n.4; *see infra* Part II.B (discussing how BLM waived its right to later say no to projects).

dismissal of this information was unreasonable and contrary to the evidence before the agency, in violation of NEPA.

#### 3. *BLM Failed to Take a Hard Look at New Information Related to Other New Discoveries Around the Reserve.*

Northern Center raised substantial questions about the potential impacts of other discoveries in the region that could substantially increase the cumulative impacts to subsistence and other resources in the Reserve. BLM acknowledges in the revised DNA there was the potential for these projects to cumulatively combine with impacts from leasing and development in the Reserve,[49] but never analyzed the significance of this information in a NEPA analysis. BLM and ConocoPhillips instead dismiss this information by asserting that the developments are outside the Reserve and the IAP contemplated generally that exploration might lead to discoveries outside the Reserve.[50] The Court should reject these arguments.

The generalized assessment in the IAP that exploration and future discoveries might occur is not sufficient to satisfy NEPA at this stage. The IAP did not contemplate there would be discoveries and developments of this scale so close to the Reserve and existing development.[51] Nanushuk is a massive new

---

[49] ER 57.
[50] BLM Br. at 44–45; CPAI Br. at 44–46.
[51] Opening Br. at 52–53.

development that will extend the existing infrastructure at Prudhoe Bay up to the border of the Reserve, just outside the community of Nuiqsut and adjacent to ConocoPhillips' existing infrastructure in the Reserve.[52] The fact that there will not be activities in the Reserve from this development does not mean that there will not be impacts to subsistence and other values in the Reserve from this development.[53] NEPA's consideration of impacts is not limited to the boundaries of the Reserve.

The Nanushuk project will further encircle the community of Nuiqsut with development and will have serious cumulative impacts that BLM should have considered as part of its cumulative impacts analysis for the lease sale. Smith Bay is another massive discovery in state waters just outside the Reserve.[54] BLM's dismissal of Smith Bay on the ground that areas near there are closed to leasing ignores the fact that there could be both offshore and related onshore activities and infrastructure with the potential for serious impacts in the Reserve.[55] Despite the significance of these discoveries and the potential for cumulative impacts, BLM failed to take the threshold step of analyzing their significance in an EA. It cannot

---

[52] *Id.* at 22–23.
[53] *Cf.* BLM Br. at 44 (noting BLM's explanation for rejecting this information was that it was outside of the Reserve).
[54] Opening Br. 52–53.
[55] ER 56.

now rely on its cursory dismissal of the impacts in the revised DNA to satisfy NEPA.

ConocoPhillips' reliance on *Habitat Education Center, Inc. v. U.S. Forest Service* is misplaced.[56] That case is not on point because it involves a supplemental EIS (SEIS) claim. Because this is not an SEIS case, Northern Center was not required to show new scientific evidence to trigger BLM's NEPA obligations. The lease sale was an independent major federal action subject to NEPA and this relevant new information about the cumulative impacts should have been considered in a NEPA analysis. ConocoPhillips' claim that the projects will be analyzed later is also off point because BLM was obligated at this stage to consider the full range of potential impacts of the lease sale in light of this information.[57] BLM's dismissal of this information was unreasonable, and its failure to consider the cumulative impacts of the Nanushuk and Smith Bay discoveries, at a minimum, in an EA prior to the lease sale violates NEPA.

---

[56] 673 F.3d 518 (7th Cir. 2012); CPAI Br. at 46–47.
[57] *See infra* Part II.B (discussing how BLM waived its right to later say no to projects).

#### 4. *BLM Failed to Take a Hard Look at New Information Related to the 2016 Lease Sale.*

Northern Center raised substantial questions about the potential impacts of the lease sale in light of the results of the 2016 lease sale. BLM dismissed this information on the ground that the IAP already assumed there would be leasing and that there was more acreage under lease at the time of the IAP.[58] But the IAP's 2013 assumptions about the likely levels of leasing and development were set against a backdrop where interest in the Reserve had been waning, where there had been substantial reductions in the anticipated oil quantities, and where many companies were relinquishing their leases.[59] The 2016 lease sale, combined with other discoveries like Willow, marked a shift in not only the level of interest in the Reserve, but also the potential levels of development. Almost all the leases in 2016 were also obtained by ConocoPhillips, which was already moving forward aggressively with development, in an area that would extend existing development activity.[60]

The 2016 lease sale and related discoveries indicated there was far greater interest and an increased likelihood of significant development in an area that was

---

[58] ER 57–58; BLM Br. at 46; CPAI Br. at 47–48.
[59] ER 247.
[60] Opening Br. at 55; ER 99–104.

already experiencing serious impacts to subsistence and other resources, beyond what BLM considered in the IAP. All this information was relevant and related directly to the likely cumulative impacts from additional leasing. NEPA requires that, when several actions have the potential for cumulative effects, agencies consider those potential consequences in a NEPA analysis.[61] BLM failed to take a hard look at this information in a NEPA analysis and its explanation for dismissing the information is unreasonable.

5. *BLM Failed to Take a Hard Look at New Information Related to the GMT-1 Project and the RMS.*

Northern Center raised substantial questions about the potential impacts of the lease sale to subsistence uses in light of the Greater Mooses Tooth-1 (GMT-1) decision and BLM's development of a Regional Mitigation Strategy (RMS). BLM concedes that the findings related to subsistence impacts were at odds with those in the IAP, but argues now that BLM will analyze those impacts and require appropriate mitigation if later proposals indicate there will be impacts to subsistence not anticipated at the time of the IAP.[62] BLM's assertions that it will address subsistence impacts at a later point in time are meaningless because the

---

[61] 40 C.F.R. § 1508.27(b)(7); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378–79 (9th Cir. 1998).
[62] BLM Br. at 47–48; *see also* CPAI Br. at 49–50.

agency also claims it no longer has the authority to deny those proposals and adopt a no action alternative.[63] The purpose of NEPA is to ensure agencies take a hard look at potential impacts prior to committing resources — not after.[64]

BLM's and ConocoPhillips' arguments are also contrary to the record. They ignore the fact that BLM recognized in the GMT-1 decision that there would be serious impacts to subsistence from not only GMT-1, but also other development projects going forward.[65] BLM's GMT-1 decision acknowledged the intensity and degree of impacts to subsistence from development in the region were higher than anticipated in the IAP.[66] Contrary to ConocoPhillips' assertions, those impacts were not due to a "unique risk" from ConocoPhillips' preferred project design.[67] Because the existing measures in the IAP were not sufficient to adequately address these impacts, BLM prepared an RMS to address the impacts of GMT-1 and future developments.[68] BLM never even mentions the RMS in its DNAs.[69] BLM's

---

[63] *See infra* Part II.B; *Block*, 690 F.2d at 763 (indicating the promise to conduct a more detailed NEPA analysis in the future is meaningless if the agency no longer retains the authority to adopt an alternative); *see also infra* note 86 (discussing how BLM takes the position it can no longer adopt the no action alternative in development decisions).
[64] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[65] ER 115–17, 123–24.
[66] ER 123–24.
[67] ER 121; Opening Br. at 57; CPAI Br. at 49.
[68] ER 58.
[69] ER 58, 78–81.

dismissal of this information was unreasonable. BLM should have evaluated this relevant information in a NEPA analysis for the lease sale. Its failure to do so violates NEPA.

## II. THE DISTRICT COURT ERRED IN HOLDING BLM DID NOT NEED TO CONDUCT A SITE-SPECIFIC ANALYSIS.

The District Court also erred in concluding BLM did not need to conduct a site-specific NEPA analysis. First, because this claim is not a challenge to the IAP, it is not time barred. Second, because BLM made an irretrievable commitment of resources when it issued the leases, it was required to conduct a site-specific analysis prior to the lease sale. The IAP was programmatic and not a site-specific analysis, and BLM did not do any other site-specific analysis prior to the lease sale. BLM's failure to conduct a site-specific analysis for the lease sale violates NEPA.

### A. Northern Center's Claim Is Not Time Barred.

Contrary to BLM's assertion,[70] this claim is not barred by the 60-day statute of limitations in the NPRPA.[71] BLM raised and lost the same argument in the district court.[72] In making this argument, BLM misunderstands Northern Center's

[70] BLM Br. at 21–23.
[71] 42 U.S.C. § 6506a(n)(1).
[72] ER 9–11.

claim as being a challenge to the level of analysis in the IAP.[73] Northern Center is not bringing a challenge to the IAP. Northern Center is challenging BLM's failure to conduct a site-specific analysis prior to the lease sale — the point at which it made an irretrievable commitment of resources. The lease sale is an independent agency action subject to NEPA; it is a separate decision from BLM's adoption of the IAP.[74]

BLM's argument would effectively force plaintiffs to raise their site-specific claim before there is a legal obligation for BLM to conduct that analysis. As discussed next, an agency is not required to fully evaluate site-specific impacts until it proposes to make an irretrievable commitment.[75] Here, that occurred when BLM issued leases that did not retain its authority to later deny all activities on that lease.[76] BLM could, and did, postpone conducting a site-specific analysis in the IAP. However, once BLM issued the leases, it made an irretrievable commitment and was obligated to conduct a site-specific analysis.[77] This NEPA violation occurred at the time of the lease sale and not when BLM adopted the IAP. Accordingly, the statute of limitations does not apply.

---

[73] BLM Br. at 21–23.
[74] *Cf. High Sierra Hikers*, 390 F.3d at 639.
[75] *Yosemite Valley*, 348 F.3d at 800 (quoting *Block*, 690 F.2d at 761).
[76] *Conner v. Burford*, 848 F.2d 1441, 1448 (9th Cir. 1988).
[77] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006).

### B. BLM Was Required to Conduct a Site-Specific Analysis for the Lease Sale.

BLM was obligated to conduct a site-specific analysis prior to the lease sale because it made an irretrievable commitment of resources.[78] Its failure to do so violates NEPA. BLM made an irretrievable commitment of resources when it issued the leases because it did not retain the authority to wholly preclude any surface disturbing activities in the future.[79] It was undisputed to date that BLM did not retain this authority and had made an irretrievable commitment of resources in awarding the leases.[80] On appeal, BLM makes conflicting statements about the nature of the leases. BLM concedes it made an irretrievable commitment when it issued the leases and needed to prepare a sufficiently site-specific assessment (which it claims it did in the IAP),[81] but also contradicts itself by claiming it retains the authority to impose restrictions on future activities.[82]

While BLM may have the ability to regulate activities, that is not the same as retaining the authority to prohibit surface-disturbing activities on leases — i.e.,

---

[78] *Block*, 690 F.2d at 761.
[79] *See, e.g.*, ER 70; Opening Br. at 60–61.
[80] Opening Br. at 60. Contrary to ConocoPhillips' assertion, CPAI Br. at 27, that irretrievable commitment did not occur at the point of the IAP. The irretrievable commitment occurred at the point of the lease sale, when BLM issued leases that did not retain the ability to preclude all activities.
[81] BLM Br. at 23.
[82] *Id.* at 28–29.

by issuing No Surface Occupancy (NSO) leases.[83] These are not NSO leases.[84] BLM points to mitigation measures it might apply at various stages, but never asserts it issued NSO leases or that it retained the authority to fully prohibit a lessee from engaging in any activities once it issues those leases.[85] BLM's statements on appeal also contradict the position it takes in development decisions in the Reserve, where it claims it no longer has the authority to adopt the no action alternative because it made the decision to allow activities at the lease sale stage.[86] BLM cannot put off analyzing site-specific impacts to a later point when it has already waived the right to preclude those activities.[87] Promises that BLM will analyze the impacts and impose mitigation measures later are contrary to NEPA if the agency no longer has the ability to say no to those projects.

---

[83] *See, e.g.*, ER 70–71 (listing measures BLM can impose "[t]o the extent consistent with the lease rights granted"); *see also Conner*, 848 F.2d at 1448–50 (explaining the difference between NSO leases and non-NSO leases).
[84] Opening Br. at 60.
[85] BLM Br. at 28.
[86] *See, e.g.*, BUREAU OF LAND MGMT. & U.S. ARMY CORPS OF ENG'RS, JOINT RECORD OF DECISION AND PERMIT EVALUATION: PROPOSED GREATER MOOSES TOOTH TWO DEVELOPMENT PROJECT 8 (2018), *available at* https://eplanning.blm.gov/epl-front-office/projects/nepa/65817/160123/195768/Record_of_Decision_with_cover_page.pdf. The court can take judicial notice of agency documents. *Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010).
[87] *Block*, 690 F.2d at 761, 763, 765; *Pit River Tribe*, 469 F.3d at 784; *Conner*, 848 F.2d at 1451.

BLM also contradicts itself by conceding it was obligated to evaluate the site-specific impacts because it made an irretrievable commitment, but later asserting it was not required to examine the site-specific impacts because the lease sale did not authorize on-the-ground activities.[88] BLM was obligated to conduct a site-specific analysis at the point when it proposed to make an irreversible and irretrievable commitment.[89] The Ninth Circuit in *Conner v. Burford* clearly stated the agency crosses that threshold when it issues non-NSO leases, like it did here.[90] It is immaterial to the analysis that BLM did not also authorize additional on-the-ground activities.

ConocoPhillips mischaracterizes the court's holding in *Conner* as relating only to whether an EIS had to be completed for leasing.[91] In *Conner*, the agency prepared EAs, but not an EIS, for a lease sale. One of the agency's improper reasons for concluding it only needed to prepare an EA and not an EIS was because the decision to lease conformed with the requirements of the area's management plan.[92] The question in *Conner* was both when the agency was required to move from a programmatic-level NEPA analysis to a site-specific

---

[88] BLM Br. at 23, 25, 31; *see also* CPAI Br. at 28.
[89] *Block*, 690 F.2d at 761.
[90] 848 F.2d at 1448.
[91] CPAI Br. at 27.
[92] *Conner*, 848 F.2d at 1444, 1446.

NEPA analysis and whether that later analysis needed to be an EIS. The *Conner* court was clear that there needed to be a site-specific NEPA analysis at the leasing stage for the non-NSO leases, and that the EAs were insufficient.[93] Here, the agency's NEPA failure is even more egregious since BLM relied entirely on the programmatic-level IAP without preparing even an EA for the lease sale.

BLM's assertion that the IAP was a site-specific analysis fully covering all subsequent lease sales is contrary to the record.[94] The IAP was a broad, programmatic-level management plan that governed how BLM would manage the entire, 23-million-acre Reserve and multiple resources.[95] The IAP's Record of Decision recognized it was "suitably specific for broad-scale management decisions," while acknowledging that BLM would need to do site-specific NEPA analysis for future decisions approving actions on the ground.[96] The IAP never purported to be a site-specific analysis. Here, BLM cannot defer conducting that

---

[93] *Id.* at 1449–51.
[94] BLM Br. at 25–26, 29.
[95] *See, e.g.*, ER 142, 171. Contrary to ConocoPhillips' assertion, leasing is not "*the action* addressed by the IAP EIS." CPAI Br. at 35. Oil and gas activities were a part of what BLM considered in the IAP, but it also considered more broadly how BLM would manage and protect other surface uses and values in the Reserve. *See, e.g.*, ER 154.
[96] ER 154; Opening Br. at 18–19 (discussing how, outside of the limited areas with known petroleum resources, the IAP only looked at what infrastructure is typical of oil and gas developments generally and did not consider what the impacts of oil and gas might be in specific areas).

site-specific analysis (which it did not do in the IAP) past the point when it makes an irretrievable commitment of resources (which it did in issuing the leases).

The District Court correctly concluded that the IAP was programmatic and never held the IAP was site-specific.[97] However, the District Court erred by equating the terms "parcel-by-parcel" with "site-specific" when holding under *Northern Alaska Environmental Center v. Kempthorne* that BLM was not required to do any NEPA analysis at the leasing stage.[98] The Ninth Circuit in *Kempthorne* reaffirmed the requirement of a site-specific analysis whenever there is an irretrievable commitment of resources.[99] The Ninth Circuit concluded the analysis in that particular EIS was site-specific enough and that the agency did not need to review the potential effects by going parcel by parcel through every lease tract in its EIS.[100] The Ninth Circuit did not hold that the agency was wholly exempt from having to do a site-specific analysis — just that the analysis did not need to be parcel by parcel.[101]

The *Kempthorne* court made a handful of seemingly conflicting statements about the timing and nature of the irretrievable commitment at issue in that case,

---

[97] ER 10.
[98] ER 10–11; *Kempthorne*, 457 F.3d 969 (9th Cir. 2006).
[99] 457 F.3d at 975–76 (citing *Conner*, 848 F.2d 1441).
[100] *Id.* at 976–77.
[101] *Id.*

including stating that it assumed BLM would have the ability to prohibit or deny later applications for activities. That statement appears to be at odds with its conclusion that the leases were non-NSO leases.[102] The Court appeared to indicate the irretrievable commitment stemmed from Congress mandating that there would be a lease sale.[103] However, other case law, including *Conner*, instructs that the irretrievable commitment does not occur until the agency decides to issue a non-NSO lease.[104] Because the court reaffirmed the duty to conduct a site-specific analysis when issuing non-NSO leases and also held that the analysis in that case was sufficiently site-specific, *Kempthorne* should be understood to be ruling on the facts of the case and not to stand for the proposition as a matter of law that site-specific analyses are not required when an agency issues non-NSO leases.[105]

Here, BLM issued non-NSO leases that do not retain the agency's full authority to later deny all proposals without preparing a site-specific analysis.[106] Although BLM was allowed to prepare only a programmatic level of analysis at

---

[102] *Id.* at 976; *see supra* note 86 & accompanying text.
[103] *Kempthorne*, 457 F.3d at 976.
[104] *See, e.g.*, *Conner*, 848 F.2d at 1451.
[105] ConocoPhillips appears to urge this court to interpret *Kempthorne* to mean any management plan that considers leasing generally will be sufficient as a matter of law to fulfill the agency's NEPA obligations to conduct a site-specific analysis at the lease sale stage. CPAI Br. at 25–26, 31. The court in *Kempthorne* did not make that decision and that interpretation would put *Conner* and *Kempthorne* at odds. The IAP also disavowed that it was conducting a site-specific analysis. ER 154.
[106] *See supra* notes 83–86 & accompanying text.

the time of the IAP, BLM is required to conduct a site-specific analysis at this stage, prior to making an irretrievable commitment of resources.[107] While the agency has some amount of leeway in determining the precise level of analysis to perform at leasing,[108] BLM cannot entirely forego doing a NEPA analysis for this lease sale, as it did here. This violates NEPA.

Relying on *Point Hope*, BLM and ConocoPhillips misinterpret Ninth Circuit case law and claim an agency is not required to do a site-specific analysis at the lease sale stage even when there is an irretrievable commitment of resources.[109] *Point Hope* involved an offshore lease sale held pursuant to the Outer Continental Shelf Lands Act (OCSLA). Under OCSLA, there is no irretrievable commitment of resources at the lease sale stage,[110] so the agency is not required to consider the site-specific impacts at that time. Even so, the agency in that case prepared an EIS for both the planning stage and the lease sale stage.[111] The *Point Hope* court reaffirmed that, regardless of the stage, the agency needed to provide as much

---

[107] *Pit River Tribe*, 469 F.3d at 783–84 (stating "vague prior programmatic statements are no longer enough" when there is an irretrievable commitment).
[108] *Native Vill. of Point Hope v. Jewell* (*Point Hope*), 740 F.3d 489, 498 (9th Cir. 2014).
[109] 740 F.3d 489; BLM Br. at 31; CPAI Br. at 26.
[110] *Vill. of False Pass v. Clark*, 733 F.2d 605, 610 (9th Cir. 1984).
[111] *Point Hope*, 740 F.3d at 494, 497–98.

environmental analysis as was reasonably possible in order to foster informed decision making at the stage in question.[112]

BLM's also misrepresents *Salmon River Concerned Citizens v. Robertson* (*Salmon River*) as standing for the proposition that a programmatic impact statement will negate the need for a site-specific impact statement.[113] The statement from that case quoted by BLM refers to the fact that an agency may not need to prepare an EIS level of analysis (as opposed to an EA) if a programmatic EIS has already fully analyzed the action. It does not stand for the conclusion that the agency is wholly exempt from future NEPA reviews or from examining site-specific impacts when it makes an irretrievable commitment of resources.[114] The statement instead reflects the tiering procedures under NEPA.[115] *Salmon River* in fact reaffirmed that the agency would need to prepare a more in-depth EA or EIS when reaching the point of making an irretrievable commitment of resources.[116]

---

[112] *Id.* at 497–98.
[113] 32 F.3d 1346 (9th Cir. 1994); BLM Br. at 30.
[114] *Salmon River*, 32 F.3d at 1356.
[115] 43 C.F.R. § 46.140(c) (indicating an agency may prepare an EA "if the environmental assessment is tiered to a broader [EIS] which fully analyzed those significant effects").
[116] 32 F.3d at 1357–58; *see also Pit River Tribe*, 469 F.3d at 783–84 (examining *Salmon River* and noting the need for a site-specific analysis prior to an irretrievable commitment).

BLM's and ConocoPhillips' reliance on *Mayo v. Reynolds* is also misplaced.[117] The EIS at issue in that case involved a discrete, fifteen-year plan to manage an elk population in a specific area, where the EIS had already fully analyzed that action in depth.[118] The question in the case was whether the agency was required to prepare an SEIS every year the agency took actions specified in that plan.[119] In addition to the fact that this is not a supplementation case,[120] the programmatic EIS at issue here was for a far broader area and was intended to guide at a high level the agency's management of the entire Reserve; it did not make specific leasing decisions. Conversely, the EIS at issue in *Mayo* was a "thorough and detailed" EIS that fully analyzed the site-specific impacts of hunting a specified number of elk over a discrete timeframe.[121] Here, the fact that the IAP contemplated leasing impacts generally and that leasing might occur at future points does not excuse the agency from needing to comply with NEPA at those later stages, particularly where BLM disavowed that the IAP conducted the necessary site-specific analysis.[122]

---

[117] 875 F.3d 11 (D.C. Cir. 2017); BLM Br. at 30–31; CPAI Br. at 24.
[118] *Mayo*, 875 F.3d at 14.
[119] *Id.* at 14, 17–19.
[120] *See supra* Part I.A.
[121] *Mayo*, 875 F.3d at 21, 23–24.
[122] *See, e.g.*, *Blue Mountains*, 161 F.3d at 1214 (stating the adoption of a management plan that contemplates generally that certain actions might occur does not exempt those future actions from further NEPA review); *Yosemite Valley*, 348

In sum, BLM was obligated under NEPA to consider all reasonably foreseeable site-specific environmental impacts at the leasing stage.[123] If BLM did not have enough information to do the required analysis, it could have delayed that analysis provided that it retained its authority to later say no to projects.[124] But the agency cannot both tie its hands by issuing non-NSO leases and completely forego conducting a site-specific NEPA analysis at this stage. BLM's failure to conduct any NEPA analysis looking at the site-specific impacts at the lease sale stage violates NEPA.

## III. THE COURT SHOULD VACATE THE DECISION DOCUMENTS AND LEASES.

The presumptive remedy under the Administrative Procedure Act (APA) is vacatur.[125] It should be applied in this case.[126] Neither BLM nor ConocoPhillips met their burden of demonstrating that this case is one of the "rare circumstances" where remand without vacatur is appropriate.[127] Instead, both misapply the limited

---

F.3d at 800–01 (recognizing the agency would need to prepare appropriate NEPA analyses for future actions guided by the management plan).

[123] *See, e.g.*, *Richardson*, 565 F.3d at 718–19.

[124] *Conner*, 848 F.2d at 1450–51.

[125] 5 U.S.C. § 706(2); Opening Br. at 65; *see also* BLM Br. at 48 (acknowledging the "typical" remedy is vacatur).

[126] Opening Br. at 65–68.

[127] *See id.* at 65–66 & n.247; *see also All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1122 (9th Cir. 2018) (discussing the presumption of vacatur).

exception to vacatur to assert that vacatur is not warranted. Their arguments should be rejected.

Courts have recognized a very narrow exception from the presumptive remedy of vacatur, remanding agency decisions without vacating only in limited circumstances when there could be serious environmental harm from vacating.[128] In doing so, courts consider (1) the seriousness of the agency's error, and (2) the disruptive consequences of vacatur.[129]

Regarding the seriousness of the violation, Northern Center asserts fundamental NEPA violations: BLM failed to do a NEPA analysis taking a hard look at potential impacts, including site-specific impacts, for the lease sale. These are serious violations going to the heart of NEPA's purpose to inform decisions before the agency acts.[130]

BLM and ConocoPhillips argue that vacating the leases is unnecessary to prevent harm to the Reserve because no on-the-ground activities are authorized by

---

[128] Opening Br. at 66.
[129] *Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency* (*Cal. Cmtys.*), 688 F.3d 989, 992 (9th Cir. 2012).
[130] Opening Br. at 67; *see Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.* (*KS Wild*), 109 F. Supp. 3d 1238, 1245 (N.D. Cal. 2015) (finding failure to conduct cumulative impacts analysis was serious error); *cf. California v. BLM*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (stating "[c]ourts generally only remand without vacatur when the errors are minor procedural mistakes").

the leases, and additional NEPA analysis will take place in the future.[131] This argument ignores the central problem with BLM's actions: once leases are issued, BLM foregoes the ability to say no to future projects.[132] While future projects may undergo environmental review, the ability of BLM to respond to the analysis and impacts is limited in critical ways because of its actions now.[133] BLM is committing itself at the lease sale phase to allow activities on lease sites without that decision being informed by an adequate NEPA analysis.

Relatedly, ConocoPhillips asserts that vacatur is not warranted because the NEPA violations are minor procedural issues and that BLM will reach the same decision on remand.[134] This argument relegates NEPA to a paper exercise to justify already-made decisions. That is not the purpose of NEPA.[135] To cure the legal defects, BLM must undertake a NEPA analysis for the lease sale in the first instance — not explain a decision that it already made.[136]

---

[131] BLM Br. at 49; CPAI Br. at 53–54.

[132] *See supra* Part II.B.

[133] For this reason, ConocoPhillips' reliance on *Pacific Rivers Council v. U.S. Forest Service*, 942 F. Supp. 2d 1014 (E.D. Cal. 2013), is misplaced. CPAI Br. at 53–54. Unlike the agency decision at issue in that case, which did not authorize any on-the-ground activities, here BLM's is foreclosing future options by issuing non-NSO leases without first completing a site-specific NEPA analysis.

[134] CPAI Br. at 53.

[135] *See* 40 C.F.R. § 1502.5; *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (raising concerns about after-the-fact NEPA analyses).

[136] *See* Opening Br. at 67–68 (including footnotes).

Regarding the second factor — disruptive consequences — BLM's and ConocoPhillips' arguments are misplaced. The critical focus when looking at the disruptive consequences is whether there is likely to be serious environmental harm from vacatur.[137] There would not be environmental harm from vacatur.[138]

BLM and ConocoPhillips assert that this Court should remand the decision to BLM without vacating the leases to avoid management disruption and economic loss.[139] Contrary to the assertion that vacatur will disrupt management of the Reserve, vacatur would be consistent with BLM's legal obligation to ensure it protects other values in the Reserve. Economic concerns are typically insufficient to justify remand without vacatur. In *California Communities*, the Court noted that there would be a one billion dollar economic impact, loss of hundreds of jobs, and the possibility of rolling blackouts across southern California from vacatur (in addition to increased air pollution and the need for additional legislation).[140] Neither BLM nor ConocoPhillips have identified economic impacts of this scale.[141] The government will still receive the money from a lease sale conducted in

---

[137] *See Pollinator Stewardship Council v. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015).
[138] Opening Br. at 67–68.
[139] BLM Br. at 49; CPAI Br. at 54–55.
[140] *Cal. Cmtys.*, 688 F.3d at 993–94.
[141] *See KS Wild*, 109 F. Supp. 3d at 1246 (rejecting economic arguments).

compliance with NEPA.[142] ConocoPhillips can use seismic and permitting work done to date in the future; it will not be deprived of that information.[143]

Finally, this Court should reject BLM's and ConocoPhillips' requests to remand the case to the District Court to determine the proper remedy or for additional briefing.[144] BLM and ConocoPhillips have had the opportunity to brief the issue of remedy in both the District Court and this Court. This Court is able to grant Northern Center the relief it seeks.[145]

In sum, BLM and ConocoPhillips have failed to meet their burden of demonstrating this case is one of the rare circumstances that justify deviation from the APA's default remedy of vacatur. Accordingly, the Court should vacate BLM's decision documents and the leases.

## CONCLUSION

The District Court erred in dismissing Northern Center's hard look claim on the ground that it should have been brought as an SEIS claim and in holding BLM did not need to do a site-specific analysis. At a minimum, BLM should have prepared an EA analyzing the impacts of this lease sale, including site-specific

---

142 BLM Br. at 49.
143 CPAI Br. at 54–55.
144 BLM Br. at 49–50; CPAI Br. at 51, 56.
145 *See, e.g.*, *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1107 (9th Cir. 2011); *Pit River Tribe*, 469 F.3d at 788.

impacts. BLM violated NEPA and the NPRPA by failing to do so. Northern Center respectfully requests that the Court reverse the District Court's decision, hold BLM violated both NEPA and the NPRPA regulation, and vacate the leases and decision documents.

Date: October 7, 2019

TRUSTEES FOR ALASKA

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)

*Attorneys for Appellants*

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number: 19-35008**

I am the attorney or self-represented party.

**This brief contains 8,292 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties;
- [X] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/Suzanne Bostrom* **Date: October 7, 2019**

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

**Except for the following, all applicable statutes, etc., are contained in the addendum attached to Appellants' Opening Brief.**

## Statutes

42 U.S.C. § 6506a(n)(1) ........ A-2

## Regulations

40 C.F.R. § 1502.5 ........ A-2
40 C.F.R. § 1508.18 ........ A-3
43 C.F.R. § 46.120 ........ A-4
43 C.F.R. § 3131.1 ........ A-5
43 C.F.R. § 3131.4 ........ A-5
43 C.F.R. § 3132.5 ........ A-5

# Addendum

**42 U.S.C. § 6506a(n)(1)**
**Competitive leasing of oil and gas**

(n) Environmental impact statements

(1) Judicial review

Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the National Petroleum Reserve--Alaska shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.

**40 C.F.R. § 1502.5**
**Timing.**

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2).

For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

**40 C.F.R. § 1508.18**
**Major Federal action.**

Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

> (1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.
>
> (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

**43 C.F.R. § 46.120**
**Using existing environmental analyses prepared pursuant to NEPA and the Council on Environmental Quality regulations.**

(a) When available, the Responsible Official should use existing NEPA analyses for assessing the impacts of a proposed action and any alternatives. Procedures for adoption or incorporation by reference of such analyses must be followed where applicable.

(b) If existing NEPA analyses include data and assumptions appropriate for the analysis at hand, the Responsible Official should use these existing NEPA analyses and/or their underlying data and assumptions where feasible.

(c) An existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

(d) Responsible Officials should make the best use of existing NEPA documents by supplementing, tiering to, incorporating by reference, or adopting previous NEPA environmental analyses to avoid redundancy and unnecessary paperwork.

**43 C.F.R. § 3131.1**
**Receipt and consideration of nominations; public notice and participation.**

During preparation of a proposed leasing schedule, the Secretary shall invite and consider suggestions and relevant information for such program from the Governor of Alaska, local governments, Native corporations, industry, other Federal agencies, including the Attorney General and all interested parties, including the general public. This request for information shall be issued as a notice in the Federal Register.

**43 C.F.R. § 3131.4**
**Notice of Sale.**

(a) The State Director Alaska, Bureau of Land Management, shall publish the notice of sale in the Federal Register, and may publish the notice in other publications if he/she deems it appropriate. The publication in the Federal Register shall be at least 30 days prior to the date of the sale. The notice shall state the place and time at which bids are to be filed, and the place, date and hour at which bids are to be opened.

(b) Tracts shall be offered for lease by competitive sealed bidding under conditions specified in the notice of lease sale and in accordance with all applicable laws and regulations. Bidding systems used in sales shall be based on bidding systems included in section (205) (a) (1) (A) through (H) of the Outer Continental Shelf Lands Act Amendments of 1978 (43 U.S.C. 1801 et seq.).

(c) A detailed statement of the sale, including a description of the areas to be offered for lease, the lease terms, conditions and special stipulations and how and where to submit bids shall be made available to the public immediately after publication of the notice of sale.

**43 C.F.R. § 3132.5**
**Award of Leases.**

(a) Sealed bids received in response to the notice of lease sale shall be opened at the place, date and hour specified in the notice of sale. The opening of bids is for the sole purpose of publicly announcing and recording the bids received. No bids shall be accepted or rejected at that time.

(b) The United States reserves the right to reject any and all bids received for any tract, regardless of the amount offered.

(c) In the event the highest bids are tie bids, the tying bidders shall be allowed to submit within 15 days of the public announcement of a tie bid additional sealed bids to break the tie. The additional bids shall include any additional amount necessary to bring the amount tendered with his/her bid to one-fifth of the additional bid. Additional bids to break tie bids shall be processed in accordance with paragraph (a) of this section.

(d) If the authorized officer fails to accept the highest bid for a lease within 90 days or a lesser period of time as specified in the notice of sale, the highest bid for that lease shall be considered rejected. This 90–day period or lesser period as specified in the notice of sale shall not include any period of time during which acceptance, rejection or other processing of bids and lease issuance by the Department of the Interior are enjoined or prohibited by court order.

(e) Written notice of the final decision on the bids shall be transmitted to those bidders whose deposits have been held in accordance with instructions set forth in the notice of sale. If a bid is accepted, 2 copies of the lease shall be transmitted with the notice of acceptance to the successful bidder. The bidder shall, not later than the 15th day after receipt of the lease, sign both copies of the lease and return them, together with the first year's rental and the balance of the bonus bid, unless deferred, and shall file a bond, if required to do so. Deposits shall be refunded on rejected bids.

(f) If the successful bidder fails to execute the lease within the prescribed time or otherwise to comply with the applicable regulations, the deposit shall be forfeited and disposed of as other receipts under the Act.

(g) If the awarded lease is executed by an attorney-in-fact acting on behalf of the bidder, the lease shall be accompanied by evidence that the bidder authorized the attorney-in-fact to execute the lease on his/her behalf. Reference may be made to the serial number of the record and the office of the Bureau of Land Management in which such evidence has already been filed.

(h) When the executed lease is returned to the authorized officer, he/she shall within 15 days of receipt of the material required by paragraph (e) of this section, execute the lease on behalf of the United States. A copy of the fully executed lease shall be transmitted to the lessee.