**No. 19-35008**
OPINION filed July 9, 2020 - Before: M. SMITH and N.R. SMITH, Circuit Judges, and TUNHEIM, District Judge

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

NORTHERN ALASKA ENVIRONMENTAL CENTER, et al.,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,
*Defendants-Appellees*,

and

CONOCOPHILLIPS ALASKA, INC.,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Alaska
No. 3:18-cv-00030-SLG
Hon. Sharon L. Gleason

---

# PETITION FOR REHEARING EN BANC

---

Suzanne Bostrom
Brook Brisson
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
*Attorneys for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... 1

TABLE OF AUTHORITIES ..... 2

INTRODUCTION ..... 5

FACTUAL AND PROCEDURAL BACKGROUND ..... 6

LEGAL BACKGROUND ..... 8

ARGUMENT ..... 10

I. En Banc Review Is Needed to Ensure Consistency with Supreme Court Precedent. ..... 10

II. En Banc Review Is Needed to Ensure Uniform Application of the National Environmental Policy Act. ..... 16

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Cases**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995)....................16

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998)....................18

*California v. Block*,
690 F.2d 753 (9th Cir. 1982).................... 9, 17

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................... 13, 14

*City of Tenakee Springs v. Block*,
778 F.2d 1402 (9th Cir. 1985) .................... 8, 17

*Cold Mountain v. Garber*,
375 F.3d 884 (9th Cir. 2004)....................13

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ....................9

*Forest Guardians v. Forsgren*,
478 F.3d 1149 (10th Cir. 2007) ....................13

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003).................... 9, 11, 13

*Grand Canyon Trust v. Fed. Aviation Admin.*,
290 F.3d 339 (D.C. Cir. 2002) ....................17

*Greater Yellowstone Coal. v. Tidwell*,
572 F.3d 1115 (10th Cir. 2009) ....................13

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2016).................... 14, 15, 21

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*,
295 F.3d 955 (9th Cir. 2002)....................16

*Kleppe v. Sierra Club*,
427 U.S. 390 (1990)....................11

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) .......... 11, 20

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) .......... 8

*N. Alaska Envtl. Ctr. v. Lujan*,
961 F.2d 886 (9th Cir. 1992) .......... 9

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*,
--- F.3d ---, 2020 WL 3866583 .......... *passim*

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) .......... 20

*New Mexico ex. rel. Richardson v. BLM*,
565 F.3d 683 (10th Cir. 2009) .......... 9

*Northcoast Envtl. Ctr. v. Glickman*,
136 F.3d 660 (9th Cir. 1998) .......... 16

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 5, 11, 12, 13

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*,
377 F.3d 1147 (10th Cir. 2004) .......... 9

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) .......... 10

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 20

*Trustees for Alaska v. Hodel*,
806 F.2d 1378 (9th Cir. 1986) .......... 17

*Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*,
454 U.S. 139 (1981) .......... 11

*Western Organization of Resource Councils v.Zinke*,
892 F.3d 1234 (D.C. Cir. 2018) .......... 14, 15, 18

**Statutes**

42 U.S.C. § 4332(2)(C) .......... 8, 11, 19

**Rules**

Fed. R. App. P. 35(a) ....................5

**Regulations**

40 C.F.R. § 1501.4(c) ....................8
40 C.F.R. § 1502.20 ....................8
40 C.F.R. § 1508.18 .................... 8, 15, 19
43 C.F.R. § 1601.0-2 ....................11
43 C.F.R. § 3131.2(b) ....................15

## INTRODUCTION

En banc review is needed to "secure or maintain uniformity of the court's decisions" with Supreme Court precedent as well as to resolve "a question of exceptional importance" regarding the application of the National Environmental Policy Act (NEPA) and the appropriate level of deference to agencies in defining the applicability of NEPA.[1]

In 2013, the Bureau of Land Management (BLM) adopted the management plan for the National Petroleum Reserve-Alaska (Reserve) after completing a NEPA process; in 2017, it held a lease sale in the Reserve without conducting any additional NEPA analysis. The panel decision in this case directly conflicts with the Supreme Court's holding in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*),[2] which held that a high-level management plan similar to the one at issue here is not an "ongoing" federal action subject to supplementation under NEPA. The panel also improperly deferred to the agency's statements about the applicability of NEPA to future decisions — opening the door to agencies defining their actions to circumvent NEPA's statutory mandates. Applying the correct framework under *SUWA* and standard of review, BLM's management plan was not

---

[1] Fed. R. App. P. 35(a).
[2] 542 U.S. 55 (2004); *N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior*, --- F.3d ---, 2020 WL 3866583 (9th Cir. 2020) [hereinafter Slip Op.] (attached).

an ongoing action and BLM could not rely on that plan to eliminate its NEPA obligations for the lease sale, which was a distinct federal action subject to NEPA.

## FACTUAL AND PROCEDURAL BACKGROUND

BLM adopted a comprehensive management plan for the Reserve in 2013, called the Integrated Activity Plan (IAP).[3] The IAP is a broad, programmatic-level plan for how BLM manages a wide range of interests and resources, including oil and gas, wildlife and habitat, subsistence, and other values and activities in the Reserve.[4]

In 2017, BLM conducted an oil and gas lease sale in the Reserve.[5] BLM did not prepare a NEPA document for the lease sale, which was distinct from the agency's adoption of the IAP.[6] Instead, BLM prepared only a determination of NEPA adequacy (DNA), which is not a NEPA document.[7] In the DNA, BLM

---

[3] *See* ER 134–50, 154, 171.
[4] *See* ER 154, 157–62, 171 (stating that the purpose and need of the NEPA review was to "determine the appropriate management of all BLM-managed lands in the [Reserve] in light of new information about surface and subsurface resources and in a manner consistent with existing statutory direction").
[5] ER 64.
[6] ER 52–60.
[7] ER 52–60.

concluded it was not obligated to conduct any further NEPA analysis for the lease sale.[8]

Appellants challenged BLM's failure to prepare a NEPA analysis for the lease sale.[9] The District Court granted summary judgment for the Federal Defendants and Intervenor-Defendant ConocoPhillips Alaska, Inc. (ConocoPhillips) and Petitioners subsequently appealed to the Ninth Circuit.[10]

On appeal, the panel held, contrary to the Supreme Court's decision in *SUWA*, that BLM's IAP is an ongoing action that is subject to the NEPA supplementation regulations. As a result, the panel concluded BLM's only NEPA obligation with respect to the 2017 lease sale was to determine if there was a need to supplement the IAP based on new circumstances and new information.[11] Although the panel correctly reaffirmed that a site-specific analysis is required prior to the agency making an irretrievable commitment of resources, as BLM did when it issued these leases in 2017, the panel did not hold the agency to that standard.[12] The panel instead deferred to BLM's statements in the IAP that it

---

[8] ER 52–60.
[9] Compl. D. Ct. ECF No. 1.
[10] ER 1, 14.
[11] Slip. Op. at 28–29, 36.
[12] Slip Op. at 28–29.

would not conduct any further NEPA analysis for lease sales, absent a need to supplement the IAP.[13]

## LEGAL BACKGROUND

NEPA requires that federal agencies prepare a detailed environmental impact statement (EIS) for any major Federal action that may significantly affect the quality of the human environment.[14] In order to determine whether a project's impacts may be significant enough to require an EIS, an agency may first prepare an environmental assessment (EA).[15]

For multi-stage programs, NEPA requires both programmatic and site-specific analyses.[16] NEPA provides that the environmental analysis conducted at each stage may incorporate by reference previous, related analysis through "tiering."[17] In the oil and gas context, projects and environmental review typically follow a multi-step process, with NEPA review beginning broad and becoming more site-specific at each later step. At the "earliest and broadest level of decision-

[13] *Id.* at 35.
[14] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18 (defining major federal action).
[15] 40 C.F.R. §§ 1501.4(c), 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).
[16] *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir. 1985).
[17] 40 C.F.R. §§ 1502.20, 1508.28 (stating that "[t]iering is appropriate when the sequence of statements or analyses is . . . [f]rom a program, plan, or policy environmental impact statement to a . . . site-specific statement or analysis").

making, [BLM] develops land use plans," such as the IAP.[18] BLM next holds lease sales and issues leases for the use of a specific area.[19] The lessee may then apply for permits to develop its lease.[20] The level of detail required by NEPA at each step varies and depends on the nature and scope of the proposed action.[21]

NEPA requires agencies evaluate the site-specific impacts of an action.[22] Although a programmatic EIS is required to provide "sufficient detail to foster informed decision-making," an agency is not required to fully evaluate site-specific impacts "until a critical decision has been made to act on site development."[23] An agency reaches the threshold triggering site-specific review when it proposes to make an irreversible and irretrievable commitment.[24] In the oil and gas context, that occurs when the agency issues a lease that does not contain a provision reserving the agency's authority to preclude surface occupancy.[25] Once such a

---

[18] *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).
[19] *New Mexico ex. rel. Richardson v. BLM*, 565 F.3d 683, 716 (10th Cir. 2009).
[20] *Id.*
[21] *California v. Block* (*Block I*), 690 F.2d 753, 761 (9th Cir. 1982).
[22] *Id.*
[23] *Friends of Yosemite Valley v. Norton* (*Yosemite Valley*), 348 F.3d 789, 800 (9th Cir. 2003) (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992)).
[24] *Block I*, 690 F.2d at 761.
[25] *Conner v. Burford*, 848 F.2d 1441, 1448–50 (9th Cir. 1988).

lease is issued, "any vague prior programmatic statements are no longer enough" to satisfy NEPA.[26]

## ARGUMENT

### I. EN BANC REVIEW IS NEEDED TO ENSURE CONSISTENCY WITH SUPREME COURT PRECEDENT.

The panel's opinion conflicts with Supreme Court precedent in *SUWA* concerning the nature of agency actions and whether those actions are "ongoing" for purposes of NEPA. The panel correctly set out the framework under NEPA for supplementation when there is an ongoing agency action and for use of tiering when there is a broad EIS and later, distinct agency actions that are themselves subject to NEPA and undertaken consistent with the broader plan.[27] However, the panel incorrectly held that the IAP is an ongoing action for purposes of NEPA, subject only to the supplementation framework, and that BLM has no further NEPA obligations for later lease sales once the IAP is complete. The lease sale was a distinct, major federal action subject to NEPA, separate from adoption of the

[26] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006).
[27] *See, e.g.*, Slip Op. at 24.

IAP.[28] The agency action to hold the 2017 lease sale, which triggered that distinct NEPA obligation, did not occur until several years after the adoption of the IAP.[29]

In *SUWA*, the Supreme Court explained that "land use plans are a preliminary step in the overall process of managing public lands — designed to guide and control future management actions."[30] Supplementation is necessary only if there is a major federal action that has yet to occur for the federal action at issue.[31] Land use plans are not final implementation decisions for actions that require subsequent steps, and are not normally used to make implementation decisions.[32] Approval of a land use plan is a major federal action under NEPA, and that action is complete once the agency approves that plan.[33] Once the plan is

---

[28] 42 U.S.C. § 4332(2)(C).
[29] *See Kleppe v. Sierra Club*, 427 U.S. 390, 401–02, 405–06 (1990) (indicating NEPA requires an impact statement at the point when there is a "proposed action"); *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 146 (1981) ("[A]n EIS need not be prepared simply because a project is contemplated, but only when the project is proposed.").
[30] *SUWA*, 542 U.S. at 69 (internal quotation marks omitted) (quoting 43 C.F.R. § 1601.0-2); *see also Yosemite Valley*, 348 F.3d at 800–01 (discussing how management plans determine what future uses will be considered in a particular area, but are distinct from later implementation decisions).
[31] *SUWA*, 542 U.S. at 73. *Compare Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) (treating a dam construction project as an ongoing major federal action where the construction was not yet completed), *with SUWA*, 542 U.S. at 73 (distinguishing the facts of *Marsh* as involving an ongoing major federal action).
[32] *SUWA*, 542 U.S. at 69–70.
[33] *Id.*

adopted, there is no ongoing major federal action to supplement, absent amendment or revision of that plan.[34]

The IAP is virtually indistinguishable from the management plan at issue in *SUWA*. The Supreme Court's discussion in *SUWA* was in part related to the statutory and regulatory provisions under the Federal Land Policy and Management Act. BLM follows an analogous process in the Reserve.[35] Both plans provided a broad guide for the agency's management of an array of resources and for future actions on federal public lands, but were not implementation decisions for those future actions.[36] The IAP laid out general geographic areas BLM could offer for lease in the future, but did not obligate BLM to actually hold lease sales or specify tracts to offer in any later lease sales. Those decisions did not occur until later in time: at the lease sale.[37]

*SUWA* controls here. It dictates that a broad management plan like the IAP is not an ongoing action.[38] The adoption of the plan governing management of the

---

[34] *Id.*
[35] ER 176 (stating the IAP "analyzes a range of possible future BLM management practices for [the Reserve] in a manner similar to that done in a resource management plan" under FLPMA).
[36] *SUWA*, 542 U.S. at 69–70.
[37] *See, e.g.*, ER 69, 72.
[38] *SUWA*, 542 U.S. at 73.

Reserve was complete when the agency adopted the IAP.[39] The agency's later action to hold lease sales consistent with the plan does not make the IAP ongoing for purposes of NEPA.[40] Consistent with the Supreme Court's decision in *SUWA*, supplementation is not the correct framework for analyzing BLM's NEPA obligations for the later action — this lease sale. The lease sale itself was a distinct, major federal action subject to NEPA, separate from adoption of the IAP. The panel's dismissal of Appellants' NEPA claims on the ground that they should have been brought as supplementation claims and that BLM had no other NEPA obligations for the lease sale directly conflicts with *SUWA*.[41]

The panel's decision conflicts with other Ninth Circuit and sister circuit decisions interpreting *SUWA* and setting out agencies' obligations under NEPA.[42]

---

[39] ER 134–67.
[40] *SUWA*, 542 U.S. at 73.
[41] Slip Op. at 36.
[42] *See, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094–95 (9th Cir. 2013); *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004) (concluding under *SUWA* that issuance of a permit was not an ongoing major federal action requiring supplementation because the permit was approved and issued, and the Forest Service's obligation under NEPA was fulfilled); *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (holding a permit decision was not ongoing under *SUWA*, even though the agency retained discretion to amend the permit); *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1153–58 (10th Cir. 2007) (explaining how, under *SUWA*, the Forest Service's management plan did not constitute an ongoing agency action and that, once a plan is in place, the agency action takes place through later implementation decisions); *see also Yosemite Valley*, 348 F.3d at 801 (recognizing the agency would need to

In *Center for Biological Diversity v. Salazar* (*CBD*), this Court stated that a plan of operations for a mine was not subject to supplementation because, under *SUWA*, there was no ongoing major federal action subject to supplementation.[43] Importantly, the Court recognized that additional, independent actions related to the mine potentially constituted major federal actions requiring their own NEPA analyses.[44]

The D.C. Circuit's decision in *Western Organization of Resource Councils v. Zinke* (*WORC*) regarding an analogous leasing program further highlights the conflict created by the panel's decision.[45] In *WORC*, the court held the agency was not required to supplement an EIS for the federal coal management program, even where the agency continued to conduct coal leasing pursuant to that plan after adoption.[46] Relying on *SUWA*, the court said "the fact that actions continue to occur in compliance with the Program does not render the original action

---

do NEPA analyses for future actions guided by the management plan); *cf. High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2016) (recognizing later agency actions, such as issuance of a permit, were "specific discrete agency actions" separate from adoption of a management plan).

[43] 706 F.3d at 1095.

[44] *Id.*

[45] 892 F.3d 1234 (D.C. Cir. 2018).

[46] *Id.* at 1243.

incomplete."[47] The court recognized that "[e]ach lease issued under the Program represents a new 'federal action'" requiring a NEPA analysis — even where the later actions, such as lease sales, were taken pursuant to that plan.[48]

The Supreme Court, this Circuit, and the D.C. Circuit's cases establish that the IAP is not an ongoing decision subject to supplementation because that action — adoption of a broad management plan — was complete upon adoption. They instruct that the fact that the agency continues to conduct lease sales consistent with the IAP does not render the management plan ongoing for purposes of NEPA. Such a conclusion would be contrary to *SUWA*. Instead, the lease sale decision is a distinct, subsequent federal action,[49] with an acknowledged irretrievable commitment of resources.[50] It independently triggers NEPA and requires preparation of at least an EA.[51] En banc review is necessary to ensure consistency with the Supreme Court's decision in *SUWA* and precedent in the Ninth and sister circuits.

---

[47] *Id.*
[48] *Id.* at 1240, 1244–45 ("NEPA compels the Department to include a complete environmental analysis in its proposal for any new major Federal action—even actions taken pursuant to the Federal Coal Management Plan.").
[49] *See High Sierra Hikers Ass'n*, 390 F.3d at 639.
[50] Slip Op. at 15.
[51] *WORC*, 892 F.3d at 1240, 1244–45; 43 C.F.R. § 3131.2(b); 40 C.F.R. § 1508.18.

## II. EN BANC REVIEW IS NEEDED TO ENSURE UNIFORM APPLICATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT.

The panel also provided unlawful deference to BLM's statements that it would not conduct any further NEPA analysis for lease sales and that the IAP analysis was both a programmatic and site-specific analysis covering both plan adoption of the IAP and all subsequent lease sales. The panel's deference to BLM's statements that it would conduct no further NEPA analysis is a matter of national importance warranting en banc review because it opens the door for agencies to label their action as consistent with the law, while acting inconsistently with the law and forgoing NEPA analysis.

Courts distinguish between "the strong level of deference . . . accord[ed] an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions."[52] An agency's decision that a particular project does not require preparation of an EIS, without first preparing an EA, is primarily a legal determination and the court reviews the decision under a less deferential standard of "reasonableness."[53] When an agency is interpreting NEPA

---

[52] *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).
[53] *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998).

itself — such as the definition of a major federal action — the court owes no deference to that interpretation.[54]

An agency has some amount of discretion in defining the scope of an EIS and could potentially do a NEPA analysis for both broad-scale and site-specific purposes in an EIS.[55] However, this Court has recognized that undertaking such an analysis in the context of a large-scale land use plan would be "no simple task" and would be "laden with empirical uncertainty."[56] Even to the extent the agency has some discretion to define the scope of its actions, that discretion "does not allow the agency to determine the specificity required by NEPA."[57] Where an EIS purports to be both programmatic and site-specific, but does not actually contain the necessary analysis, the agency is not entitled to deference and is not excused from having to comply with NEPA for those later, site-specific decisions.[58]

---

[54] *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 342 (D.C. Cir. 2002); *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1384 n.10 (9th Cir. 1986).
[55] *Block I*, 690 F.2d at 765.
[56] *Id.*
[57] *City of Tenakee Springs*, 778 F.2d at 1407.
[58] *See Block I*, 690 F.2d at 766 (stating that, if an agency chooses to do a programmatic and site-specific analysis in the same NEPA document, it may not "rely upon forecasting difficulties or the task's magnitude" as an excuse for not conducting the required site-specific analysis).

Appellants' position in this case was not that the agency could never conduct such an analysis as a matter of law. Instead, Appellants' asserted that BLM did not undertake such an analysis in the IAP. The lease sale is an independent agency action triggering NEPA and the IAP did not contain a site-specific analysis for the lease sale.[59] Because BLM did not undertake that analysis in the IAP, BLM was not excused from complying with NEPA for the lease sale.

Here, the panel correctly concluded that issuance of the leases constituted an irretrievable commitment of resources, which required a site-specific analysis under NEPA.[60] However, the panel incorrectly deferred to BLM's statements in the IAP that it was unlikely to conduct any NEPA analysis for future lease sales and would rely on the IAP for the required NEPA analysis.[61] The panel recognized that there were significant questions about the depth of analysis in the IAP, which it noted only contained a "minimal degree of site specificity" and did not consider

---

[59] *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (indicating nothing exempts an agency from having to do a project-specific NEPA analysis merely because a plan-level EIS contemplates an activity may occur); *WORC*, 892 F.3d at 1240, 1244–45 (indicating NEPA requires an analysis for every new major federal action, even where it is done pursuant to a plan-level NEPA analysis).

[60] Slip Op. at 16–18.

[61] Slip Op. at 33–34.

lease sales in any level of depth through the alternatives analysis or otherwise.[62] Nevertheless, based on BLM's statements — which the panel acknowledged were ambiguous — the panel concluded the scope of the IAP was intended to encompass later lease sales.[63] As a result, it treated Appellants' claims about the adequacy of the NEPA analysis for the 2017 lease sale as time barred and concluded the agency was not required to do any additional NEPA analysis for the lease sale.[64]

The panel incorrectly deferred to the agency's statements that it would not do a NEPA analysis for future lease sales in the face of the statutory and regulatory requirement that an agency comply with NEPA for each major federal action.[65] BLM was required to do a NEPA analysis for the lease sale because it was a distinct major federal action subject to NEPA and was not fully covered by the IAP analysis.[66] While the panel properly recognized that such analysis is required under NEPA for distinct future actions,[67] it erred as a matter of law in deferring to BLM's

---

[62] Slip Op. at 34–35.
[63] Slip Op. at 33–35.
[64] Slip Op. at 35.
[65] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18.
[66] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18.
[67] *See, e.g.*, Slip Op. 33 n.16.

statements that the IAP provided that analysis and in allowing BLM to forgo a NEPA analysis at the point of the lease sale.

The panel's decision invites agencies to construe their analyses as covering multiple, future actions, with the goal of forgoing NEPA at later stages, when in fact the agency never conducted the required NEPA analysis. This upends NEPA's statutory aims of informed decision making and public participation[68] by allowing the agency to label its actions as sufficient under NEPA. The panel's deference to BLM's statements stretches the standard of review too far.[69] It is unreasonable and contrary to law to allow an agency to label its action in such a way as to circumvent its legal obligations under NEPA.

Applying the proper legal framework under *SUWA* and standard of review, the lease sale was a distinct agency action that required a NEPA analysis and the IAP did not excuse the agency from having to comply with NEPA at that later stage. Appellants second claim is also not a time-barred challenge to the IAP

---

[68] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002).

[69] *Cf. Marsh*, 490 U.S. at 378 ("[C]ourts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record . . . . A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." (internal quotation marks omitted)).

because it challenges BLM's compliance with NEPA for a later, discrete agency action that is separate from adoption of the IAP — the lease sale.[70] Because the lease sale is an independent agency action that involved an irretrievable commitment of resources and because the agency did not conduct the NEPA analysis required for the lease sale in the IAP, BLM could not rely on the IAP to eliminate its future obligations under NEPA to hold a lease sale.

## CONCLUSION

Appellants' Petition for Panel Rehearing En Banc should be granted in order to maintain the uniformity of this Court's decisions and interpretations with the Supreme Court's decision in *SUWA* and with the agency's obligations under NEPA.

Respectfully submitted this 21st day of August, 2020.

*/s/ Suzanne Bostrom*
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

*Attorneys for Petitioners*

[70] *High Sierra Hikers Ass'n*, 390 F.3d at 639.

## FORM 11. CERTIFICATE OF COMPLIANCE FOR PETITIONS FOR REHEARING

**9th Cir. Case Number:** 19-35008

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for rehearing en banc is:

[x] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words: 3805.**

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** __/s/Suzanne Bostrom_____________ **Date** __8/21/2020___________

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER; ALASKA WILDERNESS LEAGUE; DEFENDERS OF WILDLIFE; SIERRA CLUB; THE WILDERNESS SOCIETY, INC., *Plaintiffs-Appellants*, | No. 19-35008<br>D.C. No. 3:18-cv-00030-SLG |
| v. | OPINION |
| U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; DAVID L. BERNHARDT, in his official capacity as Secretary of the Interior; BRIAN STEED, in his official capacity as the official exercising the authority of the Director of the Bureau of Land Management, *Defendants-Appellees*, | |
| CONOCOPHILLIPS ALASKA, INC., *Intervenor-Defendant-Appellee*. | |

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, District Judge, Presiding

Argued and Submitted February 7, 2020
Seattle, Washington

Filed July 9, 2020

Before: MILAN D. SMITH, JR. and N. RANDY SMITH, CIRCUIT JUDGES, and JOHN R. TUNHEIM,* District Judge.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY****


**Environmental Law**

The panel affirmed the district court's summary judgment in favor of federal agencies and officials and intervenor ConocoPhillips Alaska, Inc. in a National Environmental Policy Act ("NEPA") action brought by environmental groups challenging the Bureau of Land Management ("BLM")'s 2017 offer and sale of oil and gas leases in the National Petroleum Reserve-Alaska (the Reserve).

In 2012, BLM published a document styled as a combined Integrated Activity Plan ("IAP") and Environmental Impact Statement ("EIS"), designed to determine the appropriate management of all BLM-managed lands in the Reserve. In 2017, BLM issued a call for


* The Honorable John R. Tunheim, United States Chief District Judge for the District of Minnesota, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Case: 19-35008, 07/29/2020, ID: 11768819, DktEntry: 42-1, Page 26 of 59



nominations and comments on all unleased tracts for the 2017 lease sale.

The panel first held that, to the extent plaintiffs argued that the 2017 lease sale was a distinct federal action requiring a tiered or standalone NEPA analysis, their claims were not barred by the Naval Petroleum Reserves Production Act 60-day limitations period applicable to the 2012 EIS.

The panel agreed with the environmental groups that the 2017 lease sale required some form of site-specific analysis, but found that the instant dispute was whether the required analysis had already been prepared. The panel held that the fact that the 2012 EIS provided a programmatic-level analysis for the IAP did not preclude the legal possibility that it also served as the necessary site-specific analysis for future lease sales. The panel also was not persuaded that the degree of site specificity required for the 2017 lease sale was so clearly greater than that reflected in the 2012 EIS that the 2012 EIS could not have covered the 2017 lease sale.

The panel declined to inquire whether the 2012 EIS adequately analyzed the impacts of the 2017 lease sale, finding that this approach would rob the statute of limitations of effect in situations where some steps of a previously studied action remain to occur after expiration of the limitations period. The panel also declined to inquire whether the 2017 lease sale was in conformity with the IAP, finding that this approach fails to account for whether members of the public have fair notice of when they should challenge the NEPA compliance of a particular action.

Instead, the panel inquired whether the 2012 EIS purported to be the EIS for the 2017 lease sale, as reflected in the 2012 EIS' defined scope. The panel concluded that

Case: 19-35008, 07/29/2020, ID: 11768819, DktEntry: 42-1, Page 27 of 59



the expressly defined scope of the 2012 EIS was somewhat ambiguous as to this question, but that the language regarding future NEPA requirements provided reasonable notice that the intended scope encompassed actual future lease sales. The panel also found that construing the scope of the 2012 EIS as such was not unreasonable when considering the analysis performed therein and the applicable law. Thus, the panel deferred to BLM's reasonable position that the 2012 EIS was the EIS for the 2017 lease sale.

The panel therefore held that BLM met the NEPA requirement for the 2017 lease sale of preparing at least an initial EIS, any challenge to the adequacy of which is now time barred. Although plaintiffs alleged significant new information and circumstances known to BLM before the 2017 lease sale, the appropriate rubric for considering these allegations—given the existence of an initial EIS—was supplementation, and plaintiffs waived any supplementation claim.

---

## COUNSEL

Suzanne Bostrom (argued), Brook Brisson, and Valerie Brown, Trustees for Alaska, Anchorage, Alaska, for Plaintiffs-Appellants.

Thekla Hansen-Young (argued), John David Gunter II, and Romney S. Philpott, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Michael Gieryic, Attorney-Advisor, Office of the Solicitor,

United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Ryan P. Steen (argued) and Jason T. Morgan, Stoel Rives LLP, Seattle, Washington, for Intervenor-Defendant-Appellee.

---

**OPINION**

M. SMITH, Circuit Judge:

Northern Alaska Environmental Center (NAEC), Alaska Wilderness League, Defenders Of Wildlife, Sierra Club, and The Wilderness Society, Inc. (collectively, Plaintiffs), appeal the district court's grant of summary judgment for the U.S. Department of the Interior, the Bureau of Land Management (BLM), Secretary of the Interior Ryan Zinke,[1] and BLM Director Brian Steed (collectively, Federal Defendants), as well as Intervenor-Defendant ConocoPhillips Alaska, Inc. (collectively, Defendants). Plaintiffs assert claims under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), on the theory that BLM failed to prepare a required NEPA analysis for its 2017 offer and sale of oil and gas leases (the 2017 lease sale) in the National Petroleum Reserve-Alaska (the Reserve). Defendants contend that BLM conducted the requisite NEPA analysis in an Environmental Impact Statement (EIS) prepared in 2012. Defendants also claim that, because any challenge to the adequacy of the 2012 EIS is subject to a 60-day statute of limitations pursuant to the

---

[1] This appeal substitutes current Secretary of the Interior David L. Bernhardt.

Naval Petroleum Reserves Production Act (NPRPA), 42 U.S.C. § 6506a(n)(1), Plaintiffs' claims are time barred.

Finding that the NPRPA statute of limitations does not bar our inquiry, we analyze the scope of the 2012 EIS and ultimately defer to BLM's position that the scope of the 2012 EIS encompassed future lease sales. We therefore find that BLM met the NEPA requirement for the 2017 lease sale of preparing at least an initial EIS, any challenge to the adequacy of which is now time barred. Although Plaintiffs allege significant new information and circumstances known to BLM before the 2017 lease sale, the appropriate rubric for considering these allegations—given the existence of an initial EIS—is supplementation, and Plaintiffs have waived any supplementation claim.

Accordingly, we affirm the district court's grant of summary judgment for Defendants on all counts.

## FACTUAL AND PROCEDURAL BACKGROUND

The Reserve comprises over 23 million acres of land located along the north coast of Alaska, an area roughly the size of Indiana. This vast expanse of Arctic tundra provides habitat for polar bears, grizzly bears, gray wolves, moose, caribou, and dozens of species of migratory birds. It is home to numerous Native Alaskan communities that practice a subsistence way of life, relying on the biological resources of the Reserve. It is also a significant source of oil and gas. As of 2017, the U.S. Geological Survey (USGS) estimated that technically recoverable petroleum resources underlying the Reserve include 8.7 billion barrels of oil and 25 trillion cubic feet of natural gas.

BLM manages 22.6 million acres of the Reserve pursuant to the NPRPA, 42 U.S.C. §§ 6501–07. The

NPRPA directs BLM to lease Reserve land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts. 42 U.S.C. § 6506a. BLM's actions taken pursuant to the authority of NPRPA are also subject to NEPA procedural requirements for the analysis of potential environmental impacts and reasonable alternatives. *See* 42 U.S.C. § 4332(2)(C).

## I. The 2012 Environmental Impact Statement

In 2012, BLM published a 2,600-page document styled as a combined Integrated Activity Plan (IAP) and EIS, designed to determine the appropriate management of all BLM-managed lands in the Reserve.[2] The IAP/EIS analyzed five alternative proposals for a range of land allocations, including different options for the percentage of lands that would be made available for oil and gas leasing. The alternatives also included stipulations and required operating procedures or best management practices to mitigate environmental impacts. The IAP/EIS designated as its preferred alternative a proposal that would make approximately 52% of the federal lands in the Reserve available for oil and gas leasing.

In order to analyze the environmental consequences of the various alternatives, BLM developed a set of hypothetical development scenarios based on assumptions it considered reasonable, seeking to minimize the chance that its analysis would underestimate potential impacts. BLM

[2] Hereinafter, we refer to this document generally as the IAP/EIS. However, when we reference this document specifically in its NEPA capacity, we refer to the 2012 EIS. When we reference this document specifically in its land management plan capacity, we refer to the IAP.

Case: 19-35008, 07/29/2020, ID: 11769819, DktEntry: 42-1, Page 31 of 59



assumed that multiple annual lease sales would be held, each of which might offer all or only part of the lands made available for oil and gas leasing, and that the industry would need time to evaluate existing leases before actually leasing additional tracts. BLM assumed that full exploration and development of petroleum resources in the Reserve would take place over many decades. Based on the then-most recent USGS estimates, BLM assumed that the Reserve contained 896 million barrels of technically recoverable oil, 604 million barrels of which were economically recoverable.

The IAP/EIS predicted that it would fully satisfy NEPA's requirements for the first oil and gas lease sale. With respect to anticipated subsequent lease sales, it stated that BLM would prepare an administrative determination of NEPA adequacy (DNA) in connection with each proposed lease to determine whether the then-existing NEPA documentation was adequate.[3]

In 2013, BLM published a Record of Decision that finalized its decision to manage the Reserve under the preferred alternative. Each year thereafter, through 2016, BLM offered oil and gas leases on 1–2 million acres of the Reserve, but ultimately sold leases on only a small portion of the offered acreage. In conjunction with each offering, BLM prepared a four-page DNA documenting its conclusion that the 2012 EIS remained adequate to meet the requirements of NEPA, so no further NEPA documentation was required to support the offering or sale of the relevant leases.

[3] A DNA is not itself a NEPA document; it is not subject to public comment or consultation with other federal agencies. *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006).

Case: 19-35008, 07/29/2020, ID: 11768819, DktEntry: 42-1, Page 32 of 59



## II. The 2017 Lease Sale

In August 2017, BLM issued a call for nominations and comments on all unleased tracts for the 2017 lease sale. Several of the Plaintiffs submitted a joint comment letter arguing that BLM should not hold the proposed lease sale. Their letter contended that BLM was required either to prepare a new, "site-specific" NEPA analysis for the sale, or to retain the authority to prohibit future activities on the leased land.

In September, BLM issued a DNA evaluating the NEPA adequacy of the 2012 EIS respecting a proposal to offer leases on all of the remaining tracts within the lands the IAP made available for leasing, a total of about 10.3 million acres. The DNA asserted that the current proposal was part of the preferred alternative analyzed in the 2012 EIS, and that no new information or circumstances substantially changed the analysis.

BLM opened the bidding process in December 2017. Intervenor bid on seven of the 900 available tracts, covering roughly 80,000 acres. BLM received no other bids on any of the offered tracts. BLM accepted Intervenor's bids in January 2018. During this same period, the USGS published an updated Assessment of Undiscovered Oil and Gas Resources in formations underlying the Reserve, raising the estimate of technically recoverable oil to 8.7 billion barrels.

In early February, Plaintiffs filed a Complaint against Federal Defendants alleging that BLM had conducted the 2017 lease sale without complying with NEPA. The Complaint asserted two alleged causes of action: first, that BLM failed to prepare a NEPA analysis, and second, that BLM failed to take a "hard look" at environmental impacts. *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,*

Case: 19-35008, 07/09/2020, ID: 11746889, DktEntry: 41-1, Page 33 of 59



*Inc.*, 462 U.S. 87, 97 (1983) ("Congress in enacting NEPA . . . required only that the agency take a 'hard look' at the environmental consequences before taking a major action." (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976))). The Complaint highlighted the updated USGS Assessment along with several other recent developments that it claimed BLM had failed to properly analyze.

Later that month, BLM issued a nine-page Revised DNA that discussed several of those recent developments. The Revised DNA found the updated USGS Assessment unusable because it did not provide an estimate of economically recoverable resources, and because it included oil and gas underlying land and sea adjacent to the Reserve. It also found several other developments insignificant because the 2012 EIS had "already erred on the conservative side and over analyzed likely potential impacts." BLM's Acting Alaska State Director approved the Revised DNA and executed the seven leases purchased by Intervenor on the same day.

In May, Plaintiffs filed a First Amended Complaint that added a third cause of action, claiming that BLM had violated its own NPRPA regulations by issuing the Revised DNA "after it had already conducted the 2017 lease sale." *See* 43 C.F.R. § 3131.2(b).

### III. Proceedings in the District Court

On cross-motions for summary judgment, the district court ruled in favor of Defendants. The court concluded that Plaintiffs were not asserting a time-barred claim that the 2012 EIS failed to take a hard look at environmental consequences. Nevertheless, the court held that BLM was not required to prepare a new NEPA document for the 2017 lease sale.

The court concluded that its decision was controlled by *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006). The court interpreted *Kempthorne* to support Plaintiffs' argument that BLM must prepare a NEPA document before issuing leases wherein BLM does not retain the authority to prohibit future on-the-ground activities. However, the court read *Kempthorne* as validating BLM's position that the 2012 EIS *was* the required document. The court further interpreted *Kempthorne* to hold that parcel-specific analysis was not required until BLM was reviewing actual exploration and development proposals. The court noted that *Kempthorne* differed from this case due to the passage of time between the EIS and the lease sale, but concluded that this distinction was relevant only to whether supplementation might be required, which Plaintiffs did not allege.[4]

Plaintiffs timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment upholding an agency decision. *Kempthorne*, 457 F.3d at 975. Because NEPA does not contain its own provision for judicial review, we review BLM's compliance with NEPA pursuant to the APA. *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002).[5] Where an agency's decision not to prepare an EIS

[4] The court concluded in any event that "supplementation would likely have been unnecessary."

[5] Defendants do not renew on appeal the argument they made to the district court that the court lacked subject matter jurisdiction because the original complaint was filed before final agency action had occurred for

turns on a threshold legal question regarding NEPA applicability, rather than a predominantly factual or technical decision, we review under a standard of "reasonableness." *Id.* at 959 & n.3 (citing *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998); *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004).[6]

## STATUTE OF LIMITATIONS

We begin by rejecting Defendants' threshold argument that Plaintiffs' lawsuit is entirely time barred by the NPRPA. To the extent Plaintiffs argue that the 2017 lease sale was a distinct federal action requiring a tiered or stand-alone NEPA analysis, we find their challenge is justiciable.

---

purposes of the APA. *See* 5 U.S.C. § 704. However, because jurisdiction is something we must consider sua sponte, *see Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), we nevertheless hold expressly that the district court correctly relied on *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015), which allows us to rely on an amended complaint that satisfies the jurisdictional defects of an original complaint. *See id.* at 1043–48.

[6] Where an agency's decision not to prepare an EIS is based on preparing a NEPA "environmental assessment" (EA) and concluding therein that an action will have no significant impacts, we review under the familiar "arbitrary and capricious" standard. *Northcoast*, 136 F.3d at 666–67 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989)). This same standard applies where an agency's decision not to supplement an EIS is based on its conclusion that new information or circumstances do not rise to the level of significance, such as the determinations BLM made in the DNA and Revised DNA. *See id.* As discussed below, this case gives us no occasion to review either such decision.

The NPRPA contains the following statute of limitations:

> Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) concerning oil and gas leasing in the National Petroleum Reserve--Alaska shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register.

42 U.S.C. § 6506a(n)(1). Defendants argue that Plaintiffs "necessarily" challenge the adequacy of the 2012 EIS, regardless of how Plaintiffs attempt to characterize their complaint, and that the NPRPA statute of limitations therefore bars their claims. *Cf. Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 944–45 (9th Cir. 2006) (in applying Magnuson Act statute of limitations for challenging regulations promulgated thereunder, "the decisive question is whether the regulations are being attacked, not whether the complaint specifically asserts a violation of the Magnuson Act"). Of Plaintiffs' three claims, we find that it is possible to resolve the first and third without an untimely adjudication of the adequacy of the 2012 EIS. We find that Plaintiff's second claim, however, is potentially barred by the statute of limitations, depending on how we resolve the first claim.

Plaintiffs' first and third claims allege that BLM violated NEPA and its own NPRPA regulations by failing to prepare

Case: 19-35008, 07/09/2020, ID: 11749889, DktEntry: 42-1, Page 37 of 59



an environmental assessment (EA)[7] or EIS for the 2017 lease sale. In order to adjudicate these claims, we must determine whether the 2012 EIS *was* the EIS for the 2017 lease sale, as BLM argues. Provided we are mindful that our inquiry not amount to "judicial review of the adequacy of" the 2012 EIS, the statute of limitations does not prevent us from resolving this issue. If the 2012 EIS *was* the EIS for the 2017 lease sale, then BLM did not fail to prepare an EIS, and Plaintiffs' first and third claims fail on the merits. If the 2012 EIS was not an EIS for the 2017 lease sale—in other words, if the 2017 lease sale required at least a tiered EA regardless of the adequacy of the 2012 EIS—then Plaintiffs' first and third claims are not affected by the statute of limitations.

Plaintiffs' second claim is that BLM failed to take a hard look at the impacts of the 2017 lease sale. If the 2012 EIS *was* the EIS for the 2017 lease sale, then Defendants are correct that Plaintiffs' second claim "necessarily" must challenge the adequacy of the 2012 EIS, and is barred by the statute of limitations.[8] If the 2012 EIS was not an EIS for the 2017 lease sale, then Plaintiffs' second claim implicates

[7] If an agency is unsure whether a project may have significant environmental impacts and thus require an EIS, the agency can take the intermediate step of preparing an EA, which requires less detail and less formality of procedure than an EIS, and does not require the analysis of alternatives. 40 C.F.R. §§ 1501.4(b), 1508.9. The purpose of the EA is to determine whether the proposal *may* have significant impacts: If so, the agency must go on to prepare an EIS. *See id.* §§ 1501.4(c), 1502.14, 1508.9(a)(1). If not, the agency certifies its conclusion with a Finding of No Significant Impact (FONSI). *Id.* § 1508.13.

[8] To the extent Plaintiffs claim that BLM failed to take a hard look at information that became available *after* the 2012 EIS, the appropriate rubric would be supplementation, which Plaintiffs have waived.

only the DNA or Revised DNA,[9] and is not barred by the statute of limitations.

## ANALYSIS

In light of the above, our task is to resolve not only *whether* the 2012 EIS was the EIS for the 2017 lease sale, but also *how* that determination should be made.

Plaintiffs are correct that under a proper reading of our case law, the 2017 lease sale represented an irretrievable commitment of resources necessitating site-specific analysis in an EIS. However, we disagree with Plaintiffs' suggestion that a programmatic EIS prepared for a broad-scale land use plan categorically cannot provide the site-specific analysis required for irretrievable commitments of resources. Thus, we reject the claim that the 2012 EIS was categorically a different type of EIS than what was required for the 2017 lease sale. Furthermore, Plaintiffs fail to convince us that the required degree of site specificity was so clearly greater than that provided in the 2012 EIS that we cannot reasonably construe the 2012 EIS as covering future lease sales.

Drawing from our precedents regarding the importance of accurately describing the action being taken, and from the NEPA regulations requiring agencies to properly define the scope of proposals which are the subject of an EIS, we conclude that the proper inquiry is whether the initial EIS defined its scope as including the subsequent action. To the extent the defined scope is ambiguous on this question, we find it appropriate to consider whether the defined scope of

[9] We assume that without a properly tiered NEPA document incorporating analysis in the 2012 EIS by reference, BLM could not rely on any such analysis in defending a hard look challenge.

Case: 19-35008, 07/09/2020, ID: 11747819, DktEntry: 41, Page 16 of 36



the initial EIS can be reasonably construed to include the subsequent action given the analysis performed therein, in light of applicable laws and regulations.

Applying this framework to the facts in this case, we conclude that we can reasonably construe the defined scope of the 2012 EIS to include the 2017 lease sale. Thus, we defer to BLM's position that the 2012 EIS *was* the EIS for the 2017 lease sale.

## I. Site-Specific Analysis

We agree with Plaintiffs that the 2017 lease sale required some form of site-specific analysis. "The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not *whether* the project's site-specific impact should be evaluated in detail, but *when* such detailed evaluation should occur." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (emphasis added). "This threshold is reached when, as a practical matter, the agency proposes to make an 'irreversible and irretrievable commitment of the availability of resources' to a project at a particular site." *Id.* (quoting *Sierra Club v. Hathaway*, 579 F.2d 1162, 1168 (9th Cir. 1978)).

Whether a lease is a critical decision requiring an EIS depends on whether the lease reserves the agency's absolute right to preclude surface-disturbing activity. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 782 (9th Cir. 2006). A lease that reserves an absolute right to prohibit surface-disturbing activities, sometimes called a "no surface occupancy" (NSO) lease, does not irreversibly and irretrievably commit any resources and therefore does not require a site-specific EIS. *Id.* (citing *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063–64 (9th Cir. 1998)). A lease that does not retain an absolute right to

Caassee: 1199335500088, 0078/0291/22002200, IIDD: 1111774968889199, DDkktEEnnttrryy: 4424-11, PPaaggee 4107 ooff 5396



prohibit surface-disturbing activities, even if it retains the right to impose mitigating conditions, constitutes an irreversible and irretrievable commitment of resources and therefore does require a site-specific EIS. *Id.* (citing *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1226–27 (9th Cir. 1988); *Conner v. Burford*, 848 F.2d 1441, 1449–51 (9th Cir. 1988)).

For instance, in *Conner*, the Forest Service prepared EAs for the sale of oil and gas leases in the Flathead and Gallatin National Forests in Montana. 848 F.2d at 1443. The EAs concluded that the mere sale of the leases would have no significant impact on the environment, largely because any proposed surface-disturbing activities would be subject to future NEPA analysis. *Id.* at 1443, 1446. We agreed with the Forest Service with respect to the leases containing an NSO provision, but disagreed with regard to non-NSO leases. *Id.* at 1448, 1451. We explained that NSO leases really provide the leaseholder only a "right of first refusal," that is, a priority with respect to other developers. *Id.* at 1448. Thus, an NSO lease "does not constitute an irretrievable commitment of resources." *Id.* The opposite was true of the non-NSO leases. *Id.* at 1451 (agreeing with *Sierra Club v. Peterson*, 717 F.2d 1409, 1412–15 (D.C. Cir. 1983)). We explained that the non-NSO leases "relinquish[ed] the 'no action' alternative," consideration of which, among other "reasonable alternatives to the proposed action," is the "heart" of the EIS. *Id.* NEPA did not allow the Forest Service to delay preparation of an EIS until a point at which the "no action" option was no longer available. *Id.*[10]

[10] The Forest Service in *Conner* also argued that the non-NSO leases could not have a significant impact on the environment because they

"There is no question" that NPRPA oil and gas leases constitute "an irretrievable commitment of resources," and thus require "site specific analysis in [an] EIS." *Kempthorne*, 457 F.3d at 975–76. However, the dispute here is not whether an EIS *must* be prepared for the leases, but whether an EIS has *already* been prepared for the leases.

**A. Programmatic EISs**

Plaintiffs appear to claim that a single document cannot be both a programmatic EIS for a broad-scale land management plan and also a site-specific EIS for an irretrievable commitment of resources. *See Native Village of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014) (distinguishing between the EIS analysis required for a programmatic plan that guides management of multiple-use resources, versus for a site-specific plan at the implementation stage). Plaintiffs are incorrect.

In *Block*, we rejected a similar argument by the Forest Service that a programmatic EIS categorically "need not contain the type of detailed site-specific information normally contained in an EIS prepared for a more narrowly focused project." 690 F.2d at 761. Instead, we looked to the actual federal action being taken, which we concluded consisted of both a broad-scale management plan and a series of site-specific critical decisions that required site-specific analysis. *See id.* at 762–63. Though recognizing that a detailed site-specific analysis for a plan covering a very large area—in that case, a nationwide plan—would be

---

subjected future surface-disturbing activities to reasonable mitigation requirements. 848 F.2d at 1450. We noted that an EIS was required if there was even a chance that the mitigation measures would fail to reduce impacts to insignificance, which we thought highly likely given the typical scale of oil and gas activities. *Id.*

Case: 19-35008, 07/21/2020, ID: 11758819, DktEntry: 42-1, Page 42 of 59
Case: 19-35008, 07/09/2020, ID: 11749889, DktEntry: 41, Page 19 of 36



difficult and involve significant uncertainty, we noted that "[t]he scope of the undertaking here, however, was the Forest Service's choice and not the courts'." *Id.* at 765. *Block* demonstrates that a single "federal action" for purposes of NEPA can be both broad-scale and site-specific, and can be evaluated at both of those levels in a single EIS.

*Friends of Yosemite Valley v. Norton* is not to the contrary. 348 F.3d 789 (9th Cir. 2003), *clarified by* 366 F.3d 731 (9th Cir. 2004). There, we concluded that a programmatic EIS prepared for the Merced River management plan did not need to include detailed site-specific analysis. *Id.* at 800–01. However, our conclusion regarding the required level of site specificity was tailored to our conclusion regarding the nature of the federal action that was the subject of the EIS. *See id.* Having concluded that the management plan provided only broad guidelines and made no irreversible and irretrievable commitment of resources, we held that the EIS "contain[ed] sufficiently specific data and information for [its] purpose." *Id.* at 801. *Friends of Yosemite Valley* does not dictate that any EIS labeled "programmatic" or covering a broad-scale management plan cannot also cover site-specific actions and the impacts thereof where appropriate.

In *Kempthorne*, BLM had prepared a combined IAP and EIS to open parts of the Reserve within the Northwest Planning Area to oil and gas leasing. 457 F.3d at 973–74; *see NAEC v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005). The EIS conducted its analysis on a scale similar to that of the 2012 EIS here, using "hypothetical future projections of what might be undertaken in the exploration and development phases" to analyze impacts "on a resource by resource basis," while "not attempt[ing] to examine the impact on specific parcels." 457 F.3d at 974. In evaluating

Caase: 1199-3355008, 0078/0291/22020, IID: 1117468819, DktEntry: 4241, Page 420 of 536



the adequacy of that EIS, we treated it as equally covering "the leases" and "the leasing program." *Id.* at 976. Plaintiffs had challenged the EIS specifically on the assumption that it covered both "planning decisions and site specific . . . resource commitments," i.e., both the IAP and the individual leases. 361 F. Supp. 2d at 1078. Plaintiffs argued that the EIS was inadequate because, while it did provide the programmatic analysis necessary for planning decisions, it did not provide the site-specific analysis required for resource commitments.[11] *Id.* Although we did not consider the question directly, *Kempthorne* provides strong support for the conclusion that nothing legally precludes BLM from analyzing both an IAP and NPRPA lease sales in the same EIS.

In sum, nothing in NEPA or our caselaw prevents agencies from using a single document to undertake both a programmatic-level analysis and a site-specific analysis at the level appropriate for any irretrievable commitments of resources. Thus, the fact that the 2012 EIS provided a programmatic-level analysis for the IAP does not preclude the legal possibility that it also served as the necessary site-specific analysis for future lease sales.

### B. Degree of Site Specificity

Theoretically, one could argue that the 2012 EIS could not have been the NEPA analysis for the 2017 lease sale if NEPA clearly required a significantly greater degree of site specificity for the analysis of NPRPA lease sales than was

---

[11] Here, Plaintiffs take a different approach by arguing that the 2012 EIS simply "was" a programmatic EIS for the IAP, and "was not" a site-specific EIS for a lease sale.

Case: 19-35008, 07/09/2020, ID: 11749889, DktEntry: 44-1, Page 21 of 36



provided in the 2012 EIS. However, we are not persuaded that NEPA so required.

The question of whether any site-specific analysis is required, addressed above, is different from the question of what "degree of site specificity" is required. *Kempthorne*, 457 F.3d at 976. "The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action." *Block*, 690 F.2d at 761. "If it is reasonably possible to analyze the environmental consequences" of a particular type at a particular stage, "the agency is required to perform that analysis." *Kern*, 284 F.3d at 1072 (requiring analysis of foreseeable impacts to particular species at the resource management plan stage, notwithstanding that those impacts could be analyzed more precisely at a later site-specific project stage). "We will defer to the agency's judgment about the appropriate level of analysis so long as the EIS provides as much environmental analysis as is reasonably possible under the circumstances, thereby 'provid[ing] sufficient detail to foster informed decision-making' at the stage in question." *Native Village of Point Hope*, 740 F.3d at 498 (quoting *Friends of Yosemite Valley*, 348 F.3d at 800).

Thus, when an oil and gas lease constitutes an "irretrievable commitment of resources," the required degree of analytical site specificity depends on the specificity of the "reasonably foreseeable" environmental impacts in light of the factual context. *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009). For instance, in *Richardson*, the challenged lease pertained to a relatively small parcel (less than 2,000 acres); "[c]onsiderable exploration ha[d] already occurred on parcels adjacent to the [leased parcel]"; "a natural gas supply [was] known to exist beneath these parcels"; and the record contained sufficient information on which to predict the

Case: 19-35008, 07/21/2020, ID: 11758899, DktEntry: 44-1, Page 45 of 59



number of wells that the leaseholder would want to construct. *Id.* at 717–18. Given these facts, the Tenth Circuit concluded that "the impacts of this planned gas field were reasonably foreseeable before the . . . lease was issued." *Id.* at 718.

By contrast, in *Kempthorne*, we held that the plaintiffs' "particular challenge to site specificity lack[ed] merit" because "parcel by parcel" effects were "currently unidentifiable" given the facts at hand.[12] 457 F.3d at 977. Though acknowledging that some degree of site-specific analysis was required,[13] we upheld BLM's method of using

[12] We reasoned in part that "NEPA could never be satisfied" if BLM had to conduct "an analysis of the environmental effect with respect to each parcel involved in a possible lease for exploration and development," because "until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development." 457 F.3d at 976. However, we did not address *Conner*'s admonition that the agency could avoid this difficulty by issuing non-NSO leases. *See* 848 F.2d at 1451. Nevertheless, *Kempthorne* is not inconsistent with *Conner*. We understand the "hypothetical situations" analysis in the *Kempthorne* EIS, 457 F.3d at 976, to have satisfied *Conner*'s requirement to "estimate what [the] effects might be," 848 F.2d at 1450.

[13] *Native Village of Point Hope* does not contradict this interpretation of *Kempthorne*. *See Native Village of Point Hope*, 740 F.3d at 493–94 ("An agency is not required at the lease sale stage to analyze potential environmental effects on a site-specific level of detail." (citing *Kempthorne*, 457 F.3d at 975–76)). *Native Village of Point Hope* involved the Outer Continental Shelf Lands Act (OSCLA), 43 U.S.C. §§ 1331–1356. *Id.* Under OSCLA, a lease conveys "no right to proceed with full exploration, development, or production . . . [but rather] only a priority in submitting plans to conduct these activities." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1187–88 (9th Cir. 1988) (quoting *Sec'y of the Interior v. California*, 464 U.S. 312, 339 (1984)). Thus, OSCLA leases are necessarily NSO leases, and unlike those at issue in this case. Accordingly, we had no occasion in *Native*

"hypothetical situations that represented the spectrum of foreseeable results" as a way of analyzing oil and gas leasing in the Reserve's Northwest Planning Area. 457 F.3d at 976.

We find the facts in this case bear a far greater resemblance to those in *Kempthorne* than those in *Richardson*. Accordingly, *Kempthorne* dictates that the type of analysis employed in the 2012 EIS may qualify as the site-specific analysis required of a critical decision given appropriate factual circumstances. As Plaintiffs urge, *Kempthorne* does not preclude the theoretical possibility that some greater degree of site specificity (even if not parcel-by-parcel) was "reasonably possible," *Kern*, 284 F.3d at 1072, or that more site-specific impacts were "reasonably foreseeable," *Richardson*, 565 F.3d at 718, than that conducted or those analyzed in the 2012 EIS. However, because we ultimately conclude that the 2012 EIS covered future lease sales, the NPRPA statute of limitations makes it unnecessary for us to resolve whether BLM employed the precise degree of site specificity required. While we agree with Plaintiffs that some degree of site-specific EIS analysis is required for NPRPA leases, we are not persuaded that the degree required for the 2017 lease sale was so clearly greater than that reflected in the 2012 EIS that the 2012 EIS could not have covered the 2017 lease sale.

---

*Village of Point Hope* to consider the nuance Plaintiffs assert regarding the difference between site-specific analysis, which *Kempthorne* acknowledged was required to some degree, and parcel-by-parcel analysis, which *Kempthorne* rejected as impossible at the NPRPA leasing stage. In any event, NPRPA leases were not before us in *Native Village of Point Hope*, so we could not have decided their requirements. Because OSCLA leases appear to be NSO leases by statute, our statement was accurate for the purposes at hand.

## II. Subsequent Actions

We next consider other potential methods for determining NEPA's requirements for an action that is separated from an EIS by the passage of time.

As background, NEPA regulations provide two frameworks within which additional NEPA analysis may occur after an initial EIS is finalized: namely, tiering and supplementation. Tiering refers to the incorporation by reference in subsequent EISs or EAs, which concentrate on issues specific to the current proposal, of previous broader EISs that cover matters more general in nature. 40 C.F.R. § 1508.28. Supplementation refers to the process of updating a previous EIS in situations where the agency makes substantial changes to the proposed action, or there are significant new circumstances or information. *Id.* § 1502.9(c). The NEPA regulations do not provide any express guidance for determining whether to prepare a tiered NEPA analysis or a supplemental NEPA analysis in borderline cases. *See* Daniel R. Mandelker et al., *NEPA Law & Litig.* § 9:12 (2d ed., Aug. 2019 update).

### A. NEPA Adequacy

To support their respective contentions about what type of NEPA analysis was required for the 2017 lease sale, Plaintiffs and Defendants rely in part on cases which imply that the relevant inquiry is whether the previous EIS adequately analyzed the impacts of the subsequent action. We decline to take this approach.

In *Blue Mountains Biodiversity Project v. Blackwood*, we concluded that the Forest Service's previous programmatic forest plan EIS did not obviate the need for an EIS for several proposed timber salvage sales in an area

burned by a large wildfire. 161 F.3d 1208, 1210, 1214 (9th Cir. 1998). The Forest Service argued that its EA for one of the salvage sales was sufficient given that it tiered to the forest plan EIS for additional analysis. *Id.* at 1214. We disagreed, finding that the forest plan EIS analysis was inadequate because it "d[id] not, and could not, evaluate the impacts of this catastrophic fire, or the additional environmental impacts that large scale logging of severely burned areas could bring." *Id.* Plaintiffs here also allege significant developments that could not have been evaluated in the 2012 EIS because they did not take place until later. Our decision in *Blue Mountains* is of little utility to us in evaluating this case, however, because the fact that the proposed timber salvage sales constituted a new project was not in dispute.[14] Instead, the dispute focused on whether the EA for the new project contained sufficient analysis. Here, BLM did not prepare a contemporary NEPA analysis (such as an EA) for the 2017 lease sale. Rather, BLM argues that the 2012 EIS did contemplate the 2017 lease sale and already performed the necessary analysis.

In *Pit River Tribe*, the plaintiffs challenged a 1998 geothermal lease extension in the volcanic Medicine Lake Highlands in California. The agencies involved had prepared a nationwide programmatic EIS in 1973, which "d[id] not adequately address the potential impacts of leasing." 469 F.3d at 783. Subsequently, the agencies prepared EAs in 1981 and 1984 which considered leases but did not consider the impacts of "actual geothermal development." *Id.* at 784. The agencies then issued leases in 1988 which did not reserve an absolute right to prohibit

---

[14] Furthermore, the timber salvage sales involved surface-disturbing activities, making them more analogous to oil and gas permits for exploration or development than to oil and gas leases. *Id.* at 1210.

Case: 19-35008, 07/21/2020, ID: 11758819, DktEntry: 41, Page 49 of 59



development. *Id.* Because the statute of limitations had run, the plaintiffs challenged only the 1998 extensions of those leases, and not the original 1988 leases. *Id.* at 781. The agencies argued that they had completed the required NEPA analysis in 1973, 1981, and 1984. *Id.* We disagreed, and concluded that the agencies were required to prepare a new EIS for the 1998 lease extensions. *Id.* at 784.

*Pit River Tribe* illustrates that the adequacy of analysis in previous NEPA documents for the present action may influence whether we construe those NEPA documents as covering the present action. Relatedly, *Pit River Tribe* shows that adequacy may remain relevant even after the statute of limitations has run. However, it appears that the agencies in *Pit River Tribe* conceded that the lease extensions constituted a new action, arguing rather that a new NEPA analysis was unnecessary because the leases only maintained the status quo. *See id.* We held that the extensions did not simply maintain the status quo because they granted a new right to additional years of development which had not been granted previously. *Id.*

In *Mayo v. Reynolds*, the D.C. Circuit considered a NEPA claim where the plaintiff alleged that the National Park Service "was required to issue a new EA or EIS" for each year's proposed elk hunting authorization pursuant to a fifteen-year elk-reduction program in Grand Teton National Park. 875 F.3d 11, 14, 19 (D.C. Cir. 2017). The Park Service argued that it had prepared the required analysis in an initial EIS for the entire fifteen-year program, and the court agreed. *Id.* at 14–15. The court endorsed the Park Service's assertion that although NEPA requires agencies to take a "hard look" at environmental impacts, NEPA "does not . . . require the agency to take a *new* look every time it takes a step that implements a previously-studied action, so

long as the impacts of that step were contemplated and analyzed by the earlier analysis." *Id.* The court concluded that the original EIS had already taken a hard look at all the potential impacts associated with each year's hunt. *Id.* at 21.

Our concern with relying on NEPA adequacy as the sole determinant of whether an action requires a "new look," as *Mayo* puts it, is that this robs the statute of limitations of effect in certain situations. Specifically, the statute of limitations becomes meaningless where some steps of a previously studied action remain to occur after expiration of the limitations period. Such a result might discourage agencies from bothering to prepare EISs that contemplate the entirety of a multi-step, long-term project at all, contrary to NEPA's goals that agencies analyze connected and cumulative actions as much as possible in one EIS. *See* 40 C.F.R. § 1508.25(a). Nor are we satisfied with saying that, if the relevant inquiry is whether the initial EIS was adequate, the statute of limitations simply bars the inquiry.

### B. Underlying Plan or Program

Another approach is to look not at the initial NEPA analysis, but at the underlying plan or program. For instance, in *Mayo*, the D.C. Circuit relied in part on its conclusion that the plaintiff had not shown that the hunting authorizations deviated in any significant way from the fifteen-year program. 875 F.3d at 21. While we agree that conformity with the initially analyzed plan or program is relevant to NEPA requirements, we do not think it sufficient to answer our question here. After all, the tiering regulations generally assume that the subsequent site-specific action is consistent with the previously studied broad-scale plan. "Nothing in the tiering regulations suggests that the existence of a programmatic EIS for a [regionwide management] plan obviates the need for any future project-

specific EIS, without regard to the nature or magnitude of a project." *Blue Mountains*, 161 F.3d at 1214. Moreover, a focus on plan compliance fails to account for whether members of the public have fair notice of when they should challenge the NEPA compliance of a particular action.

We also reject Plaintiffs' argument that *Norton v. Southern Utah Wilderness Alliance* (*SUWA*) dictates that any action occurring after the adoption of a land use management plan is necessarily a new action subject to the tiering rubric. 542 U.S. 55 (2004). In *SUWA*, the plaintiffs argued that BLM was required to supplement its previous NEPA analysis for land use plans governing off-road vehicle use on public lands in Southern Utah because there was new evidence available that such use had substantially increased. *See id.* at 61. The Supreme Court held that supplemental NEPA analysis can be required only where "there remains 'major Federal actio[n]' to occur." *Id.* at 73 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)). In the circumstances of that case, the Court explained that the original EIS supported BLM's adoption of a land use plan, and that "that action [was] completed when the plan [was] approved." *Id.* There was thus "no ongoing 'major Federal action' that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised)." *Id.* (citations omitted).

Plaintiffs argue that *SUWA* dictates that the 2012 EIS covered only the adoption of the IAP, and that supplementation is not the appropriate framework for evaluating this case because Plaintiffs do not ask for an amendment to the IAP. But the circumstances here are different than in *SUWA*. In *SUWA*, BLM did not claim to be engaged in an ongoing action supported by the original NEPA analysis; what the plaintiffs challenged was BLM's

*inaction*. *See id.* at 61, 72–73. NEPA supplementation regulations did not require BLM to initiate a proposal for new action, such as amending the plans. *See id.* at 73. Here, BLM does argue that it is engaged in an ongoing action supported by the 2012 EIS, to which the NEPA supplementation regulations apply. Nothing in *SUWA* precludes BLM from structuring its activities in this way.

**C. Defined Scope**

In light of our concerns regarding the statute of limitations and the need for fair notice, we look instead to whether the initial EIS purported to be the EIS for the subsequent action.

Our precedents support looking to the language of the EIS to help us form "an accurate description of the [agency's] proposed action." *Friends of Yosemite Valley*, 348 F.3d at 801; *see also Block*, 690 F.2d at 761 ("The starting point in our analysis is 'to describe accurately the "federal action" being taken.'" (quoting *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 422 U.S. 289, 322 (1975))). For instance, in *NAEC v. Lujan*, plaintiffs challenged the adequacy of the National Park Service's EISs regarding mining in three national parks in Alaska, arguing that the EISs contained insufficiently site-specific analysis given the agency's decision to authorize mining operations. *See* 961 F.2d 886, 887, 890 (9th Cir. 1992). We rejected plaintiffs' characterization of the federal action, relying on the EISs' own description that "[i]f, however, the National Park Service determines that the impacts of proposed mining operations would violate the decision standards for plan of operations approval, and the effects could not be sufficiently mitigated, the plan would be disapproved." *Id.* at 890

Case: 19-35008, 07/29/2020, ID: 11769819, DktEntry: 42, Page 53 of 59



(citation omitted). We thus concluded that no irreversible and irretrievable commitment of resources had occurred. *Id.*

Similarly, the D.C. Circuit in *Mayo* relied on the EIS's statement that its "level of analysis [was] sufficient to allow several management actions to be carried out without having to complete additional environmental analyses (e.g., environmental assessments) prior to implementation." 875 F.3d at 18. The court factored this EIS statement into its ultimate determination that the Park Service was not required to prepare "additional environmental analyses (e.g., environmental assessments)" prior to each year's elk hunt. *See id.*

Furthermore, the NEPA regulations emphasize the need for EISs to carefully define the proposal(s) under consideration, and specify detailed criteria to be consulted in the process. For example, the regulations provide that:

> Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

40 C.F.R. § 1502.4(a). The regulations further specify that the following types of actions "should" be included within the scope of a single EIS:

> (1) "Connected actions," meaning actions that:

Case: 19-35008, 07/09/2020, ID: 11746819, DktEntry: 42, Page 31 of 36



(i) "Automatically trigger other actions,"

(ii) "Cannot or will not proceed" without other actions, or

(iii) "Are interdependent parts of a larger action and depend on the larger action for their justification"; and

(2) "Cumulative actions," meaning actions that have cumulatively significant impacts.

*Id.* § 1508.25(a). A third category, "Similar actions," "may" be included within the scope of a single EIS. *Id.* Agencies must use a public "scoping" process to decide the scope of "actions, alternatives, and impacts to be considered in an environmental impact statement." *Id.* §§ 1501.7, 1508.25.

Thus, in deciding whether a previous EIS *is* the EIS for a subsequent action, we find it appropriate to rely on an EIS's defined scope. If the defined scope of the initial EIS included the subsequent action, NEPA requirements for the subsequent action would fall under the supplementation rubric. If the defined scope of the initial EIS did not include the subsequent action (but presumably the analysis in the initial EIS is to some extent relevant), NEPA requirements for the subsequent action would fall under the tiering rubric.[15] Of course, we recognize that the defined scope of

[15] These two frameworks are not mutually exclusive. If an agency wishes to tier a new NEPA analysis to a previous NEPA analysis, the agency may have to take into account whether the previous NEPA analysis requires supplementation. Also, we are not aware of anything

the initial EIS may be ambiguous with regard to whether it does or does not include the precise subsequent action at issue. Applying our standard of review, we must determine whether the agency's interpretation of the scope is reasonable. *Ka Makani*, 295 F.3d at 959 & n.3.

Although the adequacy of the initial EIS for purposes of the subsequent action may be relevant in an extreme case, where the inadequacy of analysis is so clear as to demonstrate that the scope of the initial EIS cannot reasonably be construed as including the subsequent action, we do not think our scope inquiry constitutes "judicial review of the adequacy" of the initial EIS within the meaning of the NPRPA statute of limitations. 42 U.S.C. § 6506a(n)(1). It cannot reach the adequacy of the initial EIS for those actions actually within its scope.

## III. Application

We next undertake to determine how the 2012 EIS defined its own scope. The 2012 EIS abstract identifies the "Proposed Action" as the "National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement," which it states "is designed to determine the appropriate management of all BLM-managed lands in the [Reserve]." Under the heading, "What is BLM proposing to do in this plan?" the Executive Summary similarly states that BLM completed the combined IAP and EIS "to determine the appropriate management of the BLM-administered lands (public lands) in the nearly 23-million-acre Petroleum Reserve." It further highlights that "[a]mong the most

---

that would prevent an agency from performing the analysis required by the tiering regulations in a document styled as a supplement to a previous NEPA analysis.

important decisions the BLM will make through this plan is what lands should be made available for oil and gas leasing and with what protections for surface resources and uses." The section of the Introduction entitled "Scoping and Issues" does not clearly articulate the "range of actions . . . to be considered." 40 C.F.R. § 1508.25. As relevant here, it says only that "[t]he plan will examine a range of alternatives for oil and gas leasing and development." We find all these high-level summaries are ambiguous as to whether the "proposal which is the subject of" the EIS is merely to *designate* certain lands as available for leasing, with actual lease sale decisions to be proposed and analyzed at a later point, or if the subject proposals include the *actual* offerings and sales of the leases.[16] 40 C.F.R. § 1502.4(a).

However, a section of the Introduction regarding "Requirements for Further Analysis" provides somewhat greater guidance. This section states that "BLM anticipates that this IAP/EIS will fulfill the NEPA requirements for the first oil and gas lease sale." As to future lease sales, it states that "[p]rior to conducting each additional sale, the agency would conduct a determination of the existing NEPA documentation's adequacy. If the BLM finds its existing analysis to be adequate for a second or subsequent sale, the NEPA analysis for such sales may require only an administrative determination of NEPA adequacy." It then contrasts future "actions," such as a "proposed exploratory

[16] Similarly, Chapter 2 of the 2012 EIS, which describes the Alternatives under consideration, explains that under "[a]ll of the alternatives," "BLM has discretion to offer for lease in any given lease sale all or only some of the unleased lands that, based on the existing IAP decision document, are available for leasing." This language too is ambiguous as to whether those discretionary lease sale offerings are an aspect of the alternative proposals under consideration, or whether they are distinct future actions subject to independent NEPA requirements.

Case: 19-35008, 07/21/2020, ID: 11759819, DktEntry: 44, Page 57 of 59



drilling plan," which "would require further NEPA analysis" based on the specifics of the proposal.

By stating that future lease sales might require only an "administrative determination of NEPA adequacy," as opposed to "further NEPA analysis," this section implies that future leases are within the scope of the 2012 EIS. A DNA could suffice only if the relevant question was whether the lease sale required a supplemental EIS. *See Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (recognizing a "limited role" for non-NEPA evaluation procedures "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS"). If the relevant question was whether the lease sale required its own EIS, we assume BLM would have to prepare at least a tiered EA to make this determination. Likewise, the fact that this section does not describe future lease sales as future "actions" implies that future lease sales are components of the action that is the subject of the 2012 EIS. Finally, the fact that this section claims that the 2012 EIS will entirely fulfill the NEPA requirements for the first lease sale suggests that all lease sales are within the scope of the subject action, with the only potential trigger for additional NEPA analysis being new information or circumstances arising before subsequent sales—i.e., factors potentially requiring supplementation. *See* 40 C.F.R. § 1502.9(c).

As Plaintiffs point out, the 2012 EIS does not analyze the impacts of any proposal for when to offer which particular tracts of land for leasing, let alone alternative proposals that vary by location, amount, or timing. However, we think this is a criticism better directed at whether BLM considered adequate alternatives in 2012 EIS, than at whether BLM considered future lease sales at all. We see nothing in NEPA

Case: 19-35008, 07/09/2020, ID: 11748899, DktEntry: 44-1, Page 35 of 36



that would in principle prevent BLM from analyzing a proposed authorization of multiple, entirely discretionary lease sales. *Cf. Mayo*, 875 F.3d at 20–22 (rejecting plaintiffs' argument that EIS for fifteen-year plan could not satisfy EIS requirement for each year's elk hunt because it did not analyze the "timing, location, restrictions, and . . . potential alternatives" for each hunt). Had Plaintiffs brought a timely challenge against the 2012 EIS, they could have argued that NEPA required consideration of a reasonable alternative authorization of multiple lease sales that employed particular criteria regarding how many and which tracts to offer when. *See Kempthorne*, 457 F.3d at 978. Furthermore, to the extent the minimal degree of site specificity in the 2012 EIS might suggest that lease sales were not within its scope, we have already rejected that argument. Even if *Kempthorne* does not foreclose the possibility that proper analysis of non-NSO NPRPA leases requires some greater degree of site specificity than that provided in the 2012 EIS, we are not persuaded that the difference (if any) is so great as to make it unreasonable to construe the scope of the 2012 EIS to include such leases.

Although the expressly defined scope of the 2012 EIS is somewhat ambiguous as to the question before us, we find that the language regarding future NEPA requirements provides reasonable notice that the intended scope encompassed the actual lease sales. Furthermore, we do not find it unreasonable to construe the scope of the 2012 EIS as such when considering the analysis performed therein and the law applicable to non-NSO NPRPA leases. Thus, we defer to BLM's reasonable position that the 2012 EIS *was* the EIS for the 2017 lease sale. *See Ka Makani*, 295 F.3d at 959 & n.3.

Caasse: 1199335500088, 0077/0291/22002200, IIDD: 1117746988819, DDkktEEnnttryy: 4421, PPaaggee 5396 ooff 5396



Accordingly, Plaintiffs' first and third claims fail on the merits. BLM did not violate NEPA or its own NPRPA regulations by failing to prepare a NEPA analysis for the 2017 lease sale before the 2017 lease sale took place, because BLM prepared the required NEPA analysis in 2012. The 2017 lease sale offering did not require a new tiered or stand-alone NEPA analysis.

Furthermore, because we conclude that the 2012 EIS *was* the EIS for the 2017 lease sale, Plaintiffs' second claim, alleging that BLM failed to take a hard look at the impacts of the 2017 lease sale, is time barred in part and waived in the remainder. The NPRPA statute of limitations prevents us from inquiring whether the 2012 EIS took a sufficiently hard look at the impacts of the 2017 lease sale. Following the 2012 EIS, BLM's only remaining hard look obligation with respect to the 2017 lease sale was to analyze new circumstances and new information under the supplementation rubric. *See* 40 C.F.R. § 1502.9(c). Because Plaintiffs have disavowed a supplementation claim, we consider this issue waived.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Defendants.

**AFFIRMED.**