No. 19-35008

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

NORTHERN ALASKA ENVIRONMENTAL CENTER, et al.,
*Plaintiffs/Appellants*,

v.

U.S. DEPARTMENT OF INTERIOR, et al.,
*Defendants/Appellees*,

and

CONOCOPHILLIPS ALASKA, INC.,
*Intervenor-Defendant/Appellee.*

---

Appeal from the United States District Court for the District of Alaska
No. 3:18-cv-00030 (Hon. Sharon L. Gleason)

---

**FEDERAL APPELLEES' OPPOSITION TO APPELLANTS' PETITION FOR REHEARING EN BANC**

---

JONATHAN D. BRIGHTBILL
*Principal Deputy Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
JOHN DAVID GUNTER, II
ROMNEY S. PHILPOTT
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

Of Counsel:

MICHAEL GIERYIC
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT .......... 3

A. Statutory and regulatory background .......... 3

B. Factual background .......... 5

C. Proceedings below .......... 7

ARGUMENT .......... 9

I. The decision is correct and does not conflict with *SUWA* .......... 9

II. The decision presents no issue of exceptional national importance .......... 14

CONCLUSION .......... 16

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Center for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .......... 11

*Cold Mountain v. Garber*,
375 F.3d 884 (9th Cir. 2004) .......... 12

*Forest Guardians v. Forsgren*,
478 F.3d 1149 (10th Cir. 2007) .......... 13

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003),
*clarified,* 366 F.3d 731 (9th Cir. 2004) .......... 13, 15

*Greater Yellowstone Coalition v. Tidwell*,
572 F.3d 1115 (10th Cir. 2009) .......... 12

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2016) .......... 13

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*,
295 F.3d 955 (9th Cir. 2002) .......... 14

*Northern Alaska Environmental Center v. Kempthorne*,
457 F. 3d 969 (9th Cir. 2006) .......... 3

*Northern Alaska Environmental Center v. Lujan*,
961 F.2d 886 (9th Cir. 1992) .......... 15

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) .......... 2, 9, 10

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 4

*Talk of the Town v. Department of Finance & Business Services*,
353 F.3d 650 (9th Cir. 2003) .......... 13

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ........ 4

*Western Organization of Resource Councils v. Zinke*,
892 F.3d 1234 (D.C. Cir. 2018) ........ 12

**Statutes and Court Rule**

Administrative Procedure Act,
5 U.S.C. §§ 701-706 ........ 3

National Environmental Policy Act,
42 U.S.C. § 4332(C) ........ 4

Naval Petroleum Reserves Production Act,
42 U.S.C. §§ 6501-6508 ........ 3

Fed. R. App. P. 35(b) ........ 9

**Regulations**

40 C.F.R. §§ 1500-1508 ........ 4

40 C.F.R. § 1501.4(b)(1) ........ 4

40 C.F.R. § 1502.9(c)(1)(ii) ........ 5

40 C.F.R. § 1508.9 ........ 4

40 C.F.R. § 1502.20 ........ 11

43 C.F.R. § 46.120(c) ........ 5

43 C.F.R. § 46.140 ........ 11

43 C.F.R. Part 3130 ........ 4

77 Fed. Reg. 76,515 (Dec. 28, 2012) ........ 6

85 Fed. Reg. 38,388 (June 26, 2020) ........ 7

## INTRODUCTION

The Bureau of Land Management ("BLM") manages the National Petroleum Reserve in Alaska ("Reserve") pursuant to an integrated activity plan that designated certain areas for oil and gas leasing. Before it adopted the plan in 2013, BLM prepared an environmental impact statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), which analyzed potential impacts of leasing. Crucially, the EIS studied more than was necessary merely to support BLM's adoption of the plan. In particular, the EIS also studied all of the issues necessary to support subsequent lease sales by BLM in the areas that the plan made available for leasing.

BLM has offered leases for sale each year pursuant to the plan, and it did so in 2017. Before offering those leases, BLM determined that it need not supplement the 2012 EIS because no new information showed that the impacts of the lease sale would be significantly different from those impacts that it had previously considered. Plaintiff environmental groups challenged the 2017 lease sale under NEPA, claiming that BLM had failed to prepare any NEPA analysis for the lease sale and had failed to take a hard look at the sale's environmental impacts.

The panel rejected Plaintiffs' claim that BLM had not prepared any NEPA analysis for the 2017 lease sale, holding that the 2012 EIS was BLM's NEPA analysis for the sale. That document, the panel explained, provided adequate notice to the public that it would serve as the NEPA analysis for future sales of leases in areas that the plan authorized for leasing. The panel also held that any challenge to the adequacy

of the 2012 EIS was barred by the applicable statute of limitations. Finally, the panel held that because the 2012 EIS was BLM's NEPA analysis for annual lease sales, the agency's only remaining NEPA obligation with respect to the 2017 sale was to analyze whether new information required a supplemental analysis. Because Plaintiffs expressly disavowed a supplementation claim, the panel considered that issue waived. The panel therefore affirmed the district court's judgment in favor of BLM.

Plaintiffs seek rehearing en banc on the ground that the panel's conclusion that Plaintiffs should have brought a supplementation claim conflicts with *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69-70 (2004) ("*SUWA*"). In *SUWA*, the Supreme Court held that there is no ongoing federal action (that would require supplemental environmental analysis) once BLM adopts a land use plan. The panel's decision does not conflict with *SUWA* because the panel certainly did not hold that the integrated activity plan constitutes ongoing agency action, as Plaintiffs incorrectly assert. Instead, the panel held that the 2012 EIS was prepared for both the adoption of the plan and for annual lease sales conducted under that plan. The 2017 lease sale is an additional agency action (beyond the adoption of the plan) that was not present in *SUWA*, and the panel correctly held that nothing precludes an agency from considering the impacts of more than one action in a single EIS.

Moreover, because the 2012 EIS was the NEPA analysis for the 2017 lease sale, any NEPA challenge to the lease sale must be either (1) a challenge to the adequacy of the 2012 EIS, which was time barred; or (2) a supplementation claim, which Plaintiffs

disavowed. Therefore, the panel correctly rejected Plaintiffs' NEPA challenge to the lease sale. Nothing in that rejection conflicts with *SUWA*'s holding that the "major federal action" of adopting a land use plan is complete when the plan is approved.

Plaintiffs also claim that the panel's deference to BLM's description of the 2012 EIS presents an issue of exceptional national importance because it will permit BLM to circumvent NEPA in the future. But the panel did not blindly acquiesce to BLM's position that the 2012 EIS contained the environmental analysis for future lease sales. The panel instead carefully considered the language in the 2012 EIS. Accordingly, the decision simply constitutes application of well-established principles of judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

For these reasons, the petition does not satisfy Rule 35's standard for en banc review, and it should be denied.

## STATEMENT

### A. Statutory and regulatory background

The National Petroleum Reserve consists of approximately 23 million acres on the North Slope in Alaska, and it is managed by BLM under the Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501-6508. *See Northern Alaska Environmental Center v. Kempthorne*, 457 F. 3d 969, 973-74 (9th Cir. 2006). BLM's oil and gas program in the Reserve is managed through a multi-stage process involving leasing, exploration, and development. This case involves the leasing stage.

At this initial stage, BLM determines (through the development of an integrated activity plan) which lands to make available (and unavailable) for leasing and what stipulations to apply to protect surface resources. BLM does not authorize any ground-disturbing activities. Once BLM adopts such a plan, it may offer for sale and issue leases in any area in which such leasing has been authorized, following the process outlined in 43 C.F.R. Part 3130. Lessees must obtain future authorizations before they may undertake any ground-disturbing activities.

BLM must comply with NEPA at the leasing, exploration, and development stages. NEPA is a procedural statute that serves to inform agency decision-makers of the environmental impacts of proposed actions and to make relevant information available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). NEPA thus requires agencies to consider the environmental consequences of proposed actions in a document known as an "environmental impact statement," or "EIS." *See* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1500-1508; *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).[1] An agency may prepare a shorter document known as an "environmental assessment" in order to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.4(b)(1), 1508.9. An agency must supplement an EIS if there "are significant new circumstances or information relevant to environmental

[1] The Council on Environmental Quality recently updated the NEPA regulations at 40 C.F.R. Parts 1500-1508. *See* 85 Fed. Reg. 43,304 (July 16, 2020). This brief cites the version of the regulations in effect when BLM completed the 2012 EIS.

concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1)(ii). BLM may prepare a "determination of NEPA adequacy" to decide whether it may rely upon a previously prepared EIS or instead must supplement its analysis. *See* 43 C.F.R. § 46.120(c).

**B. Factual background**

In 2010, BLM initiated the development of an integrated activity plan to guide its oil and gas leasing program for the entire Reserve. 1 Supplemental Excerpts of Record ("S.E.R") 25. The purpose of developing such a plan was to make decisions concerning "what lands should be made available for oil and gas leasing and with what protections for surface resources and uses." 1 S.E.R. 26. In a robust two-year planning process, 4 S.E.R. 982-85, BLM developed a single document that combined both an integrated activity plan and EIS that analyzed five alternatives (A, B-1, B-2, C, and D), 1 S.E.R. 27-28. These alternatives differed in the areas that would be made available to leasing, as well as the stipulations that would apply to leases. 1 S.E.R. 28, 49-55, 76-145; 4 S.E.R. 1162-67.

BLM ultimately selected Alternative B-2, which balanced development with the protection of surface resources by making approximately 52% of the Reserve (or 11.8 million acres) available for leasing, 1 S.E.R. 54-59; 4 S.E.R. 1166, and requiring oil and gas activities to comply with numerous stipulations, 1 S.E.R. 76-145; 4 S.E.R. 1167. BLM analyzed the potential impacts of each alternative—including ground-disturbing activities that could result from leasing—in the 2,600-page EIS, which it ultimately

issued in December 2012. 1 S.E.R. 22-292; 2 S.E.R. 293-584; 3 S.E.R. 585-876; 4 S.E.R. 877-1168; 77 Fed. Reg. 76,515 (Dec. 28, 2012).

The 2012 EIS approached this analysis by estimating the levels of petroleum-related activities and surface disturbances for each alternative based on what BLM would expect to see in a typical project. 2 S.E.R. 451. BLM assumed that every tract designated as available for leasing would be leased, 1 S.E.R. 43, and that there would be aggressive development, 2 S.E.R. 490-507, even though only a small percentage of tracts actually have been leased. For Alternative B-2, BLM described potential impacts that would result from (among other things) a certain number of oil and gas wells, processing units, and roads. 2 S.E.R. 520-23, 546-84. More precise analysis of site-specific impacts was not then possible because the "timing and location of future commercial-sized discoveries cannot be accurately predicted until exploration drilling occurs." *Id.* That is, BLM could not analyze the specific impacts of individual activities until it knew exactly *where* such activities might occur in the 11.8 million acres available for leasing. BLM adopted Alternative B-2 in February 2013. 5 S.E.R 1169-1282.

BLM sold leases in the Reserve from 2013 to 2016. 5 S.E.R. 1302, 1307, 1355, 1362. For each sale after the initial 2013 sale, BLM issued a determination of NEPA adequacy. BLM again offered leases for sale in 2017. 2 Excerpts of Record ("E.R.") 64, 95. BLM again prepared a determination of NEPA adequacy, which explained that the proposed lease tracts were within the area authorized for leasing, and that the agency need not supplement the 2012 EIS. 2 E.R. 78-81. One company (ConocoPhillips) bid

on only seven of the tracts (equaling 79,998 acres). 2 E.R. 64. BLM prepared a revised determination of NEPA adequacy that considered whether new information, including information that it received after holding the 2017 sale, required supplemental analysis. 2 E.R. 52-60. The agency concluded that nothing showed a significant difference in the potential impacts that it had previously analyzed, 2 E.R. 60, and it consequently issued the seven leases, 2 E.R. 17-51; 5 S.E.R. 1300-01. BLM has recently issued a new proposed integrated activity plan and final EIS; if adopted, they will replace the plan and the EIS at issue here. *See* 85 Fed. Reg. 38,388 (June 26, 2020).

### C. Proceedings below

Plaintiffs challenged the 2017 lease sale under NEPA. Plaintiffs' first and third claims allege that BLM violated NEPA by failing to prepare either an environmental assessment or an EIS for the 2017 lease sale; Plaintiffs' second claim alleges that BLM failed to take a hard look at the impacts of the lease sale. 1 S.E.R. 11-13, ¶¶ 56-71; *see also* Panel Opinion at 13-15. The district court rejected their challenge, holding that BLM was not required to prepare a new NEPA analysis before it conducted the 2017 lease sale: BLM had prepared the 2012 EIS for that purpose, and the 2012 EIS was sufficiently site-specific to satisfy NEPA under this Court's decision in *Kempthorne*, 457 F.3d at 976. 1 E.R. 7-12. Plaintiffs appealed. 2 E.R. 14-16.

The panel affirmed the district court's grant of summary judgment to BLM. Panel Opinion at 6, 15-16. Resolution of Plaintiffs' claims turned on whether the 2012 EIS properly served as the EIS for the 2017 lease sale. The panel held that nothing

precluded BLM from using a single EIS to "undertake both a programmatic-level analysis and a site-specific analysis." *Id.* at 18-20; *see also id.* at 20-23. To determine whether the 2012 EIS properly served as the EIS for the 2017 lease sale, the panel evaluated "whether the initial EIS defined its scope as including the subsequent action." *Id.* at 14, 29-32. On that score, the panel held that the 2012 EIS "provide[d] reasonable notice that the intended scope encompassed the actual lease sales." *Id.* at 32-35. The 2012 EIS itself explained that it "would fulfill the NEPA requirements for the first oil and gas lease sale," and that "[p]rior to conducting each additional sale, the agency would conduct a determination of the existing NEPA documentation's adequacy." *Id.* at 33 (citing 1 S.E.R. 43). This language "implies that future lease sales are within the scope of the 2012 EIS"—a determination of NEPA adequacy "could suffice only if the relevant question was whether the lease sale required a supplemental EIS." *Id.* at 34, 28.

Because BLM had completed the 2012 EIS precisely for the 2017 lease sale (among other sales), the panel rejected Plaintiffs' claims that BLM had not conducted any NEPA analysis for that sale. The panel also rejected Plaintiffs' claim that BLM failed to take a hard look at leasing impacts because either (1) the statute of limitations prevented review of the adequacy of the 2012 EIS, Panel Opinion at 23; or (2) any "NEPA requirements for the subsequent action would fall under the supplementation rubric," *id.* at 31, and Plaintiffs had "disavowed a supplementation claim," *id.* at 36.

## ARGUMENT

The petition for rehearing en banc should be denied. The panel's decision is correct, does not conflict with any decision of the Supreme Court or of this Court, and raises no issues of exceptional importance. *See* Fed. R. App. P. 35(b).

### I. The decision is correct and does not conflict with *SUWA*.

Plaintiffs take issue with the panel's holding that they should have framed their argument under the NEPA supplementation rubric. Petition at 10-11. They contend that the holding conflicts with *SUWA* because BLM's integrated activity plan is not ongoing agency action. This contention is premised on a misunderstanding of the 2012 EIS and the panel's decision.

The panel correctly observed that the "circumstances here are different than in *SUWA*." Panel Opinion at 28. The plaintiffs there had argued that BLM was required to supplement the NEPA analysis that it had prepared for the adoption of a land use plan governing off-road vehicle use in order to address new evidence that such use had substantially increased. *Id.* (citing *SUWA*, 542 U.S. at 61). The Supreme Court held that supplemental NEPA analysis is required only where "there remains 'major Federal actio[n]' to occur." *Id.* (citing *SUWA*, 542 U.S. at 73). The challenged action—BLM's prior adoption of a land use plan—was completed when that plan was approved, and BLM did not propose to take any new action that would require supplemental analysis. *Id.* (citing *SUWA*, 542 U.S. at 61, 72-73).

The critical distinction here, as the panel explained, is that the 2012 EIS was prepared not only for BLM's adoption of the integrated activity plan but also to analyze impacts of future annual lease sales. Panel Opinion at 32-36; *see also supra* pp. 5-9.[2] Because the 2012 EIS was BLM's NEPA analysis for the 2017 sale, any NEPA challenge to the sale had to be either (1) a challenge to the adequacy of the 2012 EIS, which was time barred; or (2) a claim that new information required a supplemental NEPA analysis for the sale, which claim Plaintiffs disavowed. Panel Opinion at 35-36.[3] In contrast, there was no additional agency action at issue in *SUWA* beyond the adoption of the plan. *Id.* at 28-29. The panel did not hold that the integrated activity plan was ongoing agency action, as Plaintiffs repeatedly assert, *see* Petition at 5-6, 7, 10, 15, and nothing in the decision conflicts with *SUWA*'s holding that the action of adopting a land use plan "is completed when the plan is approved." 542 U.S. at 73.

Plaintiffs place considerable weight on the alleged similarities between the land use plan at issue in *SUWA* and the integrated activity plan under review here, Petition at 12, but *SUWA* dealt with a land use plan promulgated under the Federal Land

---

[2] Plaintiffs refer to both the integrated activity plan and the 2012 EIS as the "IAP." Though both are in the same document, the plan is only one of the agency actions considered in EIS; the future lease sales were separate actions. *See supra* pp. 5-9.

[3] To the extent that new information did require a supplemental NEPA analysis for a particular lease sale, that analysis obviously would be tailored to the *proposed lease sale*, which is the remaining federal action yet to occur, not to adoption of the integrated activity plan, which is a completed action. *See SUWA*, 542 U.S. at 73.

Policy and Management Act. That statute has a multiple use mandate, which means that "a particular parcel need not be put to all feasible uses or to any particular use." *National Mining Ass'n v. Zinke*, 877 F.3d 845, 872 (9th Cir. 2017). By contrast, the integrated activity plan was promulgated under the Naval Petroleum Reserves Production Act, which exempts the Reserve from the preparation of a land use plan under FLPMA and instead directs the agency to undertake "an expeditious program of competitive leasing of oil and gas" in the Reserve. 2 E.R. 175-76.

Although Plaintiffs would have BLM analyze leasing impacts in a new NEPA document, even if that document built on the 2012 EIS, nothing mandates BLM to follow the so-called "tiering" approach outlined in the applicable regulations. *See* 40 C.F.R. § 1502.20; 43 C.F.R. § 46.140. As the panel correctly observed, *SUWA* does not "dictate[] that any action occurring after the adoption of a land use management plan is necessarily a new action subject to the tiering rubric," Panel Opinion at 28, and "[n]othing in *SUWA* precludes BLM from structuring its activities in this way," *id.* at 29.

For the same reasons and contrary to Plaintiffs' contention, *see* Petition at 13-15, the panel's decision also does not conflict with other decisions interpreting *SUWA*. In *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013) ("*CBD*"), this Court rejected the contention that BLM was required to supplement its EIS for a previously approved plan of operations for a mine. Importantly, the EIS at issue there did not purport to serve as the NEPA analysis for the subsequent permitting actions

that were challenged by the plaintiffs in that lawsuit. *Id.* at 1088-89, 1094-95. Here, by contrast, the 2012 EIS stated that it would serve as the NEPA analysis for subsequent leasing actions, and the EIS actually analyzed the foreseeable impacts of those actions. The panel's decision accordingly does not conflict with *CBD*.

Nor does the decision conflict with *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234, 1238-40, 1244 (D.C. Cir. 2018) ("*WORC*"). In that case, the plaintiffs argued that the U.S. Department of the Interior should have supplemented its NEPA analysis for the Federal Coal Management Program, which allocated certain land for coal leasing. The D.C. Circuit held that the challenged agency action—which was the Program—was complete once it was adopted and accordingly did not require supplemental analysis to address new information. *See id.* at 1243-44. But Plaintiffs here have challenged agency action—the 2017 lease sale—that was studied in the EIS. If new information became available, BLM was required only to evaluate whether it was significant and relevant, precisely as BLM in fact did here.

Plaintiffs also argue that the panel's decision conflicts with five additional cases that are string cited in a footnote. The first three cases are distinguishable on the facts. None involved an EIS that served as the NEPA analysis for both the original action and for a subsequent federal action that was under judicial review. *See Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004) (rejecting a challenge to a permit for a bison-testing facility operated by the State of Montana, not the federal government); *Greater Yellowstone Coalition v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (rejecting a challenge

to a permit for elk feeding grounds operated by the State of Wyoming, not the federal government); *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1153-58 (10th Cir. 2007) (rejecting a challenge to a forest plan where the plaintiffs had challenged no agency action taken after the plan was adopted).[4] The other two cases cited by Plaintiffs stand simply for the general (and unremarkable) proposition that agencies must comply with NEPA prior to taking major federal action; like *SUWA*, neither case precludes BLM from structuring its NEPA compliance the way that it did. *See Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-801 (9th Cir. 2003), *clarified*, 366 F.3d 731 (9th Cir. 2004); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640-41 (9th Cir. 2004).

In sum, *SUWA* is inapplicable. Because the agency's 2012 EIS served as the environmental analysis for both the integrated activity plan and subsequent annual lease sales in the areas that the plan made available for leasing, BLM was required only to *consider* whether it needed to supplement the 2012 EIS before it issued the leases. Therefore, the panel correctly held that Plaintiffs should have brought their claims under the rubric of supplementation. Plaintiffs have been deprived of no opportunity to seek judicial review of the 2017 leases. Instead, they simply chose not to pursue a supplementation claim. The panel's decision does not conflict with *SUWA*.

---

[4] Plaintiffs failed to present these decisions, as well as *CBD* and *WORC*, to the panel in merits briefing. This Court should accordingly decline to consider rehearing on the basis of any alleged conflict with these decisions. *Cf. Talk of the Town v. Department of Finance & Business Services*, 353 F.3d 650 (9th Cir. 2003) (declining to consider arguments not presented in the opening brief).

## II. The decision presents no issue of exceptional national importance.

Contrary to Plaintiffs' suggestion, *see* Petition at 18-20, there is no risk that the panel's holding will permit BLM to circumvent NEPA in the future. The panel did not plough new ground when it "defer[red] to BLM's reasonable position that the 2012 EIS *was* the EIS for the 2017 lease sale" after considering the relevant language and analysis contained in the 2012 EIS. Panel Opinion at 16. The decision simply reflects basic tenets of judicial review under the APA. En banc review is unwarranted.

BLM's compliance with NEPA is reviewed under the highly deferential standard of the APA. *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002). But the panel did not blindly defer to BLM's position that the 2012 EIS was the EIS for the 2017 lease sale. The panel instead reviewed BLM's reliance on the 2012 EIS (and the determination of NEPA adequacy) under the *less deferential* "standard of 'reasonableness.'" Panel Opinion at 12 (quoting *Ka Makani 'O Kohala Ohanay*, 295 F.3d at 959 n.3). To reach its decision, the panel considered "the language of the EIS," *id.* at 29, and the analysis contained therein, *id.* at 31-32. The panel held that "[a]lthough the expressly defined scope of the 2012 EIS is somewhat ambiguous," "the language regarding future NEPA requirements provides reasonable notice that the intended scope encompassed the actual lease sales." *Id.* at 35. Nor was it "unreasonable to construe the scope of the 2012 EIS as such when considering the analysis performed therein." *Id.* Contrary to Plaintiffs' claims, *see* Petition at 20, BLM had evaluated the site specific impacts of issuing the 2017 leases (to the greatest extent

possible at that early stage) and explained in the 2012 EIS that it would conduct more analysis when it knew where ground-disturbing activities might occur. *See supra* pp. 6-7. The panel correctly held that BLM's approach is consistent with *Kempthorne*, which sustained in a similar factual situation involving leasing in the Reserve the multi-step approach that BLM took in order to comply with NEPA. Panel Opinion at 35, 23.

Nothing in the panel's careful decision suggests that agencies will be able to artfully craft their environmental review to avoid having to conduct future NEPA analysis. The decision simply applied the well-established principles that (1) courts should start their review by considering relevant language (such as the defined scope of the 2012 EIS); and (2) courts should defer to agencies when reviewing their actions under the APA. *See id.* at 29-30 (discussing cases); *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 887, 890 (9th Cir. 1992) (considering the agency's project documents to determine the scope of the project); *Friends of Yosemite Valley*, 348 F.3d at 800-801 (same).

Plaintiffs also allege that the panel's decision will deprive the public of the ability to participate in the NEPA process. *See* Petition at 20. In fact, the opposite is true. The panel was cognizant of "the need for fair notice," Panel Opinion at 29, and it determined that the "language regarding future NEPA requirements provides reasonable notice that the intended scope [of the 2012 EIS] encompassed the actual lease sales," *id.* at 35; *see also id.* 27-28 (recognizing need for notice). Knowing from the panel's decision that courts will conduct a thorough review of the language in an

EIS to determine its scope, BLM will have the incentive to be more clear in its future NEPA documents.

In sum, the decision reflects well-established principles of judicial review and presents no issue of exceptional national importance.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be denied.

Respectfully submitted,

s/ Thekla Hansen-Young
JONATHAN D. BRIGHTBILL
*Principal Deputy Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
JOHN DAVID GUNTER, II
ROMNEY PHILPOTT
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

Of Counsel:

MICHAEL GIERYIC
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

November 2, 2020
90-1-4-15333

## Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

**9th Cir. Case Number(s)** 19-35008

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/answer to petition is:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: 4,142.

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Thekla Hansen-Young

**Date** November 2, 2020